**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: TESTOSTERONE REPLACEMENT THERAPY PRODUCTS LIABILITY LITIGATION | Case No. 1:14-cv-1748<br>MDL No. 2545<br><br>Hon. Matthew F. Kennelly |
| THIS DOCUMENT RELATES TO ALL CASES | |

**PSC'S SUPPLEMENTAL BRIEF REGARDING
THE FORMAT OF PRODUCTION OF ELECTRONICALLY
STORED INFORMATION BY DEFENDANTS**

In their July 7, 2014 submission (*see* Defendants' Supplemental Brief in Support of their Proposed Production Format dated 7/7/14 ("Def. Mem."), Dkt. # 174, at 1), defendants misrepresent to the Court the proper standard for determining which party is entitled to make the initial election concerning the format of production. Defendants claim that, under the Federal Rules of Civil Procedure, they, as the producing party, are entitled to choose the format of production for electronically stored information ("ESI") and that their election should govern. This claim is, plainly stated, a misrepresentation of what the Federal Rules say. *Cf.* Fed. R. Civ. P. 34(b)(1)(C) (the request for production "may specify the form or format in which electronically stored information is to be produced."). Defendants have not provided any legal authority to support this overreaching claim, which runs contrary to the requirements of the Federal Rules of Civil Procedure.

## I. Introduction

The issue currently before the Court is whether the defendants should make their production of electronically-stored information ("ESI") in native format or TIFF format. The Plaintiffs' Steering Committee ("Plaintiffs" or "PSC") has requested that defendants produce ESI in native format, which has many advantages:

* **Producing in native is faster and far less costly for defendants.**

* **The process of creating TIFF images strips files of important functionality and imposes unnecessary burdens on Plaintiffs, while native production results in a level playing field.**

* **Native documents are far less costly for Plaintiffs to review, store, manage and use than a TIFF production.**

* **The PSC has hired a vendor that uses a document review platform that obviates defendants' concerns regarding inadvertent alteration, labeling and verification of authenticity of documents, thus relieving any claimed burden associated with native production.**

To facilitate a native production, the PSC has retained an ESI vendor[1] that uses Relativity, the same platform employed by AbbVie and certain other defendants for their document review.[2] As explained in more detail herein and in the Declaration of Derrick Logan of Iris Data Services ("Iris Declaration"; Exhibit A hereto), the technology already in use by many of the defendants' counsel provides simple solutions to defendants' concerns about

---

[1] Iris Data Services ("Iris") has been hired as the PSC's vendor for electronic discovery and will host the TRT MDL document depository. Iris has extensive experience in supporting document production by defendants through Relativity and is very familiar with what is involved in a large scale document production. Iris supplied a declaration in support of the arguments contained herein. *See* Exhibit A. Representatives from Iris are available to provide live testimony if that would assist the Court.

[2] While most defendants have not advised the PSC what document review platform they typically use or will be using, stating that they have not yet chosen a vendor in this case but are considering Relativity (*see* Exhibit B - 8/17/14 e-mail from Janet Kwuon to Seth Katz) — AbbVie and Pfizer have advised the PSC of their use of Relativity as a review platform — the PSC has reason to believe that Eli Lilly and Auxilium will also be utilizing Relativity. *See* Exhibit C (article concerning Reed Smith's use of Relativity) and Exhibit D (article concerning Morgan Lewis' teaming up with kCura to license Relativity).

inadvertent alteration, identification, authentication and confidentiality of documents, without creating any additional burden or expense.[3]  This is of particular benefit in this case, where the TRT defendants will likely produce tens of millions of pages of material in this MDL.

Minimizing e-discovery costs for both sides will achieve the goal of "reducing the cost and burden of electronic discovery consistent with Rule 1 of the Federal Rules of Civil Procedure."  *See* Seventh Circuit Electronic Discovery Pilot Program, Executive Summary to Interim Report on Phase Three, at 1 (Exhibit E hereto).  Any perceived burden or difficulty to defendants is outweighed by the cost-effectiveness and efficiency of native production for all parties.  Therefore, the PSC respectfully requests that the Court order production of ESI in native format.

## II.    Procedural Posture of Negotiations

The case against AbbVie is the most advanced from a discovery standpoint.  Right now, AbbVie is the only defendant to whom the PSC has propounded discovery — in the form of Requests for Production, Interrogatories, and two Rule 30(b)(6) deposition notices with more to be served.[4]  Additionally, to date, the overwhelming majority of cases pending in this MDL name AbbVie as a defendant, which is consistent with AbbVie's share of the TRT market. Discussions with AbbVie regarding discovery of ESI and the format of production are the most

---

[3] Plaintiffs are willing to agree that any documents that require redaction can be produced as TIFF images accompanied by searchable text (with appropriate page breaks), the metadata for the document and an appropriate load file.  The reality is that a very small percentage of the documents that will be produced should contain redactions and the PSC does not want "the tail to wag the dog."  Additionally, the productions will not be 100% native productions because documents that only exist in paper — which are not considered ESI — have to be produced as an image, such as a TIFF.  This process obviates one of Defendants' objections to a native production. *See* Def. Mem. at 8-10.

[4] Plaintiffs have served a Notice of Deposition Pursuant to Fed. R. Civ. P. 30(b)(6) that requests testimony from AbbVie regarding ESI.  That deposition will not take place until November, so it may be necessary to revisit some aspects of production of ESI based on new information learned in that deposition.  The PSC is planning to serve a similar deposition notice on Actavis next week (noticing the deposition for October 2014) and have advised Actavis' counsel of that intent.

advanced, though the PSC has had productive conversations with Pfizer.  With regard to

AbbVie, on September 8, 2014, the parties had a meet-and-confer and realized that an agreement

with regard to format of production would not be reached and that the PSC would need to submit

a response to defendants' July 7, 2014 submission to the Court.[5]

## III.    Legal Standard

The Federal Rules of Civil Procedure outline specific procedures that determine the

format of production of ESI.  First, the requesting party "may specify the form or forms in which

electronically stored information is to be produced." Fed. R. Civ. P. 34(b)(1)(C).  "The response

may state an objection to a requested form for producing electronically stored information. If the

responding party objects to a requested form--or if no form was specified in the request--the

party must state the form or forms it intends to use." Fed. R. Civ. P. 34(b)(2)(D).  As with other

types of discovery disputes, "[i]f counsel or the parties are unable to resolve a production format

issue, then the issue should be raised promptly with the court."  Seventh Circuit Electronic

Discovery Pilot Program – Standing Order Relating to the Discovery of Electronically Stored

Information, Principle 2.06 (a).  There is no default rule for which format is to be used when the

parties cannot agree, nor does the preference of one party automatically win the day.

---

[5] At the current time, AbbVie is the defendant with the largest TRT market-share, the greatest number of cases pending in this MDL, and likely the largest anticipated production, which is why the PSC has opted to serve discovery on it first and move the case against AbbVie out in front.  Given that the discussions with AbbVie have broken down and it has become apparent that an agreement regarding format of production would not be reached, the PSC is making the instant submission so that AbbVie's production can begin to be made.  A production on the scale expected from AbbVie is best made in native format for the reasons set forth herein, however, the PSC is willing to continue to meet-and-confer with other defendants and evaluate the facts related to each defendant individually to determine if a format other than native would be appropriate for a particular defendant based on its individual facts and circumstances.  The PSC recognizes that with regard to ESI, it is not a "one-size-fits-all" concept.  Discussions with the non-AbbVie defendants may or may not result in requests to modify any ruling by the Court on these issues.

## IV.    Argument

### A.    Defendants Do Not Get To Select the Format for Production.

Defendants falsely assert that "[t]he Federal Rules of Civil Procedure provide that the producing party is entitled to choose the format of production" for ESI.  Def. Mem. at 1.  That claim is simply not supported by the Federal Rules of Civil Procedure.  As set forth above, the Federal Rules clearly permit the requesting party to elect the format for production and also require that, if the parties are unable to reach an agreement through a meet and confer process, they are to submit the dispute to the Court.  According to the Advisory Committee Note to Rule 34, "[i]f [the parties] cannot agree and the court resolves the dispute, the court is not limited to the forms initially chosen by the requesting party, stated by the responding party, or specified in this rule for situations in which there is no court order or party agreement."  Fed. R. Civ. P. Rule 34, Advisory Committee's Note (2006 Amendment, subdivision (b)).  Plaintiffs have requested under Rule 34(b)(1)(c) that the material be produced in native format and because defendants are unable to demonstrate undue hardship or expense, Plaintiffs are entitled to a native production.

Defendants assert that "absent some exigency" for Plaintiffs, "Defendants' election should govern."  Def. Mem. at 1.  Again, defendants misstate the law in an attempt to have the Court rule in their favor.  In ruling on motions to compel production of ESI in native format, courts have stated that it is the burden of the party *objecting* to native production to show undue hardship and expense.  *See, e.g.,* Saliga v. Chemtura Corp.,2013 U.S. Dist. LEXIS 167019, at *5-7 (D. Conn. Nov. 25, 2013) (granting plaintiffs' motion to compel production of ESI in native format where defendants failed to provide a compelling reason why they could not produce in the format requested); *Romero v. Allstate Ins. Co.*, 271 F.R.D. 96, 107 (E.D. Pa. 2010) (compelling production of documents produced in native format with their associated metadata;

"the burden falls on the party objecting to its production to show undue hardship and expense."); *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 2010 U.S. Dist. LEXIS 50769, at \*23 (W.D. Pa. May 24, 2010) ("Preferably, and absent a clear showing of substantial hardship and/or expense, Defendants shall supplement their production by reproducing ESI in its native format. Although a clear showing of undue hardship and/or expense may excuse Defendants' production in native format, the fact that such a production may be more useful or cause less expense to Plaintiffs obviously will not."); *In re Netbank, Inc. Secs. Litig.*, 259 F.R.D. 656, 681-82 (N.D. Ga. 2009) (granting motion to compel production of ESI in native format) ("Although the Defendants have listed a number of hypothetical problems with providing documents in native format, they have not asserted these to be actual problems arising in the present case. . . . The Defendants having given no good reason why they should not produce Mr. Brown's requested documents in native format, the Motion to Compel production of ESI information in native format is granted."). *See also In re Porsche Cars N. Am., Inc. Plastic Coolant Tubes Prods. Liab. Litig*., 279 F.R.D. 447, 449-50 (S.D. Ohio 2012) (granting Plaintiffs' motion seeking production of documents in their native format with associated metadata, and finding that the defendant's concerns regarding the requested format (increased monitoring costs and the inability to use Bates numbering) were "minimal.").

Here, defendants simply have not met and cannot meet this burden.  Accordingly, defendants cannot show a compelling need to deprive Plaintiffs of the benefits of a native production.

### B.	Native Production Offers Significant Advantages over TIFF Production.

Native production is superior to TIFF production for the following reasons, each of which is described in more detail below:

1. Producing in native is faster and less expensive for defendants.

2. TIFF production is unnecessarily burdensome for Plaintiffs. Native production results in a level playing field because both sides will be able to review information in the form closest to how it existed and was prepared in the ordinary course of business.

3. Reviewing, storing and using documents in native format is vastly less expensive for Plaintiffs.

   **1.    Native Production is Faster and Less Expensive for Defendants than TIFF Production.**

Conversion of electronic documents from their native format to single-page TIFF images is more costly than producing them in native format. Producing in native eliminates several time-consuming, costly steps from the document production process. *See* Iris Declaration at 10(a)-(h). By producing in native, defendants will avoid (a) converting native documents to single-page TIFF images and (b) creating load files to make the TIFF files useable by Plaintiffs. Iris Declaration at 10(a)-(h) & 11. As a result, a native format production will be more than twice as fast and cost approximately half as much as a TIFF format production. *See* Iris Declaration at 12. *See also, e.g., Covad Communs. Co. v. Revonet, Inc.*, 254 F.R.D. 147, 150, 2008 U.S. Dist. LEXIS 104204, at *10 (D.D.C. 2008) ("printing [the documents] or converting them to TIFF files probably (and ironically) costs more so [defendant] is hard pressed to claim that producing them now in their native format is unfairly burdensome.").

The native production proposed by the PSC (especially where the production will be Relativity-to-Relativity) will result in faster production and significant cost savings for defendants. Additionally, productions in native format, even if not being made between the same review platforms, will load faster than a production made in TIFF-Load File format, making it more readily usable for the PSC upon receipt. Iris Declaration at 16(b). This is especially so given that defendants are expected to produce tens of millions of pages of

documents in this MDL. "The native method of production will reduce the volume, cost and time associated with producing data in this matter. [I]t is anticipated that tens of millions of pages will be produced in this litigation. The cost and time needed to generate this many images in TIFF format will be significant." Iris Declaration at 5. "The cost of hosting these images will be significant to Plaintiffs as will the time it will take to copy the unnecessarily voluminous productions generated from native files." Iris Declaration at 16(d). Thus, a native production is less burdensome for both defendants and the PSC than a TIFF production, not more. Accordingly, defendants cannot articulate a proper basis to deprive the PSC of documents in native format.

> **2.     TIFF Production Creates Unfair, Unnecessary Burdens for Plaintiffs, While Native Production Results in a Level Playing Field.**

The Federal Rules contemplate that both sides will have the opportunity to review data in the form closest to how it existed in the usual course of business.

> Rule 34(b) provides that a party must produce documents as they are kept in the usual course of business or must organize and label them to correspond with the categories in the discovery request. The production of electronically stored information should be subject to comparable requirements to protect against deliberate or inadvertent production in ways that raise unnecessary obstacles for the requesting party. Rule 34(b) is amended to ensure similar protection for electronically stored information.

Fed. R. Civ. P. Rule 34, Advisory Committee's Note (2006 Amendment, subdivision (b)). *See also* Fed. R. Civ. P. 34 (b)(2)(E)(ii) ("If a request does not specify a form for producing electronically stored information, a party must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.").

While defendants have yet to advise the PSC whether they will be performing their review in native or TIFF format (*see* Exhibit B; Aug. 17, 2014 e-mail from Janet Kwuon to Seth Katz; "no defendant can say definitely whether it will conduct its review in native or tiff

format"), it is reasonable to assume that defendants AbbVie and Auxilium will follow the best practices espoused by their counsel and conduct their review in native. *See* Exhibit F (Morgan Lewis & Bockuis "Metadata in Discovery" best practice is electronic native review) and Exhibit G (Winston & Strawn "e-lunch Briefing" best practice is review in native format and to review hidden data if necessary). Additionally, as detailed in the Iris Declaration it is a common practice for defendants and defense counsel in pharmaceutical cases to conduct their review in native format (regardless of the format in which production will be made) and then generate a production set — and when making a TIFF production they create the production set in TIFF format using the tools in their document review platform. Iris Declaration at 10(a)-(f) & 14.

A native production affords Plaintiffs the same access to documents and data — including "hidden data" — that defendants and their counsel have, thereby leveling the playing field when it comes to document review and functionality. By contrast, TIFF images have many limitations that result in an unnecessary burden on plaintiffs. The process of stripping native files of important metadata denudes documents of important functionality that is available when they are used in the ordinary course of business.

> "[S]imple image productions (such as TIFF) require significant processing that is time consuming and costly. The image productions, by themselves, also lose searchable text and metadata that might enable better understanding and utility of the evidence. In an effort to replicate the usefulness of native files while retaining the advantages of static productions, image format productions are typically accompanied by "load files," which are ancillary files that may contain textual content and relevant system metadata. Again, however, there are potentially significant costs inherent in this process, and it does not work well for certain types of electronically stored information such as spreadsheets and dynamic databases."

Sedona Conference Principles Addressing Electronic Document Production, Second Edition, Comment 12b, at 62.

One example of an avoidable problem regularly encountered by plaintiffs' counsel reviewing TIFF productions is the difficulty with searching and locating key information within large documents. In order for TIFF images accompanied by extracted text to have functional text searching capability, the load file must properly denote the page breaks. Importantly, the inclusion of page breaks does not appear to be required under the proposal defendants submitted with their July 7th brief.[6] Consider, for example, a 500-page document in which the word "orange" appears ten times. If the document is produced in TIFF format with extracted text but the page breaks are not properly communicated, a search for the word "orange" will yield results that tell the reviewer that the word appears ten times, but will not tell the reviewer where to find those ten occurrences in the document. The reviewer will not be able to find the word "orange" without manually paging through the document and looking at every page. The result is an unacceptably inefficient and ineffective document review process.

By sharp contrast, in a native production, the reviewer can quickly and easily jump to each location of the key word or phrase being searched for, in a matter of seconds. This is because a search of a native file searches the actual document being viewed, as opposed to searching extracted text that is separated from the TIFF image. This is the functionality that defendants and their counsel have at their disposal because they have access to the native documents. Pursuant to Fed. R. Civ. P. 34(b), absent undue burden — a burden they have not met here — defendants should not be permitted to strip the document of this important functionality to the detriment of the PSC.

A second example of a burdensome limitation of TIFF production is that some electronic files have inherent functions that are only available when produced in native format. One

---

[6] During the discussions with AbbVie's counsel, they insisted that they would use page-breaks and properly insert them, however, the proposed order submitted by defendants with their submission does not account for page-breaks.

common example is a PowerPoint presentation, which is likely to be common file format within some defendant's productions. Many PowerPoint presentations contain animations, video or audio content that simply cannot be displayed in a static, two-dimensional TIFF image. *See* Exhibit H (example of a PowerPoint slide where one part of the slide obscures content underneath it due to an animation within the native file). Requiring defendants to produce in native format will allow Plaintiffs to view PowerPoints and similar documents in the same format in which they were prepared and intended to be viewed.[7] Permitting defendants to produce PowerPoints and similar files as TIFFs will deprive Plaintiffs of relevant, non-privileged content that they are entitled to discover.

These limitations, which are inherent and unavoidable in TIFF production, amount to burdensome obstacles for Plaintiffs. Requiring a TIFF production under these circumstances is contrary to the requirements of Fed. R. Civ. P. 34(b):

> Rule 34(b) provides that a party must produce documents as they are kept in the usual course of business or must organize and label them to correspond with the categories in the discovery request. The production of electronically stored information should be subject to comparable requirements *to protect against deliberate or inadvertent production in ways that raise unnecessary obstacles for the requesting party*.

Fed. R. Civ. P. Rule 34, Advisory Committee's Note (2006 Amendment, subdivision (b)) (emphasis added).

Furthermore, the Advisory Committee Notes state that "[i]f the responding party ordinarily maintains the information it is producing in a way that makes it searchable by electronic means, *the information should not be produced in a form that removes or significantly degrades this feature*." *Id.* (emphasis added). The process of flattening a robust,

---

[7] Defendants acknowledge that there are certain document/file types that should be produced in native format due to special circumstances of that file format, but defendants limit these to Excel as well as audio and video files. Def. Mem. at 2, fn. 1.

native document into a marginally-searchable TIFF image degrades the functionality of the electronic production. *See* Iris Declaration at 10(g)(i). This limitation imposes an undue burden on Plaintiffs.

### 3. Management and Review of Native Documents is Simpler and Less Expensive for Plaintiffs.

Just as producing in native is less costly for defendants than producing in TIFF, storing native files is much less costly for Plaintiffs than storing TIFF images. *See* Iris Declaration at 16(c). TIFF productions require far more storage space than native format productions, which drives up the cost of data hosting, because the file size for a TIFF is almost always larger than the file size for the corresponding native file. *See* Iris Declaration at 3 & 16(c). Additionally, reviewing native productions is significantly faster and can be done at lower cost than reviewing TIFF format productions. *See* Iris Declaration at 3.

The cost-effectiveness of working with a native production is very important to the PSC. The cost to host the many terabytes[8] of data that will be produced by defendants was an important factor in the PSC's decision to propose a native production and to use Relativity as the Plaintiffs' document review platform. The PSC has an obligation to maintain the MDL document depository and make it available for the benefit of all Plaintiffs for the duration of this litigation. While minimizing cost is not the only objective, it makes good sense for the PSC to select the option that allows it to carry out its fiduciary obligations in a cost-effective manner.

### C. The Fact That Other Litigations Have Utilized TIFF Productions is Irrelevant.

The only support for defendants' assertion that TIFF productions are "widely used and universally accepted" is defendants' "say so." Defendants claim that their "informal poll of

---

[8] A terabyte is one trillion bytes, or 1,000 gigabytes. It is not unreasonable to expect the combined production of all TRT Defendants to exceed ten terabytes.

several reputable electronic discovery vendors" supports a claim that over 90% of productions are "generally" made in TIFF.  Def. Mem. at 3.  The methodology of defendants' "informal poll" was not shared in their brief, but suffice it to say that the reliability of this unsworn assertion by counsel in their brief is questionable and has no value as evidence in support of their argument. The PSC's ESI vendor believes that the use and popularity of native productions have increased greatly over the last five years as a result of the cost and efficiency gains associated with native production that are described herein.  *See* Iris Declaration at 4.  Moreover, there have been MDLs that have used either full-native or near-full native productions.

### D.    Responses to Defendants' Concerns About Native Documents

In their July 7, 2014 submission, defendants raise several objections to producing ESI in native format, each of which is a red-herring.  Tellingly, defendants have proposed to produce certain types of files in their native format — including Excel spreadsheets — without the fears that they have identified for producing other file types in native format.   As detailed herein, there are ways to minimize or eliminate the risk of each concern identified in defendants' July 7, 2014 submission, in a manner that negates any possible claim of undue hardship or expense.  The following sections detail ways to address the following concerns: (1) inadvertent alteration with native documents, (2) difficulty with Bates and confidentiality labeling for native documents, and (3) that native productions require additional time and expense to review, redact,[9] and process.

### 1.    The Risk of Inadvertent Alteration is the Same for Native and TIFF Productions, and Native Production does not Necessitate Extra Effort, Time or Expense to Verify Whether Documents have been Altered.

---

[9] As stated previously, the PSC is willing to agree to accept documents that require redaction in TIFF (with all metadata and appropriate load files) because, while there are ways to redact in native files, it is likely going to be a very small set of documents.

Defendants have expressed concerned that native documents are somehow uniquely susceptible to inadvertent alteration during the document review process, which necessitates an additional process to verify the authenticity of native documents. This simply is not a realistic concern. First of all, native documents are no more likely to be altered than TIFF documents. Further, there is no undue burden associated with verifying the authenticity of native documents because the exact same burden applies to TIFFs. Therefore, defendants' stated concern in this regard does not justify requiring Plaintiffs to accept a TIFF production.

The concern about inadvertent alteration is not unique to native files. TIFFs can also be altered. "The mere fact that a document is in TIFF format and Bates stamped does not make it impossible for a party to tamper with the contents of the document. The Court is confident that both parties will be double checking the authenticity of any documents relied upon by the other side and, while Bates stamping may provide a simple method for locating and authenticating documents, it is certainly not the only method." *Hagenbuch v. 3B6 Sistemi Elettronici Industriali S.R.L.,*, 2006 U.S. Dist. LEXIS 10838, at *12 (N.D. Ill. March 8, 2006).

As noted above, Plaintiffs are using the same document review technology, Relativity, that AbbVie is using and other defendants will likely use. Because the Relativity platform can create a "read only" controlled environment for native documents, any potential inadvertent modification of data is eliminated. Iris Declaration at 17(c). Native files can be reviewed by Plaintiffs in a "read only" mode in the same fashion in which they will be when defendants review them before making their production. It is equally as unlikely that Plaintiffs would inadvertently alter a document prior to printing for a deposition as it is that defendants would inadvertently alter a document prior to production.[10] *See* Iris Declaration at 17(a)-(e).

---

[10] Defendants will likely review their documents in native format (or at least some defendants will) based on the best practices espoused by several of defense counsel. *See* Exhibit F and G*; see also* Iris Declaration at 11-14.

Relativity's viewer renders hundreds of current and legacy file types, eliminating the need to open a file natively in any version of that file's software and thereby eliminating the risk of inadvertently altering a document with an errant keystroke. *See* Iris Declaration at 17(c) & (d). The risk of inadvertent modification of a native file prior to rendering to paper or image is eliminated by using Relativity's features. *See id.*

The risk of inadvertent alteration during printing of a native document often arises when a party opens the file in its native program in order to print. Plaintiffs' use of Relativity as a document review platform eliminates the concern of inadvertent changes to a document by controlling the permission settings for reviewers so that documents will be printed through Relativity, as opposed to having reviewers open documents in their native software in order to print. With Plaintiffs' proposed controls in place it will be impossible to accidentally alter a document prior to printing. A reviewer would have to have administrative access to the native document, willfully[11] alter the data (thereby changing the metadata and MD5 or SHA1 hash values for the document), then re-ingest the manipulated data into the review platform. *See* Iris Declaration at 17(c). The same technical controls that are used by defendants during the document review process will be in place to prevent Plaintiffs from inadvertently altering a document as well. *See* Iris Declaration at 17(b) & (c).

Verifying the authenticity of an electronic document is very simple.[12] Plaintiffs propose that defendants produce MD5 or SHA1 hash values for all native files they review. *See* Iris

---

[11] Once the discussion turns to "willful" modification of documents, there is no difference between "willful" modification of native documents or TIFF images. Both formats can be modified if someone is intent on undertaking such improper conduct.

[12] Like all of the issues raised in defendants' briefing, there are different way to address the issue of authenticity. One way is for the Court to enter a separate Authentication Protocol, which has been done in other pharmaceutical MDLs. *See, e.g.*, Exhibit I (*In re Seroquel Products Liability Litigation* Authentication Protocol). These are not issues that are unique to this MDL, nor are they unique to native vs. TIFF productions. Authentication of documents will have to be addressed regardless of the format of production, unless defendants are agreeing that any document they produce in TIFF is automatically authentic. Admissibility will also have to be addressed at the appropriate

Declaration at 17(a) & 18. In the unlikely event that a document is somehow altered, the hash value for the "new," altered document will reflect that a change has been made. *See id.* If someone suspects that a party has altered a file in any way, they can electronically check each file to see if the hash value has changed. This process is not time consuming or costly. *See id.*

Defendants have argued it will require additional steps to manually verify the authenticity of printed documents that are used in depositions or other proceedings. However, this claimed burden is not unique to native documents—the need to manually verify the authenticity of a printed document applies equally to TIFFs and native documents. Defendants' counsel will no doubt diligently carry out their responsibility to verify the authenticity of exhibits, as will Plaintiffs' counsel. Though both sides have many technological tools at their disposal, there is no automated way to verify the authenticity of a printed document, whether native or TIFF. The only way to determine whether a printed document has been altered — whether printed from a TIFF or a native file — is by comparing the printed version against the production set. There is simply no way around that.

Plaintiffs' proposal includes an inexpensive and quick methodology to confirm the integrity of any electronic document that is suspected to have been changed. Authenticating and comparing printed versions of documents is not uniquely challenging to either side, and this task is no different for native and TIFF documents because both documents will have to be compared with the electronic source to verify authenticity. Therefore, defendants' concerns regarding authentication do not justify a TIFF production.

      **2.**      **A Unique Identification Number and Applicable Confidentiality Designations will be Branded into all Printed Documents.**

---

time. These are issues that are dealt with in every case. The PSC respectfully requests that the Court not be scared off by or fall prey to the red-herring issues raised in defendant's July 7th submission.

Defendants have expressed concern that it is difficult to Bates label and append confidentiality designations to documents produced in native format. This concern is easily addressed by Plaintiffs' use of Relativity's built-in process to brand a unique identifier, like a Bates number, and the applicable confidentiality designation onto every page of every printed document. Even though defendants' preferred method addresses confidentiality and identification in a different way, Plaintiffs' proposal fully addresses defendants' concern in this regard and, therefore, there is no undue burden to defendants that justifies forcing Plaintiffs to accept a TIFF production.[13]

As Mr. Logan explains, "[w]hile native productions do not afford for Bates numbers to be applied to each page, each native document can be assigned a unique document identification number in the same fashion that Bates numbers are assigned." Iris Declaration at 19(d). These unique numbers can be printed on each document and there is really no functional difference between these unique identifiers and a traditional bates number. *Id.* As an example, the document identified as "54321" will be the only Document 54321 in AbbVie's production. Page 1 of Document 54321 will be labeled "54321.0001", and that identifier will be completely unique. Page 2 of Document 54321 will be labeled "54321.0002", and so forth. This convention is no more complicated than traditional bates labeling, and there is no risk of confusion about which page or which version of a document is being referenced at any time.[14] As set forth in *Hagenbuch*, this is an acceptable method for designating each page of a document: "[T]he

---

[13] There are different ways that can be utilized to have unique identifiers on documents and also the requisite confidentiality legends. One very simple way to address these issues is contained in the Iris Declaration (at 19(a)-(e)), but there are other ways that have worked. By way of example, in one recent litigation, the parties used slip sheets (or cover sheets) that preceded each document produced in native format and the slip sheet contained the document's Bates number and any confidentiality legend.

[14] Given that defendants have already agreed to produce Excel files in native format, a process like the one described herein will have to be used for all Excel files. Extending that process to other document formats is no more burdensome or inefficient than using it on that limited set of Excel files.

benefits of adding Bates numbers to the TIFF documents do not justify [defendants'] failure to produce the designated electronic media. As discussed in open court, the parties can agree on any number of ways to designate each page of each document produced, including, but not limited to, relying on file names and page numbers." 2006 U.S. Dist. LEXIS 10838, at *11-12.

To facilitate optimal use of a native-to-native production and ensure that pagination is consistent regardless of which party prints a document, Plaintiffs propose that the parties share settings used to image or print documents. *See* Iris Declaration at 19(a)-(e). This procedure does not alter the content or metadata of any document, and in reality the only difference is the timing of identification of the document. *See id.* Instead of having a unique number branded into each page when the producing party renders a TIFF image of each page of their production, the branding will occur at the time of printing. This procedure is equally available to both sides as a built-in function of the Relativity document review tool, and the only additional step necessary is to program the imaging and printer settings (as opposed to the hours of work and thousands of dollars that defendants would have to invest to convert every page to a TIFF image prior to making a TIFF production).

### 3. The Preparation of Native Productions Does Not Take Any More Time or Money to Review the Documents for Production.

Defendants claim that reviewing and preparing documents for production in native format is additionally time consuming and expensive. Defendants appear to be overstating this concern because at least some of the defendants are conducting their document review in native format using Relativity, just as Plaintiffs would like to do. There is a reason that the defendants will be using Relativity to review files in native format. Ms. Blair (Morgan Lewis, counsel for Auxilium) has told her clients since 2006 that the best practice is to review in native. Exhibit F. The eDiscovery Chair of Winston Strawn (counsel for AbbVie) advises that the best practice is

to review in native.  Exhibit G.  Moreover, if a document is 12 pages long, it will still take a reviewer a set amount of time to review a 12-page document.  In fact, it may take that reviewer less time to review a native document because the pages will likely change faster in a native document as opposed to a TIFF/Load File document.  Iris Declaration at 16(b).

Furthermore, there is no basis for the claim that native review takes additional time and costs more because documents have to be opened in their native programs.  The Relativity review platform renders "hundreds of current and legacy file types, eliminating the need to open a file natively in any version of that file's software."  Iris Declaration at 17(d).  Therefore, there is no additional time required to "locate, purchase, load and launch software to view each file type on multiple computers" as defendants claim.[15]

## V.     Making a Native Production Does Not Result in Cost Shifting to the Receiving Party

As explained in *Zubulake v. UBS Warburg LLC*, cost-shifting is not appropriate simply because the evidence to be produced is in an electronic format.  217 F.R.D. 309, 317-318 (S.D.N.Y. 2003).  In fact, this Court recently issued an order denying a motion to shift the cost of production of accessible ESI to the requesting party, noting the general presumption that "the responding party must bear the expense of complying with discovery requests."  *See United States EEOC v. Dolgencorp, LLC*, 2014 U.S. Dist. LEXIS 102933 (N.D. Ill. July 29, 2014), *quoting Oppenheimer Fund v. Sanders*, 437 U.S. 340, 358, 98 S.Ct. 2380, 2393 (1978).  As explained in *Zubulake*, "whether production of documents is unduly burdensome or expensive

---

[15] Defendants also note that, to the extent their clients use any proprietary or non-standard software, the parties will need to make arrangements for reviewers to have access to that software.  To date, no defendant has identified any ESI that requires proprietary software.  If and when that issue arises, the parties can address it.  However, that is not a reason to deprive Plaintiffs of a native format for the run-of-the-mill Word documents and emails that will make up a large proportion of defendants' production.  Moreover, defense counsel will have access to the software from their clients —who must have the software if they that file format in their ordinary course of business.

turns primarily on whether it is kept in an *accessible or inaccessible* format (a distinction that corresponds closely to the expense of production)." 217 F.R.D. at 317 (emphasis in original). Cost-shifting should be considered *only* when electronic discovery imposes an "undue burden or expense" on the responding party, and only when the electronic data is relatively inaccessible, such as in backup tapes. *Id.* at 309, 318.

Plaintiffs' First Request for Production, which has only been propounded on the AbbVie defendants so far, seeks information to be produced that is standard in pharmaceutical cases, all (or at least virtually all) of which should be active/accessible data. Moreover, at this stage of the MDL, defendants have not identified sources of electronic information, such as backup tapes, that can only be accessed using costly data recovery processes. If and when any such inaccessible sources are identified, the parties can address whether production of those sources presents any basis to engage in a discussion about cost-shifting.

## VI.    Conclusion

Production of ESI in TIFF format is more costly and, for the reasons set forth herein, would saddle Plaintiffs with unnecessary burdens. The inherent limitations of a TIFF production unfairly hamstring Plaintiffs' use and review of defendants' documents and deprive Plaintiffs of access to information in the form that defendants and their counsel will have.

Plaintiffs have addressed each of defendants' concerns regarding production of ESI in native format. Each of defendants' concerns can be addressed by using the e-discovery tools that certain defendants already have in place, so there is no additional burden imposed on them by requiring a native production. Defendants have represented that they have not started collecting documents to produce, so there is no prejudice to requiring certain controls be put in place prior to defendants' production by having the parties technology people work together. Perhaps most

importantly, requiring defendants to make their productions in native format will greatly reduce the overall cost of electronic discovery in this litigation.

Accordingly, the PSC respectfully requests that the Court compel defendants to produce electronically stored information in native format.

Dated: September 19, 2014

Respectfully submitted,

By:

/s/ Seth A. Katz
BURG SIMPSON ELDREDGE HERSH &
JARDINE, P.C.
40 Inverness Drive East
Englewood, CO 80112
Phone: (303) 792-5595
Fax: (303) 708-0527
Email: skatz@burgsimpson.com
*Plaintiffs' Executive Committee*

/s/ Ronald Johnson, Jr.
SCHACHTER, HENDY & JOHNSON PSC
909 Wrights Summit Parkway, Suite 210
Ft. Wright, KY 41011
Phone: (859) 578-444
Fax: (859) 578-4440
Email: rjohnson@pschacter.com
*Plaintiffs' Co-Lead Counsel*

/s/ Trent B. Miracle
SIMMONS HANLY CONROY
One Court Street
Alton, IL 62002
Phone: (618) 259-2222
Fax: (618) 259-2252
Email: tmiracle@simmonsfirm.com
*Plaintiffs' Co-Lead Counsel*

/s/ Christopher A. Seeger
SEEGER WEISS LLP
77 Water Street
New York, NY 10005
Phone: (212) 584-0700

Fax: (212) 584-0799
Email: cseeger@seegerweiss.com
***Plaintiffs' Co-Lead Counsel***

/s/ Brian J. Perkins
MEYERS & FLOWERS, LLC
225 West Wacker Drive, Suite 1515
Chicago, IL 60606
Phone: (312) 214-1017
Fax: (630) 845-8982
Email: bjp@meyers-flowers.com
***Plaintiffs' Co-Liaison Counsel***

*/s/* Myron Cherry
MYRON M. CHERRY & ASSOCIATES
30 N. LaSalle Street, Suite 2300
Chicago, IL 60602
Phone: (312) 372-2100
Fax: (312) 853-0279
Email: mcherry@cherry-law.com
***Plaintiffs' Co-Liaison Counsel***