IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE TESTOSTERONE REPLACEMENT THERAPY PRODUCTS LIABILITY LITIGATION COORDINATED PRETRIAL PROCEEDINGS | No. 14 C 1748<br>MDL No. 2545 |
| This document applies to:<br>*All Cases* | |

**PLAINTIFFS' EXECUTIVE COMMITTEE'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF ANALYTIC DATA AND/OR PRODUCTION OF DOCUMENTS RETURNED BY PLAINTIFFS' PROPOSED SEARCH TERMS**

February 13, 2015

TABLE OF CONTENTS

INTRODUCTION ............................................................................................................................. 1

BACKGROUND .............................................................................................................................. 3

LEGAL STANDARDS ..................................................................................................................... 7

ARGUMENT .................................................................................................................................. 7

    I.    THIS COURT SHOULD ORDER ABBVIE TO PROVIDE PLAINTIFFS WITH "HIT COUNTS" AND RESPONSIVENESS INFORMATION BEFORE DECIDING ON AN ESI PROTOCOL ............................................................................................................ 7

    II.    TO THE EXTENT THE COURT SEEKS TO SELECT AN ESI PROTOCOL BASED ON THE EXISTING NEGOTIATIONS, THE COURT SHOULD SELECT PLAINTIFF'S FEBRUARY 2 PROPOSAL ................................................................................................................ 13

        A.    The Design of Plaintiffs' Proposal Is More Likely to Identify Responsive Documents ............................................................................... 13

        B.    AbbVie Has Not Demonstrated, and Cannot Demonstrate, that Plaintiffs' Proposal Is Unduly Burdensome ........................................... 14

CONCLUSION.............................................................................................................................. 15

**INTRODUCTION**

Despite months of negotiation regarding search terms for electronically-stored information ("ESI"), Defendants AbbVie Inc. and Abbott Laboratories, Inc. (together "AbbVie") still refuse to share the most basic information necessary for Plaintiffs to assess the search term proposals AbbVie has made and the responses AbbVie has provided to Plaintiffs' proposals. Specifically, while AbbVie has repeatedly rejected terms that Plaintiffs has proposed as too burdensome, it has refused to provide Plaintiffs with "hit count" data, showing how many documents such terms actually return, or with responsiveness data, necessary to assess whether large hit counts are the result of a high degree of relevance or a large number of false positives. AbbVie refuses to share this information even though *it admits it has engaged in these types of analytics*, even though *it has claimed that the results of these analytics support its rejection of Plaintiffs' proposed terms*, and even though *it has indicated an intention to use these results (never seen by Plaintiffs) in its briefing to this Court on this issue*.

Based on AbbVie's failure to engage in cooperative, transparent negotiations, Plaintiffs believe it is premature for the Court to choose between AbbVie's final proposal and the Plaintiffs'. Because of AbbVie's failure to share information, and its insistence in engaging in one-sided negotiations, Plaintiffs have formulated their proposal largely in the dark, being forced to take AbbVie at its word, while AbbVie has been able to craft its proposal with full access to data on the effect of each and every search term it has proposed or rejected. For this reason, Plaintiffs respectfully request that the Court order AbbVie to provide hit count and relevance information with respect to the search term list that Plaintiffs proposed on December 22, 2014 (provided as Exhibit A), and direct the parties to negotiate in good faith thereafter based on the results of such data. As Plaintiffs demonstrate below, performing these analyses will not be burdensome for AbbVie, especially given that they have already run similar analytics for themselves. The issue

1

for AbbVie does not appear to lie in *performing* the analytics, but rather in *sharing* them so that the parties together can develop an appropriate search protocol grounded in actual information. Data for this relatively early proposal from Plaintiffs (one that proved acceptable to another defendant) will allow the parties to engage in negotiations that should have occurred previously, and, with information available to both sides, Plaintiffs are hopeful the parties can reach agreement on an appropriate ESI search term protocol. In order to ensure this is the case, Plaintiffs further request that the Court order AbbVie to provide Plaintiffs with similar information with respect to terms proposed by Plaintiffs and rejected by AbbVie during such subsequent negotiations.

In the alternative, should the Court determine to proceed with selecting an ESI search-term protocol at this time, Plaintiffs request that the Court select Plaintiffs' final proposal to AbbVie, dated February 2, 2015 (provided as Exhibit B), rather than AbbVie's final proposal, dated February 10, 2015 (provided as Exhibit C.). Although this protocol is the result of blind negotiation, Plaintiffs nonetheless believe it is a more appropriate protocol than that proposed by AbbVie. This is because the structure of the proposal – relying on an expanded list of combination terms, rather than on proximity connectors – is designed to be more effective as identifying responsive documents. Nor has AbbVie shown that the proposed terms in Plaintiffs' protocol that AbbVie has rejected are improper, or burdensome, or would, as AbbVie has claimed, "result in 'hits' on clearly non-responsive documents. . . ." (Of course, almost any search may hit on *some* non-responsive documents; the issue is the ratio of responsive to non-responsive documents for any particular search term – precisely the information AbbVie refuses to share.) On this point, moreover, the Court ought not reward AbbVie's negotiating tactics by considering "evidence" on these issues that AbbVie refused to provide to Plaintiffs during the course of negotiations. Such information is evidence only of AbbVie's bad faith negotiations. Based on the information

available, Plaintiffs' proposal will return more responsive documents without unfairly burdening AbbVie with review of significant numbers of "false positives." For this reason, should any protocol be chosen now, Plaintiffs respectfully request that the Court direct AbbVie to use Plaintiffs' protocol, Exhibit B, for its ESI searches.

## BACKGROUND

The parties have attempted to negotiate an ESI protocol over the course of three and a half months, but despite significant concessions by Plaintiffs, have failed to reach agreement. By way of background, on October 31, 2014, Scott Glauberman, one of AbbVie's lawyers, provided Plaintiffs with AbbVie's proposed ESI search protocol. Mr. Glauberman proposed that AbbVie would search its electronic files using an "A+B" search structure, in which only documents containing (a) a specified product identifier (from a list of approximately 21 identifiers) *and* (b) a specified adverse event, from a list of approximately 38 events) would be returned by the search. On November 4, 2014, Plaintiffs responded with a proposed list of additional terms, to be run without the "A+B" structure. On November 19, 2014, Mr. Glauberman wrote back to say that AbbVie was willing to add approximately 23 additional product identifiers and approximately 45 additional adverse events to its previously proposed "A+B" search structure. On November 20, 2014, in preparation for a meet and confer on the issues, Plaintiffs requested that AbbVie provide "a xlsx with the hit counts of the number of unique documents that would be returned from (i) each row of Plaintiffs' terms and (ii) cumulatively across all the rows, and a corresponding xlsx for AbbVie's proposed searches, so that the parties have a basis on which to meet and confer as to any requested modifications." *See* Exhibit D. No hit counts were provided.

The parties then met and conferred about their search proposals on November 24, 2014. At the meet and confer, the parties clarified their respective positions. Plaintiffs objected to AbbVie's two-tiered, "A+B" structure; AbbVie objected to the number of search terms Plaintiffs

3

proposed. Recognizing that some of the terms Plaintiffs proposed might return too many documents, Plaintiffs again requested that AbbVie provide a "hit count" for terms it believed were too broad, to document the large volume of documents that AbbVie believed these terms would return and the extent to which such documents returned would be non-responsive. AbbVie, for its part, agreed to make a revised proposal. *See* Exhibit E. By December 7, 2014, however, AbbVie still had no new proposal to convey. Instead, AbbVie's counsel, Shawn Gebhardt, wrote to Plaintiffs' counsel stating the AbbVie was still reviewing Plaintiffs' proposal; Mr. Gebhardt provided a list of terms from Plaintiffs' proposed search terms that AbbVie asked Plaintiffs to remove from their list. On December 12, 2014, Plaintiffs agreed to remove a subset of the terms AbbVie had asked be removed, and also proposed modifications of other terms, in order to narrow them.

On December 22, 2014, AbbVie finally sent its new proposal. The proposal still called for an "A+B" search structure, using a product identifier and an adverse event. The proposal differed from AbbVie's prior proposal only in that it added: nine additional product identifier terms; approximately 68 additional adverse event terms; 18 "stand-alone" terms; and a list of special proximity searches. No hit count data was provided. That same day, Plaintiffs responded to AbbVie's latest proposal, still objecting to the "A+B" structure, and suggesting that AbbVie use an adapted version of the search terms that co-defendant Auxilium agreed to use in state-court litigation in Pennsylvania. *See* Exhibit A; *see also* Exhibit G (explanatory cover email). On December 29, 2014, AbbVie's counsel wrote to say that AbbVie's December 22 proposal, including its A+B searches, was its final proposal.

Despite the apparent breakdown in negotiations, the parties thereafter continued to seek common ground. On January 9, 2015, recognizing that the "A+B" appeared to be a deal-breaker

4

for AbbVie, Plaintiffs informed AbbVie that they were prepared to agree to a search term list in the format proposed by AbbVie – some "A+B" searches, some stand-alone terms, and some proximity searches, but would request some additional items in each category. Although Plaintiffs expected that this substantial concession would yield more cooperation from AbbVie, that has not been the case.

On February 2, 2015, Plaintiffs sent AbbVie their own proposal using AbbVie' preferred formats. The proposal followed the A+B format, with an expanded list of Group A and B terms; Plaintiffs chose not to use searches with proximity connectors, but rather included the terms they sought within the Group A and Group B format.[1] On February 10, 2015, Shawn Gebhardt, one of AbbVie's lawyers, emailed to explain AbbVie's delay in responding to Plaintiffs' February 2, 2015 proposal. In this email, Mr. Gebhardt stated that "there have been a couple of technical issues that slowed the process of getting analytics run," the first time AbbVie acknowledged that it was in fact running analytics, even if it was not sharing them with Plaintiffs. Plaintiffs again requested that AbbVie share the results of its analytics, especially hit counts and responsiveness data. On February 10, 2015, AbbVie provided its response to Plaintiffs' proposal with a new proposal of its own. AbbVie again rejected many of the terms in Plaintiffs' proposal, explaining:

> Our analysis has demonstrated that these proposed search terms are ineffective as they will result in "hits" on clearly non-responsive documents, for which there is no reason for either side to incur the costs associated with reviewing. We can discuss this in greater detail on our upcoming call.

---

[1] As a technical matter, with respect to emails, Plaintiffs' proposal should be understood to include the proviso that search term "hits" in a cover email or its attachment should require production of the whole email family for completeness (even if the family member that does not include the search term is non-responsive or a duplicate). Also, AbbVie has agreed with Plaintiffs that search terms should only be applied to custodial files (a term defined in Case Management Order No. 11: Preservation Order) (Docket No. 434), and no other sources of documents, without further consultation and agreement by the parties. *See* Email from L. Gornick to S. Gebhardt et al. Nov. 24, 2014 (Exhibit E). Auxilium has also reached the same agreement with Plaintiffs.

5

*See* Exhibit C.

On the "upcoming call," on February 11, 2015 (following an email exchange in which Plaintiff again requested hit counts and other analytic data), no greater detail was forthcoming. Mr. Gebhardt for the first time stated explicitly what had long been clear: AbbVie would not share the data it had generated with its analytics; in particular, it would not share the "hit counts" it claimed supported its position that Plaintiffs' search terms were inappropriate.

In the meantime, Plaintiffs attempted to determine, on their own with the little data they had, the effectiveness of AbbVie's proposed search terms. AbbVie had provided Plaintiffs with a small document production, based on documents produced in Illinois state court litigation. The production is, by any standard, meager. Other than the initial Investigational New Drug/New Drug Application, the production consists of approximately 6,000 emails and approximately paper documents and miscellaneous items; almost none of this small production predates 2012. AbbVie has explained the size of the production as resulting from the narrow search terms used to generate it. In an email on February 10, 2015, Mr. Gebhardt explained, "I suspect that if the numbers of records produced seem low, it is likely due to the fact that the productions to date have been run *using a much narrower set of search terms than the terms AbbVie is offering in the MDL. The terms have since greatly expanded in number, breadth, and subject matter*." Exhibit F (emphasis added.) Yet, disturbingly, Plaintiffs' limited analysis shows that not even all of the documents in this narrow production would be returned by the "greatly expanded" terms AbbVie is now proposing. The absence of analytic data to support AbbVie's claim that Plaintiffs terms are ineffective takes on starker significance in the context of the apparent deficiencies of AbbVie's own search proposal and the thoroughly inadequate production that nonetheless appears to include documents that AbbVie's current proposal would not find.

6

**LEGAL STANDARDS**

Fed.R.Civ.P. 26(b) provides that parties "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." The relevant information "need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Rule 26(b) also empowers the court to limit the frequency or extent of discovery if it is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, or the burden or expense of the proposed discovery outweighs its likely benefit.

**ARGUMENT**

**I. THIS COURT SHOULD ORDER ABBVIE TO PROVIDE PLAINTIFFS WITH "HIT COUNTS" AND RESPONSIVENESS INFORMATION BEFORE DECIDING ON AN ESI PROTOCOL**

This Court should defer selecting an ESI protocol until AbbVie has provided Plaintiffs with information, already in AbbVie's possession, necessary to assess each party's proposed protocol. Commentators and courts have repeatedly recognized that transparency and collaboration are essential to the discovery process, and no more so than when it comes to electronic discovery. *See DeGeer v. Gillis*, 755 F. Supp. 2d 909 (N.D. Ill. 2010) ("Selecting search terms and data custodians should be a matter of cooperation and transparency among parties and non-parties."); *Ruiz-Bueno v. Scott*, No. 2:12-CV-0809, 2013 WL 6055402, *4 (S.D. Ohio Nov. 15, 2013) (noting that the Rule 26(f) "discussion can and should include cooperative planning, rather than unilateral decision-making"); *In re Seroquel Products Liability Litigation*, 244 F.R.D. 650, 662 (M.D. Fla. 2007) ("while key word searching is a recognized method to winnow relevant documents from large repositories, use of this technique must be a cooperative and informed process"); *Apple, Inc. v. Samsung Electronics Co.*, No. 12-CV-0630-LHK PSG, 2013 WL 1942163, *3 (N.D. Cal. May 9, 2013) (noting that "transparency and collaboration is essential to meaningful, cost-effective

7

discovery"); *In re Porsche Cars N. Am., Inc.*, No. 2:11-MD-2233, 2012 WL 4361430, *6 (S.D. Ohio Sept. 25, 2012) ("Transparency in the discovery process is necessary to ensure that all relevant information is made available to the litigants such that both parties have mutual knowledge of all relevant facts."); In *Vasudevan Software, Inc. v. Microstrategy Inc.*, No. 11-CV-06637-RS-PSG, 2012 WL 5637611, at *5 (N.D. Cal. Nov. 15, 2012) (requiring hit count and other similar information before the Court could rule on motions to compel and for a protective order).

Indeed, in 2009, the Sedona Conference issued its *Cooperation Proclamation,* emphasizing the need for "cooperative, collaborative, transparent discovery," especially with respect to electronic discovery. The Sedona Conference Cooperation Proclamation, 10 Sedona Conf. J. 331 (2009). As a Magistrate Judge of this Court has explained:

> The Sedona Conference, a non-profit legal policy research and education organization, has a working group comprised of judges, attorneys, and electronic discovery experts dedicated to resolving electronic document production issues. With regard to electronic discovery many courts have looked to the Sedona Principles and Sedona Commentaries thereto, which are "the leading authorities on electronic document retrieval and production.". . . . This Court has endorsed The Sedona Conference Cooperation Proclamation (2008) and its call for "cooperative, collaborative, [and] transparent discovery." 10 SEDCJ 331 (2009) . . . . The Cooperation Proclamation notes that courts see discovery rules "as a mandate for counsel to act cooperatively." 10 SEDCJ at *332; *see also* Allman, Conducting E-discovery After the Amendments: The Second Wave, 10 SEDCJ 215, 216 (2009) (noting that "cooperation among parties in discovery has emerged as a decisive mandate...."). "Courts expect parties to reach practical agreement on search terms, date ranges, key players, and the like." 10 SEDCJ at 217.

*DeGeer*, 755 F. Supp. 2d at 918. Thus, the *DeGeer* court noted, "Selecting search terms and data custodians should be a matter of cooperation and *transparency* among parties and non-parties." 755 F. Supp. 2d at 929 (emphasis added).

The need for transparency is especially significant in the context of key-word searching. In *In re Seroquel Products Liab. Litig.*, 244 F.R.D. 650 (M.D. Fla. 2007), for example, the court

8

found that more transparency was required in the negotiation of key-word searching. Scolding defendant for its unilateral conduct, the court noted:

> [W]hile key word searching is a recognized method to winnow relevant documents from large repositories, use of this technique must be a cooperative and *informed* process. Rather than working with Plaintiffs from the outset to reach agreement on appropriate and comprehensive search terms and methods, AZ undertook the task in secret. Common sense dictates that *sampling and other quality assurance techniques must be employed to meet requirements of completeness*

24 F.R.D. at 662 (emphasis added). Similarly, in *William A. Gross Const. Associates, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 256 F.R.D. 134, 136 (S.D.N.Y. 2009), the court concluded:

> Electronic discovery requires cooperation between opposing counsel and transparency in all aspects of preservation and production of ESI. Moreover, *where counsel are using keyword searches for retrieval of ESI*, they at a minimum must carefully craft the appropriate keywords, with input from the ESI's custodians as to the words and abbreviations they use, and *the proposed methodology must be quality control tested* to assure accuracy in retrieval and elimination of "false positives."

(Emphasis added.) It is clear that AbbVie has been engaging in some form of "quality control" analytics, but the results of those analytics have been kept secret, the precise opposite of "transparency" and "cooperation."

A recent case from the Northern District of California is especially instructive and on point. In *Vasudevan Software*, the plaintiff (VSI) sought to compel the defendant (Microstrategy) to run certain searches on its electronically-stored information; Microstrategy sought a protective order on these same searches. The court found that the parties, and in particular, Microstrategy, had not provided enough information for the court to determine the reasonableness of the proposed searches, holding:

> Before it can determine the reasonableness of VSI's request, the court—and for that matter, the parties—need more information. To that end, no later than fourteen days from this order Microstrategy shall run a search using each of VSI's terms against five custodians. The parties shall meet and confer regarding the resulting hit count for each custodian and term, and if they still cannot resolve their disputes about

9

>Microstrategy's production obligation, they shall provide the results and their respective arguments to the court for its determination.

*Vasudevan Software*, 2012 WL 5637611, *5. *See also Ruiz-Bueno*, 2013 WL 6055402, *3-4 (rejecting claim that "discovery about discovery" was improper or invaded work-product and emphasizing need for collaboration and "sharing of information).

Here, as in *Vasudevan Software*, this Court should order Abbvie to provide hit count data that can serve as the basis for negotiations grounded in transparency, rather than in secrecy and one-sided information. As in *Vasudevan Software*, it is simply not feasible for this Court to determine which party's proposal is more reasonable in the absence of information about hit counts and responsive documents.

The latter information is especially important for the Court and the parties to be able to assess the significance of the hit count information. As explained in the accompanying Declaration of Douglas E. Forrest, the number of unique documents returned by any particular search term is not dispositive of the effectiveness of that term. *See* Forrest Decl. ¶ 18. As Mr. Forrest explains:

>Determining the effectiveness of the search requires random sampling of the documents against which the search terms were run, in order to determine the percentage of responsive documents that were identified by the search terms (in statistics, this percentage is named recall). *This latter information is critical to determining whether the reason a search term is returning a large number of documents is because the term is highly relevant, or because it is returning a high number of "false positives" that must be reviewed and removed from the production.* Without this analysis, I do not believe that the "hit count" alone is sufficient to determine the usefulness of any particular search term.

*Id.* at ¶ 19. Thus, as Mr. Forrest's explanation makes clear, a search term that results in a large volume of unique hits is not necessarily burdensome or improper; the term may simply be especially relevant to the litigation; such terms are especially desirable and point towards responsive documents that should be produced. On the other hand, if a term produces a large number of "hits" on unresponsive documents, it is clearly less effective. Even then, the burden of

10

reviewing the "false positives" must still be weighed against the risk that highly relevant, responsive documents will be missed and never produced in the litigation. But in all events, it is not possible to assess either the effectiveness of, or the burden imposed by, a search term without both the hit count data and a responsiveness review of a sampling of the documents returned.

Moreover, the use of such analytics during the process by which search terms are selected is necessary to counteract, to the extent possible, the low responsiveness rate of key-word searching generally. As one Magistrate Judge has explained:

> [K]eyword searches usually are not very effective. In 1985, scholars David Blair and M. Maron collected 40,000 documents from a Bay Area Rapid Transit accident, and instructed experienced attorney and paralegal searchers to use keywords and other review techniques to retrieve at least 75% of the documents relevant to 51 document requests. . . . . Searchers believed they met the goals, but their average recall was just 20%. . . . This result has been replicated in the TREC Legal Track studies over the past few years

*Moore v. Publicis Groupe*, 287 F.R.D. 182, 191 (S.D.N.Y. 2012) (Peck, M.J.) (citations omitted), *adopted*, 2012 WL 1446534 (S.D.N.Y. Apr. 26, 2012). Proper use of analytics during the process of crafting the search terms can only increase the effectiveness of the terms, but secret analytics permit AbbVie to "hide the ball" and manipulate the results, denying Plaintiffs (and the Court) the information necessary to participate meaningfully in the crafting of the search terms.

The analytics Plaintiffs seek are not merely helpful, indeed necessary, for the proper crafting of search terms, they are also not burdensome to do. Indeed, as discussed above, AbbVie has admitted that it has already performed exactly the kinds of hit counts and responsiveness reviews Plaintiffs are seeking. Running additional such analytics is, moreover, so easily done that the counts and data Plaintiffs now seek – and such additional runs as may be necessary during negotiations that will follow – will not be at all burdensome for AbbVie to provide. As explained in the accompanying Declaration of Douglas E. Forrest, the entire manual process (that is, the part

11

that involves human time and effort) takes less than three hours. This miniscule burden cannot justify AbbVie's refusal to run, and to share, the important information obtained.

AbbVie has nonetheless asked Plaintiffs to agree to search terms without such data and now asks this Court to choose between Plaintiffs' search proposal and AbbVie's, without the benefit of the basic information necessary to assess these proposals. This Court should decline AbbVie's invitation to choose in the dark and should, instead, order AbbVie to provide hit counts and responsiveness sampling with respect to Plaintiffs' December 22, 2014 proposal.

The December 22, 2014, proposal should be used for this purpose because Plaintiffs' February 2, 2015, proposal was the result of substantial compromise on Plaintiffs' part in a good faith effort to reach a resolution of the issue. Despite the fact that AbbVie had never justified with data of any kind its refusal to run searches in any way resembling the December 22 proposal, Plaintiffs nonetheless accepted the format of AbbVie's proposal as a gesture of good faith and compromise and came up with the February 2 proposal as a middle-ground where the parties could meet. The analytics to be provided by AbbVie will represent the starting point of a negotiation based on an actual data, not on secrecy and unilateral action. That starting point should not be the Plaintiffs' ultimate middle ground, but rather a genuine starting point, where AbbVie will be required to demonstrate that a proposal Plaintiffs believe is truly appropriate is in fact overbroad or burdensome. Terms that the data shows are ineffective can be discarded or modified in an iterative process that will allow the parties to determine what search terms will best provide responsive documents without undue burden. Indeed, Plaintiffs believe that once such data are provided, the parties will, in all likelihood, be able to resolve their differences and reach agreement on a search protocol.

## II. TO THE EXTENT THE COURT SEEKS TO SELECT AN ESI PROTOCOL BASED ON THE EXISTING NEGOTIATIONS, THE COURT SHOULD SELECT PLAINTIFF'S FEBRUARY 2 PROPOSAL

Even without the hit count and responsiveness data Plaintiffs have requested, it is clear that Plaintiffs' February 2 proposal is superior to AbbVie's February 10 proposal, because (a) the design of Plaintiffs' proposal is more likely to identify responsive documents; and (b) without the analytic data AbbVie has refused to provide, AbbVie cannot demonstrate that Plaintiffs' protocol imposes any undue burden.

### A. The Design of Plaintiffs' Proposal Is More Likely to Identify Responsive Documents

Plaintiffs' proposal is superior to AbbVie's because its design, especially its expansion of Groups A and B, is more likely to identify responsive documents than AbbVie's proposal. Plaintiffs' proposal differs from AbbVie's primarily in the expansion of AbbVie's Groups A and B. The "A+B" searches are designed, according to AbbVie, to ensure responsiveness by coupling a product-related term with an issue-related term, so that only documents that concern both the relevant product and a relevant issue will be returned. Even assuming the validity of this approach,[2] it is plainly necessary that the A and B categories contain sufficient terms to ensure that a large percentage of responsive documents will be returned and that especially important responsive documents will not be missed.

Plaintiffs' proposal is superior because it contains more A and B terms than AbbVie's proposal, while still maintaining AbbVie's product + issue structure. Each term is, in and of itself, relevant to issues in the litigation, ensuring that documents containing two such terms have a high likelihood of being responsive. The extra terms on Plaintiffs' A and B lists thus reduce the chances

---

[2] Plaintiffs do not accept that such an approach is valid or necessary, but, as described above, in an attempt to reach agreement, have offered a proposal following AbbVie's desired structure.

13

that responsive documents will be missed, without substantially increasing the likelihood of non-responsive hits.

AbbVie, by contrast, has sharply limited the terms in Groups A and B. Instead, AbbVie proposes to use some of the missing terms in Group D proximity searches. Proximity searches return documents only when the selected terms appear within a specific proximity – e.g., 10 words, or 25 words, or 50 words – to each other. Unlike proximity searches, "A+B" searches return documents where both the A term and the B term appear, no matter how far apart they are within the document. By using proximity searches instead of the more expansive A+B searches proposed by Plaintiffs, AbbVie reduces the number of responsive hits, based solely on the syntactical choices of its employees. This is especially troubling in light of AbbVie's admission that it has used analytics to craft its proposal and to evaluate Plaintiffs' proposals. Thus, it is possible that AbbVie had selected proximity searches precisely because it has determined they will miss substantial numbers of documents that, because they contain and A term and a B term, are highly likely to be relevant and responsive.

B. **AbbVie Has Not Demonstrated, and Cannot Demonstrate, that Plaintiffs' Proposal Is Unduly Burdensome**

AbbVie cannot demonstrate that the larger volume of documents that will likely be returned by Plaintiffs' protocol will subject AbbVie to undue burden in reviewing them. AbbVie has at no time presented Plaintiffs with data showing the percentage of documents returned that are unresponsive, as would be necessary to support its contention that it should not be required to run the search terms Plaintiffs request. As described in detail above, *see supra* Point I, without hit counts and responsiveness data, it is simply not possible to determine the extent to which additional search terms impose additional burden, as opposed to simply generating additional responsive documents.

14

Moreover, any burden in reviewing potentially responsive documents must be weighed against the risks of missing responsive documents altogether. As explained in the Forrest Declaration, the risks of too many hits and the risks of too few are not at all symmetric. Where a search term produces too many hits, more time is required to review the additional documents. Where a search term produces too few hits, important relevance evidence may be missed altogether. Where, as here, the terms are carefully crafted to increase the likelihood that "hits" will in fact be responsive documents, any uncertainty as to particular additional terms should be resolved in favor of the terms that will cast a wider net, rather than the terms that may forever conceal important evidence from Plaintiffs and the Court.

## CONCLUSION

For the foregoing reasons, this Court should compel AbbVie to perform, and provide to Plaintiffs, hit counts and responsiveness analytics with respect to Plaintiffs' December 22, 2014 proposal (Exhibit A); to negotiate with Plaintiffs in good faith based on the results of such analytics; and to perform, and provide to Plaintiffs, such follow-up analytics as may be necessary in the course of the parties' negotiation of a search protocol. In the alternative, this Court should select Plaintiffs' February 2, 2015 proposal (Exhibit B) as the ESI search protocol to be applied by AbbVie.

Dated: February 13, 2014                    Respectfully submitted,

                                                              /s/ Trent B. Miracle
                                                              Trent B. Miracle
                                                              Simmons Hanly Conroy
                                                              One Court Street
                                                              Alton, IL 62002
                                                              Phone: (618) 259-2222
                                                              Fax: (618) 259-2252
                                                              Email: tmiracle@simmonsfirm.com

Ronald Johnson, Jr.
SCHACHTER, HENDY & JOHNSON PSC
909 Wrights Summit Parkway, Suite 210
Ft. Wright, KY 41011
Phone: (859) 578-4444
Fax: (859) 578-4440
Email: rjohnson@pschacter.com

Christopher A. Seeger
SEEGER WEISS LLP
77 Water Street
New York, NY 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
Email: cseeger@seegerweiss.com

Plaintiffs' Co-Lead Counsel

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2015, the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Trent B. Miracle
Trent B. Miracle
SIMMONS HANLY CONROY
One Court Street
Alton, IL 62002
Phone: (618) 259-2222
Fax: (618) 259-2252
Email: tmiracle@simmonsfirm.com