# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLANDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERONE WILLIAMS, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHN HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,<br><br>*Defendants.* | Case No. 22-cv-00125 |

# EXPERT REPORT OF NICHOLAS HILL

**7 August 2024**

**Figure 10: Count of Penn students who received a loan in their financial aid package**

| Academic year | Count of Penn student loan recipients |
|---|---|
| 2002–2003 | 4,108 |
| 2003–2004 | 4,123 |
| 2004–2005 | 4,072 |
| 2005–2006 | 4,055 |
| 2006–2007 | 1,856 |
| 2007–2008 | 1,762 |
| 2008–2009 | 1,418 |
| 2009–2010 | 497 |
| 2010–2011 | 425 |
| 2011–2012 | 463 |
| 2012–2013 | 511 |

Source: Corrected combined Defendant data.
Note: Counts include all students who received a loan (institutional, federal, state, and outside) as part of their financial aid package, regardless of need.

(85) In addition to increases in financial aid resulting from no-loan policies, the Defendants increasingly awarded "full ride" financial aid packages to students over time. The green bar in the figure below shows the total institutional need-based grant aid awarded to full ride students by the Defendants over time. The blue bar shows institutional need-based grant aid awarded to non-full ride students. The orange line, which represents the percent of aid being awarded to full ride students, has increased from nearly no aid in 1998–1999 to nearly 40 percent of aid awarded in 2023–2024. Dr. Singer excludes all full ride students, and their awarded aid, when he estimates purported damages.[115]

[115] Singer Report, ¶ 246 ("I drop any observations where a student was awarded a "full-ride" (i.e., where a student's total gift aid exceeded the cost of attendance).").

**Figure 11: Institutional grant aid awarded to students by the Defendants**




Sources: IPEDS; Dr. Singer's combined Defendant data.
Note: Following Dr. Singer's definition, full ride students are defined as students with total grant aid values (as reported in Defendant data) equal to or greater than the school's cost of attendance as reported by IPEDS.

(86) My analyses show that the broad patterns in the data do not support Dr. Singer's claim that the challenged conduct reduced financial aid awards. If the 568 Group or the introduction of the consensus methodology guidelines had been intended to reduce financial aid awards, the observed pattern of increasing financial aid is not the pattern that one would expect to see. Instead, one would expect to see stagnation or a decrease in financial aid awarded over time because of coordination among the Defendants to reduce financial aid.

## 4.2. The Defendants increased financial aid at the same pace as peer schools after the introduction of the consensus methodology guidelines

(87) The previous section shows that Defendant financial aid awards have been rising over time. In this section, I compare the Defendants' financial aid awards over time to financial aid awards over time at the other schools in Dr. Singer's proposed market (henceforth, "non-Defendants").[116] I do so using a

[116] The non-Defendant schools in Dr. Singer's proposed market are Carnegie Mellon, Harvard, Princeton, Stanford, and WashU.

**Figure 39: Dr. Singer's model with corrected data and post-COVID-19 controls**




Source: Corrected combined Defendant data.
Notes:
[1] Bars represent the conduct estimates from Dr. Singer's Table 11 (red bars) and correcting data for Dr. Singer's model and using dummies for each year post-COVID-19 (blue bars).
[2] Effective institutional price is regressed on school fixed effects and various control variables in models 1–3, and student-school fixed effects and various control variables in models 4–6.
[3] "Not statistically significant" means the results are not significant at the 5 percent level using two-way clustering.

### 8.3.3. Dr. Singer's opinions depend upon including flawed post-conduct data

(224) In this section, I show that Dr. Singer's conclusions depend upon including data from two years after the alleged conduct, academic years 2023–2024 and 2024–2025. This dependency upon data from these years is problematic because there are several reasons data from these years should be excluded.

(225) First, the 2023–2024 and 2024–2025 academic year data have data limitations that make estimates based on those years unreliable. For example:

- The 2024–2025 academic year data are incomplete: only four Defendants (Cornell, Georgetown, Johns Hopkins, and Penn) produced data reporting any institutional financial aid awards in that year. What is more, the data produced by these Defendants are incomplete and contain only preliminary estimates of students' financial aid awards. Georgetown, for example, stated in a letter accompanying its data production that it "only includes early-decision award data for academic year 2024–2025, to the extent available" and that "because the aid process is still

ongoing for the 2024–2025 academic year, this data is necessarily tentative and incomplete."[355] Cornell similarly stated in a letter accompanying its data production that the data for academic year 2024–2025 reflect "institutional aid award estimates."[356]

- The 2023–2024 academic year data are incomplete: the number of students and total institutional awards reported in the data for many Defendants drop off substantially in academic year 2023–2024 relative to earlier years. For example:
  - The Duke data report over 50 percent fewer students and over 90 percent fewer institutional grants offered in 2023 relative to 2022.[357]
  - Only 135 students appear as having received institutional aid in the Caltech data in 2023, compared to nearly 500 students receiving institutional aid in 2022.
  - For six Defendants that produced data containing information on paid awards, the paid award fields are not populated in 2023–2024.
- Dr. Singer's data on his institutional control variables—i.e., (1) institutional tuition revenue per full-time equivalent undergraduate (one-year lag) and (2) percent of full year-full-time equivalent undergraduates receiving financial aid—come from the Integrated Postsecondary Education Data System (IPEDS) and other public sources and are only available until 2022–2023. Hence, Dr. Singer has to extrapolate data for his institutional control variables for the academic years 2023–2024 and 2024–2025.[358]

(226) Second, while Dr. Singer includes data for the 2023–2024 and 2024–2025 academic years to estimate his model, he claims that the interpretation of these data is uncertain because the impact of the challenged conduct could have persisted beyond the end of the 568 Group.[359] He further asserts that including these data therefore makes his findings conservative because he assumes in using them that there was no lingering impact.[360] These claims are unavailing: in fact, far from being conservative,

---

[355] Letter from Daniel Fenske (Mayer Brown) to Edward Normand (Freedman Normand Friedland), Robert Gilbert (Gilbert Litigators & Counselors), and Robert Litan (Berger Montague), May 17, 2024.

[356] Letter from Emily Chen (Kirkland & Ellis) to Robert Litan (Berger Montague), Edward Normand (Freedman Normand Friedland), and Robert Gilbert (Gilbert Litigators & Counselors), March 29, 2024.

[357] Duke admissions and financial aid data, *see* Appendix J.

[358] Singer Report, n. 328 ("The institutional level control variables from IPEDS are reported for 1998-2021, and the endowment data goes from 1999-2021. I supplement missing 2022 institutional tuition revenue data and missing 2022-2023 undergraduate enrollment data using public sources (*e.g.*, Defendants' websites). For remaining missing observations, I extrapolate the institutional control variables for each Defendant by regressing the control variable on a linear time trend and a COVID dummy variable, and then using the predicted value from this regression to replace the missing value.").

[359] Singer Report, ¶ 228 ("[M]y method credits the claims by Defendants to have withdrawn from the 568 Group and counts these periods as "clean." But economics suggests that the prices set by participating in the cartel, as the Challenged Conduct is alleged to have been, do not necessarily fall back to competitive levels immediately. Thus, for these reasons, my benchmark includes prices that may well be inflated by the Challenged Conduct, and thus would tend to understate the Challenge Conduct's true economic effects on prices.").

[360] Singer Report, ¶ 228.

damages) holds for 29 percent of school-academic year combinations during the alleged conduct period.[366]

(233) These problems arise due to an econometric issue with Dr. Singer's model. The problem results from the combination of several factors, including the facts that (1) Dr. Singer's models 4–6 use a single dummy variable to identify the effect of the challenged conduct and (2) schools enter and exit the challenged conduct at different times.[367] This results in affected students serving as a control for other affected students.[368]

## 8.5. Dr. Singer has failed to account for selection bias introduced by the fact that the alleged conduct is associated with a changing fraction of students on full rides

(234) Dr. Singer's overcharge modeling is plagued by multiple forms of bias in the selection of his sample. Specifically, before estimating his regression model Dr. Singer limits his sample to students (1) whose grant aid covered less than 95 percent of the school-academic year specific cost of attendance and (2) who received a positive amount of institutional need-based grant aid.[369] Both sources of selection bias can result in an estimate of positive overcharges due to the alleged conduct when every individual class member was either unharmed or benefitted from the actions of 568 Group.[370]

(235) To illustrate this issue, I present two examples. The first demonstrates the issue with Dr. Singer excluding students whose grant aid covered more than 95 percent of the cost of attendance. The second demonstrates the issue with Dr. Singer excluding students who do not receive any form of grant aid. I will abstract from Dr. Singer's exact overcharge models for the sake of simplicity and consider the general form of Dr. Singer's "before-after" modeling.

(236) My first example is illustrated in Figure 42. Suppose there are two students, Student A and Student B, both of whom attend the same School S, for two years. School S is not a member of the 568 Group in the first year but joins prior to the second year. Now suppose that Student A has an effective

---

366 *See* my backup materials. I calculate analogous percentages for all regressions in Dr. Singer's Table 11 regressions.

367 In my analysis in Section 4.2, I mitigate the econometric difficulties highlighted in this section. I do so by using a methodology designed to overcome them.

368 Recall that Dr. Singer's models 4–6 identify the effect of the challenged conduct by comparing the financial aid granted to students whose schools changed 568 Group membership status to the financial aid granted to students whose schools did not change 568 Group membership status. This control group includes both students whose schools were in (and remained in) the 568 Group and students whose schools were not in (and remained out of) the 568 Group. It also compares students in different time periods to one another. These comparisons lead to counter-intuitive findings such as the ones described above.

369 Singer Report, ¶ 246.

370 *See*, *e.g.*, Joshua D. Angrist and Jörn-Steffen Pischke, *Mostly Harmless Econometrics: An Empiricist's Companion* (Princeton University Press, 2009), § 2.1.

institutional price of $30,000 in both years. Student B has an effective institutional price of $10,000 for the first year, and $0 for the second (i.e., student B receives a full ride the second year). Dr. Singer's "before-after" modeling would calculate an average effective institutional price of $20,000 for the "before" period (the average of Student A's $30,000 effective institutional price and Student B's $10,000 effective institutional price in the first year). Dr. Singer's approach would calculate an average effective institutional price of $30,000 for the conduct period (Student A's effective institutional price is $30,000 and Student B's price is excluded from the Dr. Singer's "before-after" as Student B received a full ride). As a result, Dr. Singer's approach would estimate an *increase* in the effective institutional price by $10,000 ($20,000 during the "before" period vs. $30,000 during the conduct period) due to the alleged conduct when neither Student A nor Student B's effective institutional price increased due to the alleged conduct—indeed, Student B's price decreased. This is an obvious modeling error, since Student A pays the same amount each year, while Student B pays less the second year.

**Figure 42: Example illustrating sample selection issues from full ride students in Dr. Singer's overcharge modeling**

| | Year 1 price (pre-conduct period) | In Dr. Singer's calculation? | Year 2 price (conduct period) | In Dr. Singer's calculation? | Difference |
|---|---|---|---|---|---|
| Student A | $30,000 | Yes | $30,000 | Yes | $0 |
| Student B | $10,000 | Yes | $0 | No | -$10,000 |
| **True average** | $20,000 | | $15,000 | | **-$5,000** |
| **Dr. Singer's average** | $20,000 | | $30,000 | | **$10,000** |

Note: Details of this example can be found in the text above.

(237) My second example is illustrated in Figure 43. Suppose there are two other students (Student C and Student D) who attended the same School S in the same two-year period as my previous example. In this example, the effective institutional price faced by Student C is $10,000 for both the first and second year (the "before" year and the conduct year). Suppose further that Student D received no aid in the first year and therefore paid the full cost of attendance of $50,000. Additionally, Student D received some aid in the second year and had an effective institutional price of $30,000. Dr. Singer's before-after model would compute an average effective institutional price of $10,000 in the first year (Student D's first year price is dropped from the analysis, as they did not receive any grant aid and the only price used in the first year is Student C's effective institutional price). Dr. Singer's model would compute an average effective institutional price of $20,000 in the conduct year (the average of Student C and Student D's prices of $10,000 and $30,000 in the second year, respectively). Dr. Singer's before-after approach would find a $10,000 increase in the effective institutional price for class members due to the conduct—the average effective institutional price increased from $10,000 in the "before" period to $20,000 in the conduct period. However, neither Student C nor Student D's effective institutional price increased from before the conduct to the conduct period, and Dr. Singer would erroneously conclude that the alleged conduct increased the effective institutional price of class members.

**Figure 43: Example illustrating sample selection issues from students receiving any aid in Dr. Singer's overcharge modeling**

| | Year 1 price (pre-conduct period) | In Dr. Singer's calculation? | Year 2 price (conduct period) | In Dr. Singer's calculation? | Difference |
|---|---|---|---|---|---|
| Student C | $10,000 | Yes | $10,000 | Yes | $0 |
| Student D | $50,000 | No | $30,000 | Yes | -$20,000 |
| **True average** | $30,000 | | $20,000 | | **-$10,000** |
| **Dr. Singer's average** | $10,000 | | $20,000 | | **$10,000** |

Note: Details of this example can be found in the text above.

(238) The previous two examples illustrate the selection issues in Dr. Singer's general "before-after" model that prevent one from interpreting his model estimates as reflective of the effect of the alleged conduct on the prices class members paid to the Defendants.

## 8.6. Damages

(239) After correcting for errors in Dr. Singer's model and corresponding damages calculations, there is no credible evidence that the class members were harmed by the alleged conduct. Hence, I conclude that Dr. Singer's report provides no credible evidence of anticompetitive harm as a result of the alleged conduct.