## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **IN RE: TESTOSTERONE** | : | **Case No. 14-c-1748** |
| **REPLACEMENT THERAPY** | : | |
| **PRODUCTS LIABILITY LITIGATION** | : | **MDL No. 2545** |
| | : | |
| **This document relates to all cases** | : | **Judge Matthew F. Kennelly** |

## DEFENDANTS ABBVIE INC.'S AND ABBOTT LABORATORIES' MEMORANDUM OF LAW IN OPPOSITION TO THE PSC'S MEMORANDUM IN SUPPORT OF ENTRY OF A DEFENSE FACT SHEET AND PROTOCOL FOR SAME AND REQUEST FOR ADOPTION OF ABBVIE'S ALTERNATIVE PROPOSAL

## PRELIMINARY STATEMENT

The PSC wants this Court to enter an order requiring AbbVie to answer a Defense Fact Sheet ("DFS") that includes roughly 50 case-specific interrogatories and 25 case-specific requests for documents (including subparts) for which they want detailed answers tailored to each of the 666 individual AbbVie-only cases. That is more than 33,000 interrogatories for which AbbVie would have to provide case-specific information and more than 16,600 case-specific document requests. Moreover, the PSC is proposing that AbbVie provide this discovery, for almost all of the cases, within the next 30 days.

Beyond the sheer magnitude of what the PSC wants, it is plain from even a cursory review of their proposed DFS that the questions asked are not amenable to easy or quick response. Plaintiffs want reams of information and back-up documentation that AbbVie would have to cull from multiple sources. By way of example only, they claim to need the following information and specifically argue that the first six requests are "critical" to bellwether selection. Specifically, they propose interrogatories and document requests regarding:

- Whether each and every one of Plaintiffs' prescribing doctors[1] has had any contacts with AbbVie of any kind or nature and the identity of all persons at AbbVie with knowledge of such contacts. Plaintiffs' request is not limited to formal inquiries seeking product-related medical information or "Dear Healthcare Provider" letters sent to physicians by AbbVie. Rather, it potentially includes any kind of communication, including informal emails, records of calls, in-person conversations, notes of meetings, and otherwise;

- Whether each and every prescribing physician was ever visited by any sales representatives regarding AndroGel. Moreover, they want the records, frequently referred to as "call notes," documenting each and every visit by each and every sales representative. They claim to need this information going back 15 years and

---

[1] Because many (if not most) cases will involve more than one prescribing physician, AbbVie anticipates that it would be forced to pull this information for in excess of 1,000 prescribing physicians. To address this concern AbbVie's proposal would limit the search for information, pre-bellwether selection, to the physician identified as having prescribed AndroGel at the time of the alleged injury.

1

unrelated to either the date of an individual plaintiff's prescription or the date of injury. They also want all relevant sales representatives' calendar entries, computer entries, backgrounder documents, marketing information, sales aids, reprints of medical articles, and e-mails;

- Whether any plaintiff or treating doctor reported the injury alleged to AbbVie through its adverse event reporting system and all documentation surrounding that reporting;

- Every consulting agreement or other contractual relationship between AbbVie and every prescribing physician of any kind and without any date or relevance limitations. In addition, they seek specific records of payments to such physicians, again without regard to amount, timeframe or reason for such payment;

- Information concerning whether AbbVie identified every prescribing physician as a "key opinion leader";

- Any and all information and/or databases to which AbbVie has "access" that tracks or aggregates information regarding the AndroGel-related prescribing habits of each and every prescribing physician. They want this information without regard to whether AbbVie would have legal authority or ability to provide such data and without time limitation or consideration of the date of prescription or use in a particular case;

- Information concerning any contact plaintiffs themselves have had with AbbVie of any kind or nature;

- Every AndroGel or testosterone-related seminar or conference attended by every prescribing physician (irrespective of whether the prescriber was a speaker or otherwise participated actively in said conference) for which AbbVie was a sponsor and every document associated with said conference including but not limited to brochures, agendas and PowerPoint slides reflecting materials presented; and

- The identity of fact witnesses AbbVie believes to be relevant to each individual Plaintiff's case including contact information.

Plaintiffs' brief argues that they merely want a "level playing field"—a fair set of counter-requests in light of the Plaintiff Fact Sheet ("PFS")—that will allow them to select their 16 bellwether cases. In fact, the PFS and Plaintiffs' proposed DFS are nothing like two sides of the same coin; the playing field is already stacked heavily towards burdening AbbVie with voluminous discovery. The proposed DFS threatens to swallow up all other useful discovery

2

efforts in an overwhelming exercise that will not aid bellwether selection, and should be rejected for multiple reasons.

First, while AbbVie acknowledges that reasonable case-specific discovery, including in the form of a DFS, is appropriate once cases are selected for trial, the depth and breadth of Plaintiffs' proposal cannot be reasonably tied to any appropriate bellwether selection need. As the PSC's own brief makes clear, their DFS really has nothing at all to do with whether a case is representative of the litigation pool and thus an appropriate bellwether candidate. Rather, it is engineered to ferret out unique or idiosyncratic facts or circumstances—as Plaintiffs note, whether one might speculate that a particular prescribing doctor in a particular case is apt to be more or less "friendly" towards AbbVie's or Plaintiffs' views. This is exactly what one should not do in picking bellwethers in an MDL.

Second, the burden of these requests is overwhelming, far greater than the burden of any requests placed on Plaintiffs by the PFS. The PFS consists of questions regarding the individual plaintiff's relevant medical history and basic claims information that every plaintiff should have before filing suit. Further, the PFS is the *only* written discovery served on individual plaintiffs and to which they are expected to respond in anticipation of bellwether selection. AbbVie, by contrast, faces multiple discovery requests including massive requests for production of individual custodial files in anticipation of corporate witness depositions. This is not about a "level playing field."

Third, it is simply not the case that Plaintiffs would otherwise be denied access to critical information that solely resides with AbbVie. Much of the information the DFS seeks Plaintiffs could find out on their own—to a reasonable degree—if they made the effort. Their own clients surely know or could easily determine whether their alleged injury was reported to AbbVie.

Their plaintiffs can and may well have already made inquiries of prescribing doctors regarding their prescribing history and sources of knowledge regarding AndroGel and related medical issues.[2]

Fourth, Plaintiffs' demands are simply too much too late, and if entertained would surely have a domino effect on all aspects of the discovery schedule. The PSC has unreasonably waited until 3 months before bellwether selection to press this issue, and is unrealistically demanding most of the production in 30 days, notwithstanding the fact that more than 470 of their own plaintiffs still have not even adequately completed their own PFS's after months of urging. They know what they want is not doable; indeed, they may be making such draconian demands because they are not looking to achieve a practical alternative within the current schedule.

Finally, AbbVie's alternative to Plaintiffs' proposed DFS has two components which AbbVie believes reasonably addresses both the issue of how detailed any DFS should be and the burden/timing issues they have created. Specifically, AbbVie has offered a two-tiered approach to DFS production. In each case, AbbVie would provide to Plaintiffs in a summary format certain more-readily available prescriber information from certain implicated databases, but would not undertake the time-consuming burden of reviewing and producing detailed back-up documentation. Then, in any case chosen as a bellwether or for case-specific discovery, AbbVie would agree to provide more fulsome answers to an agreed DFS, including reasonably appropriate document production. Previously, AbbVie was prepared to have the precise content and timing of production for both tiers negotiated by the parties. However, given Plaintiffs' refusal to negotiate and decision to file this motion, AbbVie now respectfully requests that the

---

[2] Indeed, one of the disadvantages defendants often have in this kind of litigation is that plaintiffs, but not defendants, may engage in *ex parte* communications with prescribing doctors and may attempt to influence such doctors' recollection of events and likely testimony.

Court adopt AbbVie's pre-bellwether case-specific discovery proposal attached as Exhibit A, and order completion of the full DFS (the content of which still needs to be resolved) only in the selected bellwether cases.

## BACKGROUND

### I.    History of Negotiations

On August 25, 2014 the Court entered Case Management Order ("CMO") No. 7. [Dkt. 346].[3]  CMO 7 noted that the parties shall continue negotiating and "meeting-and-conferring regarding CMOs" governing a number of issues, including a DFS. CMO 7 at 4. Subsequently, during the negotiations concerning Case Management Order 9 governing the Plaintiff Fact Sheet, counsel for the PSC on multiple occasions proposed the addition of language concerning a DFS to that order. Stanley Declaration at ¶4 (attached as Exhibit B). Although Plaintiffs' Memorandum claims this back-and-forth "memorialized" an agreement between the parties, review of the documents themselves plainly demonstrates that no agreement was reached. *Id.* Indeed, no reference to a DFS was included in the final version of CMO 9 approved by the Court on October 6, 2014.

Moreover, Plaintiffs' counsel advised the Court at the September 23, 2014 Case Management Conference that they had sent Defendants a proposed DFS and that negotiations would be commencing, *id.* at ¶6, and while Defendants offered a counterproposal to Plaintiffs' DFS on October 3, 2014, that counterproposal included no discussion regarding service of a DFS in every case. *Id.* at ¶7. At the next status conference in October, the DFS issue was again

---

[3] AbbVie regrets that the PSC brief has made it necessary to review for the Court the history of the parties' unsuccessful negotiations. AbbVie does so only because it does not want the PSC's accusations to go unanswered. AbbVie maintains, however, that this kind of accusatory finger-pointing is unproductive and misses the issue—which is what can and should be done now in light of the bellwether selection goals and the Court-ordered schedule.

referenced, but Plaintiffs' counsel did not actually respond to Defendants' proposed alternative draft until January 21, 2015, when they merely requested a resumption of negotiations. *Id.* at ¶8. On January 26, 2015, counsel for Defendants informed Plaintiffs that since Plaintiffs had waited months to respond to Defendants' last proposal, Defendants would need to confer again before resuming negotiations. *Id.* Two days later, Plaintiffs were notified by e-mail that Defendants were prepared to resume negotiations. *Id.* Plaintiffs failed to respond to Defendants' January 28 e-mail and to date have still not provided any comments to the revised draft of the DFS they were sent on October 3, 2014. *Id.* at ¶10.

Indeed, when on May 5, 2015 Plaintiffs finally attempted to renew negotiations with AbbVie specifically, they refused to acknowledge their lack of response to the counterproposal offered by all Defendants, which AbbVie supported when sent and told the PSC it would continue to support. Ultimately, the PSC decided that they were unwilling to have any discussion regarding what the DFS should include—and how extensive or burdensome it should be—unless AbbVie was willing to agree in *advance* of any such negotiations that it would provide a DFS for every single case filed. AbbVie, by contrast, suggested that the parties should *first* discuss what was reasonably needed in a DFS for bellwether selection and then discuss how to compromise on providing additional supplemental information.

## II.    Issues in Dispute

The PSC brief attempts to frame the issue solely as whether their proposed DFS should be answered in all cases or only those that are part of the bellwether pool. This is not accurate. Really, there are two issues that need to be addressed together. The first is what the DFS should include—how extensive and burdensome should it be and what do the plaintiffs really need, if

anything, to pick bellwether cases in October, versus prepare selected cases for potential trial. The second is whether AbbVie should be required to answer *any* DFS in every case.

In an effort to resolve the parties' dispute and address both issues together without involving the Court, AbbVie proposed a two-tiered plan intended to provide Plaintiffs with certain case-specific information for all cases followed by more in-depth discovery once bellwether selection has occurred and the cases are being worked up with an eye towards which actions will be tried first. *See* Exhibit A. AbbVie also proposed a protocol that enlists the assistance of Plaintiffs' counsel to provide certain information to AbbVie to allow for quicker and more efficient production of the first tier of information.

Specifically, AbbVie has offered to provide Plaintiffs a spreadsheet, listing for the physician identified as having prescribed AndroGel to the plaintiff at the time of alleged injury:

- Whether that prescribing physician was sent any of the "Dear Health Care Provider" or "Dear Doctor" letters identified in AbbVie's interrogatory responses, as this would reflect a standard manner in which the company would communicate with physicians concerning medical/product information;

- Whether or not that prescribing physician is identified as a "Key Opinion Leader" by AbbVie's Medical Science Liaison group;

- Whether or not that prescribing physician was visited by AbbVie sales representatives regarding AndroGel; and

- Whether or not that prescribing physician ever submitted to AbbVie a request for medical information related to AndroGel and whether AbbVie responded.

Such a production will provide Plaintiffs with *more* information than they need to facilitate bellwether selection, and AbbVie can reasonably deliver such data well before the bellwether selection deadline provided that Plaintiffs supply the names of their prescribing physicians in a reasonably prompt fashion. Moreover, once bellwether cases are selected, AbbVie would then

provide more comprehensive DFS information for each selected case under an agreement to be negotiated by the parties.

All that AbbVie has asked for in assistance with this process is that each firm representing plaintiffs provide AbbVie with a list containing, for each of that counsel's bellwether-eligible cases, the full name, address and state physician license number of the physician who prescribed AndroGel to the plaintiff at the time of the alleged injury. Plaintiffs' counsel are far better positioned to create such a list as they have the names and addresses of their clients' physicians readily available, whereas AbbVie would be forced to cull through each individual PFS, and potentially medical records as well, to obtain enough information about the prescribing doctor to even meaningfully search its databases. Despite the fact that under AbbVie's proposal the collective cost to the parties would be minimized and Plaintiffs would still receive all of the information they require, AbbVie's proposal was rejected by the PSC who instead filed their June 15, 2015 memorandum.

## ARGUMENT

### I.   Plaintiffs' DFS Proposal Should Be Rejected As It Would Not Aid Bellwether Selection and Would Unduly Burden AbbVie.

Plaintiffs argue that they need a complete DFS—in exactly the form they have drafted and in *all 666* cases—to select the 16 cases that they would propose for the 32 case bellwether pool. In particular, Plaintiffs claim there are six "critical" categories of information they require prior to bellwether selection. *See* Pl.'s Mem. at 6–7. Except for information regarding whether the alleged injury was reported to AbbVie, all of their "critical" requests serve one goal: uncovering potential biases or views that they may speculate influenced the decisions of the prescribing doctor. While some prescriber-specific information is appropriately discoverable when a case is being prepared for trial, there is no need to compel it prior to bellwether selection

because it does not help determine whether a case is *representative in any meaningful way of the litigation pool*. Moreover, the level of detail and burden the proposed DFS imposes, far from creating a "level playing field," goes well beyond anything that the Plaintiffs have been asked to undertake for purposes of the bellwether selection process and frankly beyond anything humanly possible in a time frame consistent with the current scheduling order. Demanding that AbbVie answer over 33,000 interrogatories and 16,600 document requests in 30 days simply is not a reasonable or feasible ask.

A.  Plaintiffs' DFS Does Not Seek Information Relevant To Representativeness

The parties have agreed—and this Court has ordered—that the parties will select bellwether cases to ensure a "representative and productive" trial process. CMO 14 at 1. The mission is not to cherry pick the "best" and "worst" cases for each side. *See* May 6 Tr. at 15. Indeed, in pharmaceutical mass tort litigation such as this, it is recognized that "[t]he bellwether process will be valuable only if the cases selected for trial are truly representative of the whole (or of more distinct categories of cases that comprise the whole) . . . . In the end, the key is to select cases that are representative of the entire claimant pool (or of specific categories in that pool)." *Standards and Best Practices for Large and Mass-Tort MDLs* 21–22, 27 (2014) ("*Standards and Best Practices*");[4] *see also* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 22.315 (2004) ("The more representative the test cases, the more reliable the information about similar cases will be."); *In re Fosamax Products Liab. Litig.*, No. 06 MD 1789 JFK, 2011 WL 1584584, n.1 (S.D.N.Y. Apr. 27, 2011) ("If [bellwether trials] are to produce reliable information

---

[4] *Available at* http://law.duke.edu/sites/default/files/centers/judicialstudies/standards_and_best_practices_for_large_and_mass-tort_mdls.pdf. Duke developed the *Standards and Best Practices* after an "intensive two-year effort" involving a number of federal and state court judges, experienced plaintiffs' and defense practitioners, and scholars. *Id.* at i – vi.

about other mass tort cases, the specific plaintiffs and their claims should be representative of the range of cases.").

Courts typically analyze a limited set of plaintiff-specific metrics to ensure the bellwether plaintiffs represent the pool as a whole. These metrics include: (1) what medications the plaintiff used; (2) when the plaintiffs used them; (3) demographic information about the plaintiff including age; (4) injury suffered; (5) date of injury suffered; and (6) other potentially relevant prior health history. *See, e.g.,* Eldon E. Fallon et. al., *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, 2345 (2008). Here, this information comes from the PFSs and medical records, which is why completion of such PFSs and production of any medical records already gathered by Plaintiffs has been so important.

By contrast, the information Plaintiffs are seeking in their proposed DFS has little or no relevance to any of the key metrics for determining representativeness. By Plaintiffs' own admission in their moving brief, five of the six most "critical" categories of information they demand all go solely to the prescribing doctors' contacts and relationships with AbbVie. But what Plaintiffs want is not a profile of a "typical" doctor for finding representative cases. They do not even pretend that they could or would meaningfully attempt to engage in such a convoluted and likely fruitless analysis. Rather, they want to know whether in any given case a doctor may or may not offer views more favorable to their claim. They want some assurance that, if the doctor will not help their case, they can impeach the doctor with "evidence" of bias.

In fact, this is exactly what bellwether selection should not do. It should not be about picking the "best" or "worst" cases based on unique factual peculiarities. In short, if bellwether selection is done, as it should be, with an eye towards a more global understanding and ability to manage the litigation as a whole, the information requested in the DFS will not be a driver.

10

B.    Plaintiffs' Request Unfairly Burdens AbbVie

Plaintiffs' DFS, if adopted, will represent a humanly impossible undertaking in the next 30 days were no other discovery taking place simultaneously.  The unfairness of the PSC's ask is only increased by all of the other discovery Plaintiffs want—including massive numbers of custodial files, continued production of thousands of pages of non-custodial files, and the beginning of corporate witness depositions.  They claim that *all* of this information is critical for case selection and trial. But they know that most of the individual, case-specific information sought by their DFS will never become relevant because the overwhelming majority of cases will never even be considered for any bellwether pool.

Plainly, this is not a case of creating a "level playing field."  Indeed, Plaintiffs have only had to submit a completed PFS seeking medical information known to them and producing records already gathered and in their possession—a far less arduous undertaking.  Further, the overwhelming majority of Plaintiffs have failed to do what the PFS requires despite months of opportunity.  For example, of the PFSs received to date for AbbVie-only cases, 222 of them were accompanied by less than 100 pages of medical records, 78 failed to include pharmacy authorizations, 64 provided no prescribing physician authorizations, 381 provided no employment authorizations and 73 completely fail to even identify a prescribing physician.  In other words, Plaintiffs continue to press AbbVie for more discovery while showing little interest in compromising or remedying these deficiencies.

The Federal Rules of Civil Procedure mandate that district courts "must limit the frequency or extent of discovery" if one of three conditions exists.  Fed. R. Civ. P. 26(b)(2)(C).  The court must limit discovery if (1) the discovery sought can be obtained from a "more convenient, less burdensome or less expensive" source; (2) the party has had "ample

opportunity" to obtain the information; or (3) the burden—or expense—of the discovery "outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." *Id.* In exercising this power, the district court "should consider the totality of the circumstances, weighing the value of the material sought against the burden of providing it." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002) (internal citations omitted); *see also Dobbey v. Randle*, No. 10 C 3965, 2014 WL 1364428, at *3 (N.D. Ill. Apr. 7, 2014) (denying in part a motion to compel discovery of documents in the plaintiffs' control as well as meeting minutes because the burden of producing outweighed the likely marginal relevance); *see also Sabratek Liquidating LLC v. KPMG LLP*, No. 01 C 9582, 2002 WL 31520993, at *4 (N.D. Ill. Nov. 13, 2002) (holding that a defendant did not need to produce all of defendant's communications regarding the plaintiff because the request is overly broad and certain to "catch documents not relevant to any claim or defense in the instant litigation"). Here, the burden of forcing AbbVie to fill out 666 separate DFSs and pull, review, redact, and produce all of the requested information comprising literally tens of thousands of individual questions far outweighs any potential relevance this data may have to the determination of representativeness.

C.      Plaintiffs Are Not Disadvantaged By Any Claimed Lack of Access to Information

Plaintiffs argue that whereas the PFS seeks information uniquely held by the plaintiffs, the DFS seeks information uniquely held by AbbVie. This claimed parallel does not exist. Plaintiffs surely know or could easily determine whether their alleged injury was reported to AbbVie. Similarly, their plaintiffs can and may well have already made inquiries of prescribing doctors regarding their prescribing doctor's sources of information and views on AndroGel—

without sharing that information with AbbVie—reflecting the advantage plaintiffs have over AbbVie in discovering this case-specific information. If Plaintiffs really intend to propose cases not for representativeness, but rather based on the speculated testimony of the prescribing doctor, their own client's experience with those doctors surely gives them a significant advantage.[5]

D.  Plaintiffs, Not AbbVie, Unreasonably Delayed Pursuing a DFS

As set out above,[6] Defendants were on multiple occasions and over months prepared to negotiate concerning a DFS. Each time Plaintiffs failed to respond. It was only after neglecting to pursue this discovery for over seven months that Plaintiffs, on the eve of the PFS deadline for hundreds of cases, reached out to AbbVie in an effort to resume negotiations. Having wasted months when the parties could have reached an agreement, sought the Court's guidance, or begun gathering the requested information, Plaintiffs are now suggesting that AbbVie should bear the burden of Plaintiffs' delay and be forced to assume wholesale the burden of Plaintiffs' proposal. But it is not AbbVie's responsibility to pursue Plaintiffs' discovery in a reasonable time period—particularly when Plaintiffs on two separate occasions waited *months* to respond to Defendants' counterproposals. *See, e.g.*, *Berry v. Rite Aid Corp.*, No. CIV. A. 00-0049, 2001 WL 527815, at *1 (E.D. Pa. May 16, 2001) ("The Court determines that Plaintiff has had ample opportunity by discovery to obtain the information sought [via interrogatories]. Plaintiff's request comes at the end of discovery and Plaintiff provides no reason for the delay. Thus, the Court denies Plaintiff's Motion."); *Reed v. Citigroup, Inc.*, No. CIV.A. 12-2934 JAP, 2014 WL

---

[5] Similarly false is the notion that AbbVie would expend the time and resources to review for 666 cases the information Plaintiffs request prior to bellwether selection, without sharing with Plaintiffs. That speculation just does not recognize the reality of the discovery burdens already placed on AbbVie and AbbVie's repeatedly stated commitment that bellwether selection must be about representativeness.

[6]       *See supra*, pp. 5–8.

1958387, at *2 (D.N.J. May 15, 2014) (affirming magistrate judge's denial of a motion to compel discovery related to defendant's relationship with doctors because over the course of the preceding year, plaintiffs had "ample opportunity" to seek the information but failed to do so). Given that Plaintiffs have offered no explanation for their delay in pursuing this issue, the severe burden placed upon AbbVie to comply with Plaintiffs' tardy proposal, and the comparative reasonableness of AbbVie's compromise proposal, Plaintiffs' proposed DFS protocol should be rejected by the Court.

II.   **AbbVie's Proposed Alternative Provides Plaintiffs With More Than Is Reasonably Needed for Bellwether Selection But Does Not Threaten The Schedule with Overly Burdensome and Not Useful Discovery.**

Plaintiffs' Memorandum cites six types of information they claim is "critical to bellwether case selection." Pl.'s Mem. at 6–7. AbbVie's proposal would give plaintiffs top line yes/no type answers to most of the "critical" categories identified by the PSC brief. Specifically, AbbVie proposes to provide plaintiffs with a spreadsheet listing:

- Whether the prescribing physician was sent any of the "Dear Health Care Provider" or "Dear Doctor" letters identified in AbbVie's interrogatory responses, as this would reflect a standard manner in which the company would communicate with physicians concerning medical/product information;

- Whether or not the prescribing physician is identified as a "Key Opinion Leader" by AbbVie's Medical Science Liaison group;

- Whether or not the prescribing physician was visited by AbbVie sales representatives regarding AndroGel (thereby providing basic yes/no sales "call"/detailing information); and

- Whether or not the prescribing physician ever submitted to AbbVie a request for medical information related to AndroGel and whether AbbVie responded.

Simultaneously, AbbVie has offered to negotiate towards a more reasonably tailored but still detailed DFS that would be answered in the 32 bellwether cases. So, payments to

physicians, and information regarding general prescribing habits, as well as back-up documents related to the information requested (including call notes) would be subject to later production in cases being fully discovered for trial.

In fact, this staged and more trial-focused approach is not at all inconsistent with the various CMOs plaintiffs have attached from other litigations where a DFS has been used, even though Plaintiffs' string cite does not fairly provide any real context or history for the individual courts' decision making. Those CMOs, read fairly and in the aggregate, reflect that there is variability in what courts require depending on the timing and circumstances of different cases. Even Plaintiffs' own examples show (1) DFSs more limited in scope than what Plaintiffs propose here; (2) DFSs which provide defendants substantially more time to respond than what Plaintiffs propose here (especially where a backlog exists); and (3) DFSs where production of data that is burdensome and time-consuming to produce is tied to full discovery of and/or commencement of depositions in a smaller and select universe of proposed trial cases.

In short, AbbVie's proposal would address the great majority of Plaintiffs' concerns and also maintain Plaintiffs' ability to get more detailed information in advance of picking actual trial cases. It would also put the burden on both Plaintiffs and AbbVie, in a more equitable way, to share the process of gathering case-specific information.

## CONCLUSION

For the foregoing reasons, the Court should reject the PSC's entry of a DFS protocol. Instead, AbbVie respectfully asks the Court to adopt a plan that is substantially similar to AbbVie's proposal set out in Exhibit A.

Dated: June 26, 2015              Respectfully submitted,

By:    */s / David M. Bernick*
David M. Bernick
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036-6797
Tel: (212) 698-3500
Fax: (212) 698-3599
david.bernick@dechert.com

Hope S. Freiwald
DECHERT LLP
2929 Arch St., Cira Centre
Philadelphia, PA 19104-2808
Tel: (312) 646-5827
Fax: (312) 698-5858
hope.freiwald@dechert.com

***Attorneys for AbbVie, Inc.***

## <u>CERTIFICATE OF SERVICE</u>

I, Christopher R. Boisvert, hereby certify that on June 26, 2015, the foregoing document was filed via the Court's CM/ECF system, which will automatically serve and send email notification of such filing to all registered attorneys of record.

*/s/ Christopher R. Boisvert*