**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE: TESTOSTERONE REPLACEMENT THERAPY PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO ALL CASES | MDL No. 2545<br><br>Master Docket Case No. 1:14-cv-01748<br><br>Honorable Matthew F. Kennelly |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
THE MOTION OF ABBVIE INC. AND ABBOTT LABORATORIES
TO FURTHER AMEND AMENDED CMO NO. 9 AND AMENDED CMO NO. 14**

**I.    PRELIMINARY STATEMENT**

   **A.    Introduction**

The Plaintiffs' Steering Committee (the "PSC") respectfully submits this memorandum in opposition to the Motion of Defendants AbbVie Inc. and Abbott Laboratories (collectively, "AbbVie") Pursuant to the Court's June 15, 2015 Amended CMO 14 to Assure the Finality and Integrity of the Bellwether Pool, filed on July 6, 2015 (the "AbbVie Motion"; Dkt. No. 871).

Despite the grandiose title of the AbbVie Motion, the "integrity" of the bellwether pool is sufficiently protected by the existing provisions of Amended CMO No. 9 (Dkt. No. 666) and Amended CMO No. 14 (Dkt. No. 793).[1]  Once again, AbbVie insists there is a crisis with the

---

[1] AbbVie repeatedly suggests, without any basis, that the PSC is trying to "game" the bellwether process. (AbbVie Mot. at 1, 2 n.3).  Frankly, it is AbbVie that is inappropriately attempting to revisit established case management orders to its own advantage, with the attendant delay that accompanies AbbVie's requests.

1

bellwether selection process, when none exists. AbbVie's current attempt to amend these orders a second time should be denied.[2]

B. **Brief Summary of Existing Bellwether Procedures**

Amended CMO No. 14 establishes a case management plan for AbbVie-only bellwether cases, and it contemplates additional CMOs to complete the selection process. Amended CMO No. 14 § I.A provides that on or before August 10, 2015, the parties shall submit to the Court a proposed CMO identifying the process for the parties to select 32 bellwether candidate cases for case-specific discovery, which are to be identified by the parties by October 31, 2015 pursuant to Amended CMO No. 14 § I.B.[3] Amended CMO No 14 § I.B contemplates that the PSC and AbbVie will each pick eight thromboembolism clotting injury cases (*e.g.*, deep vein thrombosis, pulmonary embolism, or other clotting cases) ("TE") and eight (8) cardiovascular cases (*e.g.*,

---

[2] As the Court may recall, AbbVie sought unnecessary changes to CMO No. 9 (regarding service of the plaintiffs' fact sheets) in February and CMO No. 14 (regarding bellwether selection) in May. (*See generally* PSC'S Memorandum in Opposition to the May 4, 2015 Submission of AbbVie Inc. and Abbott Laboratories at 1-4 May 11, 2015, Dkt. No. 766.) To avoid the expense and delay of litigating AbbVie's motion to amend CMO No. 9, the PSC agreed to a modified schedule (and other provisions) proposed by AbbVie, which was entered as Amended CMO No. 9 on March 3, 2015 (Dkt. No. 666). The issues raised by AbbVie on May 4, 2015 regarding service of the PFS were resolved through negotiation (following briefing and a hearing) that led to the entry of the stipulated terms of Amended CMO No. 14 on May 29, 2015 (Dkt. No. 793). Now, AbbVie wastes additional time by seeking, in effect, to further amend these orders without cause.

[3] Contrary to AbbVie's contention in the AbbVie Motion (*see* AbbVie Mot. at 1), it is the parties (not the Court) who will identify the 32 bellwether discovery cases (*see* Am. CMO No. 14 § II.B). The parties should be part of the selection process as thy have an understanding of the liability, causation and other issues in the litigation that will take shape in the case-specific discovery process. The Court ultimately will make the determination which cases should be selected for trial. AbbVie agreed with this approach when CMO No. 14 was entered. (*See* PSC's Mem. in Support of Pls.' Proposed Unified Case Management Plan at 4 Oct. 30, 2014, Dkt. No. 450; "Similarly, during the meet and confer process, the AbbVie Defendants did not object to the PSC's proposal with respect to the number of bellwether candidates to be selected by each side….".)

heart attack) ("CV"), for 16 TE bellwether discovery cases and 16 CV bellwether discovery cases.

The 32 bellwether discovery cases are going to be reduced to six trial cases by the Court pursuant to Amended CMO No. 14 §§ II.B and II.C. The first three TE bellwether trials are scheduled for October 31, 2016, December 5, 2016, and January 9, 2017, and the first three CV bellwether trials are scheduled for February 13, 2017, March 20, 2017, and April 24, 2017. (*See* Am. CMO No. 14 § V.) In accordance with Amended CMO No. 14 § II.B, the parties will prepare a proposed CMO that will provide the process by which each side proposes the six trial cases from the 32 bellwether discovery cases on or before February 15, 2016.

The cases eligible to be considered as bellwether cases are those in which a complaint was filed and a Plaintiff Fact Sheet ("PFS") was completed in accordance with Amended CMO No. 9 on or before June 15, 2015. Although AbbVie is in the best position to know the number of AbbVie-only cases in which a PFS was completed by June 15, 2015, it is the PSC's understanding that 666 cases have met this criterion. (AbbVie Mot. at 3.) To summarize, the six bellwether trial cases will be ready to be selected by the Court on February 15, 2016 from the 32 bellwether discovery cases that are selected by the parties on October 31, 2015, which, in turn are selected from the 666 eligible AbbVie-only cases with a PFS that was completed by June 15, 2015. This process was established long ago, it is intact and there is no need to change it.

The PFS provides that certain documents and authorizations to obtain records from third parties are to be served with the PFS. (*See* Am. CMO No. 9 § III.) The purported failure to provide such authorizations are among the deficiencies that AbbVie complains about in the AbbVie Motion. Amended CMO No. 9 controls how deficiencies are cured, and deficiencies have been resolved through agreement and motion practice.

Further, and perhaps more troubling to the PSC, AbbVie has revealed that it no longer intends to actually use the authorizations before the bellwether discovery plaintiffs are selected (AbbVie Mot. at 3), even though it previously advocated so strenuously to this Court that they were needed. AbbVie has been using the purported failure of Plaintiffs to provide authorizations as a means to attack Plaintiffs and distract the PSC since AbbVie's new counsel entered its appearance on February 18, 2015. (*See, e.g.*, Notice of Appearance of David M. Bernick, Esq. Feb. 18, 2015, Dkt. No. 649.) On the same day, AbbVie filed its motion to amend CMO No. 9 (Dkt. No. 656), in which AbbVie highlighted the failure to provide authorizations as a basis for amending the schedule for service of the PFS.[4]

AbbVie's focus seemingly changed during the March 20 CMC from harping on authorizations to insisting that medical records in possession of plaintiffs' counsel be attached to the PFS. At the April 21 CMC, the Court ordered an issue-specific mini-CMC on May 6, and the parties submitted briefs on the issue (AbbVie's Submission on May 4, 2014, Dkt No 758; PSC's Opp. on May 11, 2015, Dkt. No. 766; and AbbVie's Reply on May 13, 2015, Dkt. No. 767). For example, the February 18 motion to amend CMO No. 9 provided, in part, the following:

> Combined with the fact that the vast majority of PFS served on AbbVie are deficient (***particularly regarding record authorizations***), the result has been that less than 10 percent of the MDL cases against AbbVie have sufficient PFS for medical record collection and review.
>
> (AbbVie's Mot. to Modify CMO No. 9 at 1 Feb. 18, 2015, Dkt. No. 656; emphasis added.)

---

[4] The purported failures to provide authorizations were discussed at the CMCs on February 20, 2015 (*see* Hr'g Tr. Feb. 20, 2015 at 7:11-8:8; "[W]e don't have authorizations, so we can't get medical records."), March 20, 2015 (*see* Hr'g Tr. Mar. 20, 2015 at 7:19-13:22; "authorizations, that's all being pursued with these deficiency letters"), April 21, 2015 (*see* Hr'g Tr. Apr. 21, 2015 at 24:9-27:7; "So we need to have the authorizations, but we need to have the fact sheets with the attachments be as robust as possible."), and May 6, 2015 (*see* Hr'g Tr. May 6, 2015 at 23:20-23:21; "we have not been able to use the authorizations until really the last couple of weeks").

At the time of the March 20 CMC, AbbVie was still seeking authorizations through the deficiency process in CMO No. 9, but it also insisted on receiving the medical records in the possession of Plaintiffs. At the March 20 CMC, AbbVie's counsel stated, in part, the following:

> MR. BERNICK: A facial deficiency. For example, the failure to -- ***authorizations, that's all being pursued with these deficiency letters***. It's a somewhat cumbersome process, but it is what it is. We have not asked to change it.
> ….
> And in deference to the meet-and-confer process, I didn't flag it, but now that Mr. Seeger has raised the issue of the authorizations, it's not the authorizations. It is the obligation to furnish with plaintiff fact sheets those medical records that are in the possession of -- the possession of the plaintiff.
> ….
> ***It's not a question of deficiency or authorization. It is whether the fact sheets are being completed by using medical records as an attachment***.

(Hr'g Tr. Mar. 20, 2015 at 12:9-12:13, 13:11-16, 13:20-13:22; emphasis added.)

Only recently (and now confirmed in the AbbVie Mot. at 3) has the PSC learned that AbbVie was not actually using the authorizations as previously expected. It is highly unusual for a defendant to request authorizations for records as part of a PFS process (and file motions and make representations to the other parties and the Court that they are necessary) and later decide not to use them and merely rely on copies of medical records that the plaintiffs' counsel provides with a completed PFS.[5] While it is AbbVie's prerogative to change course (albeit 180 degrees), a purported failure to provide authorizations, particularly when they are not being used, should not

---

[5] If AbbVie is not going to use the authorizations, perhaps Plaintiffs should be relieved of the obligation to provide them. AbbVie wastes the time of the PSC, individual Plaintiffs and the Court with motion practice and its claims of PFS deficiencies when it is behind schedule on producing custodial files.

5

form the basis for dismissing a plaintiff's case, for diminishing the pool of eligible cases for bellwether consideration or for derailing the bellwether trial schedule.

## II. ARGUMENT

In the AbbVie Motion, AbbVie seeks an order dismissing cases, with prejudice, for immaterial discovery violations, in conflict with the dispute resolution provisions of Amended CMO No. 9. Additionally, AbbVie requests that the Court exclude from the initial "AbbVie-only" bellwether pool Plaintiffs who have used testosterone products other than AndroGel at any point in their lives, adding a concept to Amended CMO No. 14 that was not contemplated by that Order.

### A. The Court should deny AbbVie's request to, in effect, amend Amended CMO No. 9

Both the original and amended CMO No. 9 include dispute resolution provisions that provide a Plaintiff the opportunity to cure a purported deficiency (*see* CMO No. 9 § II.D) and a failure to provide a PFS or any authorizations at all (*see* CMO No. 9 § II.E) once he or she receives notice from a defendant. AbbVie seeks to short circuit the procedure to which it agreed[6] and wants the Court to summarily dismiss, with prejudice, cases with certain purported PFS deficiencies if they are not cured by August 14, 2015. This summary dismissal for discovery violations is not contemplated by Amended CMO No. 9 and implicates Plaintiffs' right to due process because it does not require AbbVie to make a motion on notice. Additionally, many of the purported deficiencies identified by AbbVie simply do not exist. Many others have already been cured, and the remaining deficiencies will likely be cured in short order. Moreover, many of the deficiencies are irrelevant if AbbVie is not using the authorizations. In sum, there is no

---

[6] These provisions of the original and amended CMO No. 9 were fiercely negotiated with both sides making significant compromise. AbbVie now seeks to undo those compromises without any showing of real need.

reason to re-do or change the dispute resolution provisions set forth in Amended CMO No. 9 to which the parties agreed, and which were so-ordered by the Court.

As an initial matter, dismissal with prejudice should not be the remedy for what amounts to a discovery delay. As the Court is aware, the negotiated terms of the PFS are intended to serve in lieu of case-specific interrogatories and document requests. PFSs are commonly used as a substitute for such discovery devices in multidistrict litigations like this one. In many respects the PFS is a benefit to AbbVie, who would have to individually issue discovery requests in over 1,200 cases pending against it in this litigation. Both the original and amended CMO No. 9 provide that a Plaintiff is required to answer the questions contained in the PFS "to the best of his or her ability" (Am. CMO No. 9 § II.B), and, despite AbbVie's assertions that there is a deluge of deficiencies, there are relatively few for the number of cases that have been filed in this MDL.

On June 25, 2015, AbbVie sent Plaintiffs' Co-Lead Counsel a letter that asserted there were numerous alleged PFS deficiencies in the 666 AbbVie-only cases for which PFSs had been submitted as of June 15, 2015. Apparently AbbVie thereafter sent deficiency letters to individual Plaintiffs' counsel along with a copy of the June 25th letter, but AbbVie did not identify the purported deficiency with any detail. Like the exhibits attached to the AbbVie Motion, the June 25, 2015 letter and the subsequent letters to plaintiffs' counsel merely included a spreadsheet with entries of the single word "Yes" in one or more of several columns with summary headings listing a type of purported deficiency, rather than identifying a purported deficiency with any particularity, as contemplated Amended CMO No. 9. (*See, e.g.*, Amended CMO No. 9 § D.1.b ("Defendant's email communication shall identify the case name, docket number and thirty (30) day deadline date and include sufficient detail regarding the alleged deficiencies.").) Without sufficient detail about the alleged deficiencies, it has been difficult to determine exactly what

7

AbbVie considers to be the purported deficiency, but it is clear that AbbVie's spreadsheets have been sloppily prepared and in many cases AbbVie was simply wrong.

Many of AbbVie's purported deficiencies are not material, in that they will not affect AbbVie's ability to choose bellwether discovery candidates. Moreover, AbbVie has informed the PSC that it does not intend to use the authorizations for medical and pharmacy records for purposes of bellwether selection, rendering this entire exercise pointless, moot and arguably an improper issue to raise with the Court. While there may be certain picayune shortfalls in a PFS, they should not form the basis for summarily dismissing a case on the schedule proposed by AbbVie.

AbbVie lists nine types of purported deficiencies in the spreadsheet attached as Exhibit A to the AbbVie Motion. The table below shows the PSC's effort to track the number of purported deficiencies that fall within the nine types listed on Exhibit A to the AbbVie Motion, and which of these purported deficiencies do not actually exist and which have been cured:

|    | **Purported Deficiency in Ex. A**              | **Number on Ex. A** | **Not actually deficient** | **Cured** | **Not yet cured** |
|----|------------------------------------------------|---------------------|----------------------------|-----------|-------------------|
| 1. | PFS not Signed/Dated                           | 38                  | 3                          | 28        | 7                 |
| 2. | No authorizations                              | 8                   | 3                          | 2         | 3                 |
| 3. | Missing pharmacy authorizations                | 63                  | 14                         | 40        | 9                 |
| 4. | Missing Prescriber authorizations              | 52                  | 21                         | 22        | 9                 |
| 5. | Prescriber not identified                      | 61                  | 29                         | 26        | 6                 |
| 6. | Prescriber address not provided or incomplete  | 4                   | 1                          | 0         | 3                 |
| 7. | Incomplete/Missing Pharmacy information        | 25                  | 10                         | 7         | 8                 |
| 8. | No Dates of Usage                              | 8                   | 1                          | 2         | 5                 |
| 9. | No date of Hospitalization for injury          | 8                   | 1                          | 5         | 2                 |
|    | Total                                          | 267                 | 83                         | 132       | 52                |

In Exhibit A to the AbbVie Motion (the cases that AbbVie wants dismissed with prejudice), AbbVie listed 169 cases with 267 purported deficiencies. However, six of those 169

cases were left blank and did not have any deficiencies identified. Of the 267 purported deficiencies, AbbVie listed 83 incorrect deficiencies—*AbbVie was simply wrong*. Of the remaining 184 purported deficiencies, *132 have already been cured*. Of the remaining 52 purported deficiencies, there are entirely understandable reasons why it may be difficult to track down the requested information (for example, the PSC is aware of one instance where a plaintiff is on active military service overseas and it has been difficult to communicate with the plaintiff). The PSC and all individual plaintiffs are willing to work with AbbVie on resolving these deficiencies (as Amended CMO No. 9 requires), but AbbVie is raising a red herring based on a technical aspect of this litigation. First, the PFS deficiency cure process is working. Second, any deficiencies will not impact the bellwether selection process. This is especially the case when AbbVie is not going to use the authorizations. Of the nine categories of purported deficiencies listed on Exhibit A to the AbbVie Motion, only the first (PFS not signed/dated), eighth (no dates of use), and ninth (no date of hospitalization for injury) could even be claimed as a problem under such circumstances. Accordingly, there are only 14 remaining deficiencies that are even arguably material, and they pose no threat to AbbVie's ability to select 16 cases for bellwether discovery.

These purported deficiencies are a distraction for the Court and the parties from the more serious threat to the bellwether trial schedule, specifically AbbVie's failure to complete more than one custodial file production. AbbVie has consistently missed discovery deadlines and agreed upon extensions in this litigation, and it is surprising that it seeks to hold certain plaintiffs' feet to the fire to obtain dismissal of substantive claims with prejudice for purported discovery violations.

9

The deficiencies are immaterial, and the cure provisions of CMO No. 9 are working. The rationale AbbVie offers to circumvent these provisions is that it would be "more efficient" (AbbVie Mot. at 2), but only efficient for AbbVie because it would not have to comply with this Court's orders and would reduce its liability through unjust dismissals. AbbVie seeks to advance its goal of limiting the size of the potential bellwether pool at the cost of denying plaintiffs' substantive rights. AbbVie has apparently filed motions to dismiss based on the dispute resolution provisions in Amended CMO No. 9 in nine cases (out of more than 1,200 cases pending against AbbVie) where a Plaintiff has not served a PFS at all. (*See* AbbVie Mot. at 1 n.2.) However, AbbVie has correctly consented to vacate dismissal after receiving the PFS in at least one of these cases. (*See, e.g.*, Hr'g Tr. July 9, 2015 43:25 to 45:15; Minute Entry Dkt. No. 877; vacating dismissal order and reinstating *Witter v. AbbVie Inc.*, No. 14-Civ-3623.)

AbbVie's request to dismiss the cases on its Exhibit A to the AbbVie Motion should be denied. Moreover, these cases should not be omitted from the bellwether pool until AbbVie complies with the dispute resolution process in Amended CMO No. 9.

### B. The Court should deny AbbVie's request to, in effect, further amend Amended CMO No. 14 to re-define "AbbVie-only"

AbbVie requests that the bellwether pool be defined to exclude any Plaintiff who has used a testosterone product other than the AndroGel product manufactured by AbbVie. AbbVie purportedly lists 184 cases on Exhibit B to the AbbVie Motion, where plaintiffs have sued only AbbVie but disclosed in their PFSs that they have used a testosterone product other than AndroGel at any point in their lives. (*See* AbbVie Mot. at 8.) While the PSC has not been able to confirm whether that list is accurate, the PSC is, however, aware of cases listed on Exhibit B where the non-AndroGel testosterone product was used far in advance of a plaintiff's injury and even cases where the non-AndroGel testosterone product was used after the plaintiff's injury,

10

rendering the connection with AndroGel immaterial. Even assuming, *arguendo*, that the list on Exhibit B to the AbbVie Motion is accurate, the request should be denied.

AbbVie seeks to limit the cases in the potential bellwether pool by re-defining the parties' understanding of the term "AbbVie-only" cases. While the term "AbbVie-only" was not expressly defined in the original or amended version of CMO No. 14, the parties referred to "AbbVie-only" cases to mean cases where a plaintiff only sued AbbVie. At the time CMO No. 14 was entered and amended, the parties were focused on different discovery schedules for the core defendants in this MDL. AbbVie now wants to change the plain meaning of the term "AbbVie-only" to "AndroGel-only" cases, which would apparently reduce the number of cases in the potential bellwether pool from 666 to 482, but it might not result in representative cases for bellwether purposes. Indeed, where over 27.6% of the AbbVie-only cases involve use of more than one testosterone product, the Plaintiffs submit that it may be instructive to include such a case as an early bellwether trial. However, this determination should be made after the parties engage in additional discovery. There may be many instances where a plaintiff started using one product (perhaps by injection), stopped using it for a period of time, and subsequently started using AndroGel (a topical gel). Anecdotally, it is the PSC's understanding that there are very few cases of true contemporaneous use of more than one testosterone product, but, again, the PFS has not been able to complete a full review of all the PFSs at issue.

AbbVie argues there is no time in the Court's schedule to permit the participation of other manufacturers during this AbbVie-only phase of the litigation (AbbVie Mot. at 9), but there is no indication that AbbVie would sue another manufacturer and there is no obligation on the Plaintiff's part to sue every manufacturer, only the manufacturer of the drug that caused his injury. It is highly probable that AbbVie would take advantage of another manufacturer's

11

absence to the fullest extent possible to try to pin liability on the "empty chair" in the courtroom. Additionally, the PSC expects that the issue of causation and the potential latency period of testosterone will be fully explored in any bellwether trial. AbbVie's contention that an AndroGel-only trial will be simpler than a trial involving more than one product should not be given much weight. Even if Plaintiffs select a case involving more than one testosterone product as one of their 16 bellwether discovery cases, it at the PSC's risk if the Court should later determine that the case is not representative and should not be picked as one of the first six trials. However, it would be premature to make that determination at this point in the proceedings, and there is no downside to keeping these cases in the bellwether pool at this point.[7]

AbbVie argues that the different regulatory histories and different warning issues presented by different drugs render these cases as unrepresentative. (AbbVie Mot. at 10.) However, that argument is premature and must fail.[8] A similar issue was recently addressed in the various hormonal birth control litigations. *See In re Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Prods Liab. Litig.*, MDL 2100 (S.D. Ill.) (Herndon, J.); *In re Ortho Evra Prods. Liab. Litig.*, MDL 1742 (N.D. Ohio) (Katz, J.); and *In re NuvaRing Prods.*

---

[7] There is no harm to AbbVie if these cases remain in the pool of eligible bellwether cases. For example, although the parties anticipated that AbbVie would order medical records for all the 666 cases in the AbbVie-only pool, AbbVie is apparently not ordering medical records until the 32 bellwether discovery cases are picked by the parties. In fact, the only punishment would be to the PSC, where the size of the bellwether pool at 666 cases was cited by AbbVie in its arguments that it should not be forced to produce the call notes of sales representatives due to the burden of production, and the Court ordered that only one-quarter of the call notes should be produced before bellwether discovery case selection rather than all of them as requested by the PSC. (*See* Hr'g Tr. July 20, 2015 at 22:23-24:14.)

[8] Indeed, it is s slippery slope if sub-classes of AbbVie-only cases are excluded from the bellwether pool. If the Court accepts AbbVie's argument that cases involving another testosterone product should be omitted, AbbVie may argue next that cases before 2010 (before AbbVie purchased AndroGel should be excluded), as they arguably involve manufacturers other than AbbVie.

*Liab. Litig.*, MDL 1964 (E.D. Mo.) (Sipple, J.). In those cases, the plaintiffs were not required to sue the manufacturers of prior hormonal birth control products that they used. Indeed, representative cases in those litigations were cases that included both new users of the hormonal birth control at issue and users with experience with other brands of hormonal birth control. Similarly, in scores of other products liability cases, the plaintiff uses similar products made by different manufacturers before they use the product that causes them harm. It is the plaintiff's prerogative to name and sue the manufacturer that he or she determines is the appropriate defendant, which is typically the manufacturer of the product in use at the time of his or her injury.

Moreover, it is AbbVie's decision whether to plead third-party claims if it thinks having such a co-defendant is in any way necessary. Clearly, they do not. Notwithstanding that PFSs have been served in AbbVie-only cases over the last eight months, the PSC is not aware of a single instance of AbbVie naming a third-party defendant in any case in this litigation. AbbVie's suggestion that a multiple-defendant trial may be required when a plaintiff has used multiple testosterone products, even in AbbVie-only cases, is specious. AbbVie wants to omit nearly a third of the AbbVie-only docket while it does nothing to sharpen the issue of whether multiple-defendant trials are necessary. The 32 bellwether discovery cases should be selected by the parties as set forth in Amended CMO No. 14, and, if a potential issue is identified through discovery (or if AbbVie elects to do what no pharmaceutical defendant has ever done in a case like this and implead a co-defendant manufacturer), the parties and Court can address this issue during the process of bellwether trial case selection.

AbbVie's request to substitute "AndroGel-only" for "AbbVie-only" is simply an inappropriate attempt to further limit the eligible bellwether cases and should be denied.

13

## IV. CONCLUSION

Based on the foregoing, the PSC respectfully requests that the Court enter an order denying AbbVie's requests in its motion filed on July 6, 2015.

DATED: July 24, 2015

Respectfully submitted,

/s/ Christopher A. Seeger
Christopher A. Seeger
SEEGER WEISS LLP
77 Water Street
New York, NY 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
Email: cseeger@seegerweiss.com

Ronald Johnson, Jr.
SCHACHTER, HENDY & JOHNSON PSC
909 Wrights Summit Parkway, Suite 210
Ft. Wright, KY 41011
Phone: (859) 578-4444
Fax: (859) 578-4440
Email: rjohnson@pschacter.com

Trent B. Miracle
SIMMONS HANLY CONROY
One Court Street
Alton, IL 62002
Phone: (618) 259-2222
Fax: (618) 259-2252
Email: tmiracle@simmonsfirm.com

*Plaintiffs' Co-Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 24, 2015, the foregoing Plaintiffs' Memorandum in Opposition to the Motion of AbbVie Inc. and Abbott Laboratories to Further Amend Amended CMO No. 9 and Amended CMO No. 14 was electronically filed with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Trent B. Miracle
Trent B. Miracle
SIMMONS HANLY CONROY
One Court Street
Alton, IL 62002
Phone: (618) 259-2222
Fax: (618) 259-2252
Email: tmiracle@simmonsfirm.com