IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: TESTOSTERONE REPLACEMENT THERAPY PRODUCTS LIABILITY LITIGATION | MDL No. 2545<br><br>Master Docket Case No. 1:14-cv-01748<br><br>Hon. Judge Matthew F. Kennelly |
| This document relates to:<br><br>MEDICAL MUTUAL OF OHIO,<br><br>        Plaintiff,<br><br>v.<br><br>ABBVIE INC., ABBOTT LABORATORIES, ABBOTT PRODUCTS, INC., SOLVAY AMERICA, INC., SOLVAY PHARMACEUTICALS, INC., SOLVAY, S.A., UNIMED PHARMACEUTICALS, LLC, BESINS INC., BESINS S.A., AUXILIUM, INC., GLAXOSMITHKLINE LLC, OSCIENT PHARMACEUTICALS, INC., ELI LILLY AND COMPANY, LILLY USA, INC., ACRUX COMMERCIAL PARTY LTD., ACRUX DDS PARTY LTD., ACTAVIS PLC, ACTAVIS, INC., ACTAVIS PHARMA, INC. WATSON PHARMACEUTICALS, INC., WATSON LABORATORIES, INC., ANDA, INC., and ENDO PHARMACEUTICALS, INC.,<br><br>        Defendants. | No. 1:14-cv-08857 |

## ABBVIE DEFENDANTS' SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 1

I.   MMO FAILS ADEQUATELY TO ALLEGE THAT IT WAS INJURED BY THE
     ABBVIE DEFENDANTS' ALLEGED MISCONDUCT. ................................................. 1

     A.   TPPs Are Not Injured In *Their Own* "Business or Property" When They Use
          Their Beneficiaries' Premium Payments To Pay For Prescriptions. ...................... 2

     B.   MMO Fails To Plead Concrete Facts Showing That It Paid For A Single
          AndroGel Prescription That Was "Medically Inappropriate." ............................... 3

II.  THE SAC FAILS TO SATISFY RULE 9(b). ......................................................... 6

     A.   "Lumping Together" Of Defendants .................................................... 6

     B.   Copying Allegations From A *Qui Tam* Complaint Without Conducting A
          Plaintiff-Specific Investigation .................................................. 7

     C.   Failure To Allege The Predicate Acts of Racketeering With Particularity ........... 9

III. MMO'S STATE-LAW CAUSES OF ACTION AGAINST THE ABBVIE
     DEFENDANTS FAIL TO STATE A CLAIM. ............................................................ 10

     A.   Illinois Consumer Fraud Act ......................................................... 11

     B.   Insurance Fraud and Common-Law Fraud/Negligent Misrepresentation ............ 12

     C.   Unjust Enrichment ................................................................... 14

IV.  THE COURT LACKS PERSONAL JURISDICTION OVER ALL CLAIMS
     AGAINST SOLVAY, S.A. AND SAI ................................................................. 14

CONCLUSION .................................................................................................................. 15

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*,
    751 F.3d 796 (7th Cir. 2014) ...................................................14

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................5

*Avery v. State Farm Mut. Auto. Ins. Co.*,
    835 N.E.2d 801 (Ill. 2005)...................................................12

*Beck v. Prupis*,
    529 U.S. 494 (2000)...................................................9, 10

*Buckman Co. v. Plaintiffs' Legal Comm*,
    531 U.S. 341 (2001)...................................................3

*Cleary v. Philip Morris, Inc.*,
    656 F.3d 511 (7th Cir. 2011) ...................................................14

*Cohen v. Am. Sec. Ins. Co.*,
    735 F.3d 601 (7th Cir. 2013) ...................................................14

*Comm. Union Assurance Co. PLC v. Milken*,
    17 F.3d 608 (2d Cir. 1994)...................................................3

*Concert Health Plan Ins. Co. v. Killian*,
    2015 U.S. Dist. LEXIS 23195 (N.D. Ill. Feb. 26, 2015) ...................................................13

*Daimler AG v. Bauman*,
    134 S. Ct. 746 (2014)...................................................15

*DeBouse v. Bayer AG*,
    922 N.E.2d 309 (Ill. 2009)...................................................11

*Dist. 1199P Health & Welfare Plan v. Janssen L.P.*,
    784 F. Supp. 2d 508 (D.N.J. 2011) ...................................................3, 4, 5

*In re Epogen & Aranesp*,
    2009 U.S. Dist. LEXIS 58697 (C.D. Cal. June 17, 2009) ...................................................4

*Evans v. City of Chicago*,
    434 F.3d 916 (7th Cir. 2006) ...................................................1

*Fox Assocs., Inc. v. Robert Half Int'l, Inc.*,
    777 N.E.2d 603 (Ill. App. 2002) ...................................................13

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Frye v. L'Oreal USA, Inc.*,
  583 F. Supp. 2d 954 (N.D. Ill. 2008) ........................................................................11

*Health Care Serv. Corp. v. Olivares*,
  2011 U.S. Dist. LEXIS 117750 (E.D. Tex. Sept. 2, 2011) .......................................2

*Int'l Bhd. of Teamsters, Local 734 v. Philip Morris Inc.*,
  196 F.3d 818 (7th Cir. 1999) .............................................................................2, 12

*Ironworkers Local Union 68 v. AstraZeneca Pharms., LP*,
  634 F.3d 1352 (11th Cir. 2011) ...........................................................................2, 4

*U.S. ex rel. King v. Solvay S.A.*,
  2013 U.S. Dist. LEXIS 143658 (S.D. Tex. Oct. 2, 2013) .........................................7

*Knox Coll. v. Celotex Corp.*,
  430 N.E.2d 976 (Ill. 1981) ...............................................................................12, 13

*Landau v. CAN Fin. Corp.*,
  886 N.E.2d 405 (Ill. App. 2008) ..............................................................................11

*Lewis v. Casey*,
  518 U.S. 343 (1996) ..................................................................................................5

*Limestone Dev. Corp. v. Vill. of Lemont*,
  473 F. Supp. 2d 858 (N.D. Ill. 2007) ........................................................................6

*Malmsteen v. Berdon, LLP*,
  477 F. Supp. 2d 655 (S.D.N.Y. 2007)......................................................................14

*Merrilees v. Merrilees*,
  998 N.E.2d 147 (Ill. App. 2013) ..............................................................................13

*Neptuno Treuhand-Und Verwaltungsgesellschaft MBH v. Arbor*,
  692 N.E.2d 812 (Ill. App. 1998) ..............................................................................13

*Oliveira v. Amoco Oil Co.*,
  776 N.E.2d 151 (Ill. 2002) .......................................................................................11

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*,
  631 F.3d 436 (7th Cir. 2011) ...................................................................7, 8, 9, 12

*Reiter v. Sonotone Corp.*,
  442 U.S. 330 (1979).....................................................................................................1

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
    2009 U.S. Dist. LEXIS 58900 (D.N.J. July 10, 2009)..........................................3, 4

*Season Comfort Corp. v. Ben A. Borenstein Co.*,
    655 N.E.2d 1065 (Ill. App. 1995) ........................................................14

*Slaney v. Int'l Amateur Athletic Fed'n*,
    244 F.3d 580 (7th Cir. 2001) ........................................................6, 10

*Steadfast Ins. Co. v. Auto Mktg. Network*,
    1998 U.S. Dist. LEXIS 20286 (N.D. Ill. Dec. 21, 1998) ........................................12

*Steele v. Hosp. Corp. of Am.*,
    36 F.3d 69 (9th Cir. 1994) ........................................................1

*United States v. King-Vassel*,
    728 F.3d 707 (7th Cir. 2013) ........................................................3

*Vector-Springfield Props., Ltd. v. Cent. Ill. Light Co.*,
    108 F.3d 806 (7th Cir. 1997) ........................................................12

*Vicom, Inc. v. Harbridge Merchant Servs., Inc.*,
    20 F.3d 771 (7th Cir. 1994) ........................................................6

*Walden v. Fiore*,
    134 S. Ct. 1115 (2014)........................................................15

**Statutes**

720 ILCS 5/17-10.5 ........................................................12

735 ILCS 5/13-205 ........................................................14

Illinois Consumer Fraud Act, 815 ILCS 505/1 ........................................................11, 12, 14

Ga. Code Ann. § 10-1-399........................................................11

RICO Act, 18 U.S.C. § 1964(c) ........................................................ *passim*

Tex. Code Ann., Bus. & Comm. § 17.505(a) ........................................................11

**Other Authorities**

Fed. R. Civ. P. 9(b) ........................................................ *passim*

Fed. R. Civ. P. 11 ........................................................7

iv

Defendants Solvay, S.A., Solvay America, Inc. ("SAI"), Solvay Pharmaceuticals, Inc.,

Unimed Pharmaceuticals, LLC, Abbott Products, Inc., AbbVie Inc., and Abbott Laboratories

(collectively, "AbbVie" or the "AbbVie Defendants") submit this Supplemental Memorandum of

Law in support of their Motion to Dismiss the Second Amended Complaint ("SAC") of Plaintiff

Medical Mutual of Ohio ("MMO").

## INTRODUCTION

As the Defendants' Joint Memorandum explains, MMO's entire lawsuit is flawed in mul-

tiple respects.  Here, the AbbVie Defendants write separately to elaborate on several additional

reasons why MMO's claims against them must be dismissed.  First, the Complaint does not al-

lege that MMO experienced any cognizable injury attributable to the AbbVie Defendants.  Sec-

ond, the Complaint fails to satisfy Rule 9(b) as to the AbbVie Defendants.  Third, the state-law

causes of action pled as to the AbbVie Defendants fail to state a claim.  And fourth, this Court

lacks personal jurisdiction over Solvay, S.A. and SAI.[1]

## ARGUMENT

## I.    MMO FAILS ADEQUATELY TO ALLEGE THAT IT WAS INJURED BY THE ABBVIE DEFENDANTS' ALLEGED MISCONDUCT.

A RICO claim is available only to a plaintiff who has been "injured in his business or

property."  18 U.S.C. § 1964(c).  This phrase has a "restrictive significance," *Reiter v. Sonotone*

*Corp.*, 442 U.S. 330, 339 (1979), and requires a "concrete financial loss," not a "speculative and

amorphous" harm, *Evans v. City of Chicago*, 434 F.3d 916, 932 (7th Cir. 2006); *see also Steele v.*

*Hosp. Corp. of Am.*, 36 F.3d 69, 70-71 (9th Cir. 1994) (actual "out of … pocket" loss required).

---

[1] The SAC also names "Besins Inc." and "Besins S.A." as defendants and includes them in the grouping it refers to as the "AbbVie Defendants," although it makes no substantive allegations about them.  The undersigned counsel does not represent the "Besins" entities, which have apparently not been served.

MMO has failed to plead a cognizable RICO injury for at least two reasons.

A.      **TPPs Are Not Injured In <u>Their Own</u> "Business or Property" When They Use Their Beneficiaries' Premium Payments To Pay For Prescriptions.**

RICO requires a concrete, "out of pocket" injury—but, as the Eleventh Circuit explained in a similar off-label RICO case, TPPs do not pay for prescriptions out of *their own* general funds. *See Ironworkers Local Union 68 v. AstraZeneca Pharms., LP*, 634 F.3d 1352, 1368 (11th Cir. 2011). They "charge their enrollees an up-front fee, i.e., a 'premium,' in exchange for [prescription-drug] coverage." *Id.* at 1364. Using sophisticated actuarial methods, TPPs set premiums so that the total funds collected will cover the cost of all beneficiaries' prescriptions— "*including medically unnecessary or inappropriate prescriptions*"—plus overhead. *Id.* at 1364-65, 1368 (emphasis added). The higher the total cost of beneficiaries' prescriptions, the higher the premiums charged; the TPP always breaks even. Thus, TPPs' payment for "unnecessary or inappropriate prescriptions" is not a concrete "out of pocket" injury to the TPP. *See id.* at 1369; *Health Care Serv. Corp. v. Olivares*, 2011 U.S. Dist. LEXIS 117750, at *18 (E.D. Tex. Sept. 2, 2011) (following *Ironworkers*).

The Seventh Circuit employed this same reasoning in affirming the dismissal of a TPP RICO case involving allegedly fraudulent cigarette marketing:

> [TPPs] say that they are injured by the amount they pay to provide medical care for smokers….[However,] it is necessary to consider both the income and the expenditure sides of the insurer's balance sheet….**Having collected extra money *from the smokers*…, an insurer can't turn around and collect from the tobacco manufacturer for the same outlay**….[TPPs] are just financial intermediaries. They collect the premiums and spend them to provide the contracted-for care; **their books balance whether the costs of care are high or low**….**[P]urchasers of insurance, not the [TPPs], foot the medical bill in the end.**

*Int'l Bhd. of Teamsters, Local 734 v. Philip Morris Inc.*, 196 F.3d 818, 823-24 (7th Cir. 1999) (bold emphasis added; italics in original).

2

These holdings comport with the principle that RICO damages are intended to "place [plaintiffs] in the same position they would have been in but for the illegal conduct." *Comm. Union Assurance Co. PLC v. Milken*, 17 F.3d 608, 612 (2d Cir. 1994). But for AbbVie's alleged misrepresentations, prescription rates would have remained at their "proper" level. MMO, in turn, would have set its premiums so that its books balanced on the basis of that "proper" figure, rather than the higher, "inflated" figure—and would have ended up exactly where it is now. Thus, awarding MMO the "millions of dollars [it made] in payments for AndroGel" (SAC ¶ 865) would not place it "in the same position [it] would have been in but for [AbbVie's allegedly] illegal conduct." *Milken*, 17 F.3d at 612. Instead, it would give MMO an enormous windfall.

**B.** **MMO Fails To Plead Concrete Facts Showing That It Paid For A Single AndroGel Prescription That Was "Medically Inappropriate."**

As set out in Defendants' Joint Memorandum, payment for a prescription is not a RICO injury simply because it was the result of "off-label" promotion or written for an "off-label" use. *See In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, 2009 U.S. Dist. LEXIS 58900, at \*33-40 (D.N.J. July 10, 2009) (deeming this theory of injury "patently illogical and plainly untenable"), *aff'd*, 678 F.3d 235 (3d Cir. 2012). Even if manufacturers may not *promote* drugs for off-label uses, such uses are "widespread" and are "often … essential to giving patients optimal medical care." *Buckman Co. v. Plaintiffs' Legal Comm*, 531 U.S. 341, 350, 351 n.5 (2001); *see also United States v. King-Vassel*, 728 F.3d 707, 709 (7th Cir. 2013) ("off-label" uses are "ubiquit[ous]" and "often … find support in scientific literature").

Nor is it enough to plead that, absent the defendant's conduct, a TPP would not have purchased or paid for the drug in question. "[A] cognizable RICO injury cannot be solely based upon inducement." *Dist. 1199P Health & Welfare Plan v. Janssen L.P.*, 784 F. Supp. 2d 508, 522-23 (D.N.J. 2011) (citing *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 228-29 (2d Cir. 2008))

3

(TPP failed to plead a RICO injury by alleging that "absent Defendants' fraud, Plaintiffs would have reconsidered Risperdal's placement on its formulary").

Rather, to plead a "concrete injury" in a case like this one, the plaintiff must allege that, as the result of the defendant's wrongdoing, it paid for prescriptions that were "medically unnecessary or inappropriate according to sound medical practice"—*i.e.*, prescriptions that no physician "practicing sound medicine" could "reasonably" write for a given patient with a given condition. *Ironworkers*, 634 F.3d at 1360 & n.20. Thus, "there is no economic injury … when the drug proves *at all beneficial* to the patient prescribed it." *Id.* at 1363 (emphasis added). These allegations of injury must be concrete, rather than conclusory. *See Intron/Temodar*, 2009 U.S. Dist. LEXIS 58900, at *53 ("[T]he Court simply will not accept Plaintiffs' conclusory allegations…that the Subject Drugs were ineffective."); *In re Epogen & Aranesp*, 2009 U.S. Dist. LEXIS 58697, at *20 (C.D. Cal. June 17, 2009) ("mere[] assert[ions]" a product was promoted for "'ineffective' or 'unapproved' uses, without more, will not pass muster…").

Here, the SAC alleges, in general terms, that "TPPs were financially injured by paying for millions of TRT prescriptions for drugs that … did not work as had been advertised and promoted and that had unknown serious health risks." (SAC ¶ 5.) But such conclusory allegations are insufficient: MMO must allege *facts* showing that it paid for *particular* AndroGel prescriptions that were medically inappropriate for *particular* beneficiaries. *See Dist. 1199P*, 784 F. Supp. 2d at 521-22 (TPP failed to plead injury where complaint "d[id] not identify any [beneficiary] who received an ineffective or unsafe off-label Risperdal prescription").

Defendants raised this argument in their original Motion to Dismiss, and in response, MMO has added a paragraph supposedly containing "representative examples of the injury suffered by TPPs and their members." (SAC ¶ 831.) In that paragraph, MMO identifies 33 pseu-

4

donymous "Patients" who received TRT drugs and also experienced health problems. But only *one* of these 33 individuals—"Patient 2"—was a beneficiary of MMO; the others were beneficiaries of other TPPs. (*Id.*) Thus, only the allegations concerning Patient 2 are relevant. *See Lewis v. Casey*, 518 U.S. 343, 357 (1996) (a named plaintiff must plead "that [he] personally ha[s] been injured," not "that injury has been suffered by [other] members of the class").

What does the SAC say about Patient 2? He is "a 60 year old male"; he "was prescribed Andro[G]el and Androderm" at an unstated time or times "between 2007 and 2011"; and "he suffered a myocardial infarction" (heart attack) in 2011. (*Id.*) The SAC does *not* allege that Patient 2 received AndroGel for an "off-label" condition, as opposed to "classical hypogonadism." This is dispositive, as the SAC concedes that use of TRT drugs for classical hypogonadism is medically appropriate and that "***the benefits [of such use] outweigh the [alleged] risks***." (*Id.* ¶ 21 (emphasis added).) Moreover, even assuming *arguendo* that Patient 2 received AndroGel for an "off-label" condition, the SAC does not identify that condition—let alone permit the inference that no reasonable physician "practicing sound medicine" could have prescribed AndroGel for Patient 2, or that AndroGel failed to provide Patient 2 with relief from whatever condition it was prescribed to him for. Nor does the SAC allege, even in conclusory fashion, that it was *AndroGel* that caused Patient 2's 2011 heart attack—as opposed to obesity, smoking, heredity, another drug, or something else entirely—or plead facts from which such a causative association could be reasonably inferred. Even taken as true, the paltry facts alleged about Patient 2 do not show above the speculative level that MMO suffered any "concrete financial loss" when it allegedly reimbursed for his AndroGel prescription(s). *See Dist. 1199P*, 784 F. Supp. 2d at 518–19; *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (a complaint must be dismissed if it "pleads facts that are 'merely consistent with' [the] defendant's liability").

5

## II. THE SAC FAILS TO SATISFY RULE 9(b).

RICO claims "are subject to the heightened pleading standard of Fed. R. Civ. P. 9(b)." *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001). MMO flunks Rule 9(b)'s stringent pleading requirements for several reasons.

### A. "Lumping Together" Of Defendants

Because "[RICO] liability is limited to [those] who have '*personally* committed' at least two predicate acts of racketeering," a complaint in a multi-defendant RICO case "must … describe two predicate acts of fraud *by each Defendant* with some specificity." *Limestone Dev. Corp. v. Vill. of Lemont*, 473 F. Supp. 2d 858, 873 (N.D. Ill. 2007) (emphasis added); *see also Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 778 (7th Cir. 1994) (Rule 9(b) "prohibit[s] ... lumping defendants together").

The SAC lumps together nine different entities as "the AbbVie Defendants" (SAC ¶ 49), and then proceeds to allege that "the AbbVie Defendants" committed various bad acts. These lumped-together entities include companies from as far afield as Belgium and Thailand. (*Id.* ¶¶ 40, 45.) There are only a handful of (mostly non-substantive) allegations about individual "AbbVie Defendants," which do not come close to showing that *each* AbbVie Defendant committed two cognizable predicate RICO offenses. The AbbVie Defendants are left to guess at who has allegedly done what, in blatant violation of Rule 9(b).

For example, The SAC pleads that Solvay, S.A. originally "marketed [AndroGel] in the United States … *through its U.S.-based subsidiaries*." (SAC ¶ 68 (emphasis added).) This is literally all the SAC says about this entity. There is no allegation that Solvay, S.A. committed any wrongdoing—let alone two predicate acts of racketeering.

Similarly, as for SAI, the SAC pleads that "[a]t all times relevant," it "was engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and introducing

6

8110767

[AndroGel] into interstate commerce, *either directly or indirectly through third parties or related entities….*" (*Id.* ¶ 41 (emphasis added).) Again, this is literally all the SAC says about this entity. There is no allegation that it committed two predicate acts of racketeering.[2]

As for "Besins Inc." and "Besins S.A.," the SAC alleges only that the latter entity "developed the pharmaceutical formulation for AndroGel" and that it "manufactured AndroGel for sale in the United States." (SAC ¶ 45.) The SAC does not allege that the former entity did anything at all, and it alleges nothing about either entity that constitutes an act of racketeering.

### B. Copying Allegations From A *Qui Tam* Complaint Without Conducting A Plaintiff-Specific Investigation

As the Seventh Circuit held in a similar TPP suit, pursuant to Rule 9(b), a plaintiff cannot simply crib allegations of misconduct from other lawsuits and repeat them, without "bolster[ing] its complaint" with "firsthand facts or data" making a convincing showing that *it* was injured by the alleged misconduct. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 444-45 (7th Cir. 2011).

In *Pirelli*, the Seventh Circuit stressed that Rule 9(b) "forces the plaintiff to conduct a careful pre[complaint] investigation." *Id.* at 441. TPPs obviously have "knowledge about [their own] reimbursement data"—and therefore, a plaintiff who is a TPP is obligated to take a "fulsome look at its own data" before filing suit. *Id.* at 444. If those data confirm that the plaintiff was injured by the fraudulent scheme, Rule 9(b) requires a TPP to "bolster its complaint with information" reflecting that fact. *Id.* And if those data *do not* confirm that the plaintiff was in-

---

[2] Indeed, MMO's claims against SAI arise from a simple case of mistaken identity. As the district court recognized in *U.S. ex rel. King v. Solvay S.A.*, 2013 U.S. Dist. LEXIS 143658 (S.D. Tex. Oct. 2, 2013), the "Solvay America, Inc." described in MMO's SAC was renamed Solvay Pharma U.S. Holdings, Inc. in 2005 and later acquired by Abbott Laboratories in 2010. The "Solvay America, Inc." that MMO actually *sued* is a separate and distinct entity that had no involvement at all in the sale or marketing of AndroGel. (*See* Buckingham Aff. ¶¶ 7–17.)

8110767

jured by the alleged scheme, then the TPP has no business filing suit. *See* Fed. R. Civ. P. 11.

In *Pirelli*, the TPP plaintiff did plead some "preliminary reimbursement data" in an attempt to corroborate that it was injured by the fraudulent scheme alleged in the earlier *qui tam* suit. 631 F.3d at 444-45. But the Seventh Circuit found that data lacking: it concerned only "eleven [of the TPP's] members nationwide," and without considerably more "context," this "small-*n* analysis" did not "corroborate" its claim that it had been victimized. *Id.*

Here, as in *Pirelli*, MMO's allegations are largely cribbed from an earlier *qui tam* complaint. As illustrated by the redline in the Appendix following this brief, most of MMO's allegations as to the AbbVie Defendants are drawn near-verbatim from the Fifth Am. Compl. ("5AC") in *United States ex rel. King v. Solvay S.A.*, No. 4:06-cv-02662, Dkt. 154 (S.D. Tex.) (Ex. 2 to Declaration of William F. Cavanaugh, Jr. in Support of Joint Memorandum).[3] For example, both MMO's SAC and the *King* 5AC allege that:

- The AbbVie Defendants promoted AndroGel for off-label uses to physicians through seminars and conferences whose content they controlled. (SAC ¶¶ 298–333; cf. *King* 5AC ¶¶ 183, 186–202, 237, 242–68.)

- The AbbVie Defendants paid "kickbacks" to respected physicians and thought leaders for presenting at these conferences and lending their names to AbbVie-sponsored research. (SAC ¶¶ 398–447; *cf. King* 5AC ¶¶ 302–34, 345–61.)

- The AbbVie Defendants placed information supporting off-label use of AndroGel in medical journals and clinical studies. (SAC ¶¶ 448–476; *cf. King* 5AC ¶¶ 180, 192, 222–23, 242–46, 270–76.)

- The AbbVie Defendants sought to turn the normal aging process into a treatable condition by marketing AndroGel for "andropause." (SAC ¶¶ 4, 13–14, 24, 27, 271, 330, 346, 367, 451; *cf. King* 5AC ¶¶ 176–202, 215, 252.)

- The AbbVie Defendants strategically targeted their promotion based on unapproved uses,

---

[3] For the avoidance of confusion: the statute-of-limitations section of Defendants' Joint Memorandum refers to the *Second* Amended Complaint in *King* (unsealed Dec. 7, 2009), which put MMO on notice of its potential claims. But the wording in MMO's Complaint and SAC is copied from the subsequent *Fifth* Amended Complaint in *King* (filed Nov. 22, 2011).

including treatment of diabetes (SAC ¶¶ 329, 341, 387–90; *cf. King* 5AC ¶¶ 267, 275, 216), obesity (SAC ¶ 391; *cf. King* 5AC ¶ 217), women (SAC ¶¶ 379–84; *cf. King* 5AC ¶¶ 210–14), HIV (SAC ¶¶ 395–97, 406–07; *cf. King* 5AC ¶¶ 183, 219–21, 310–11); depression (SAC ¶¶ 370–76; *cf. King* 5AC ¶¶ 190, 204–07); osteoporosis (SAC ¶ 377; *cf. King* 5AC ¶ 208); and sexual dysfunction (SAC ¶¶ 343, 378, 385, 421, 462; *cf. King* 5AC ¶¶ 183, 209, 215, 237, 273, 328).

As *Pirelli* makes clear, Rule 9(b) does not permit a follow-on plaintiff like MMO to repeat a *qui tam* relator's allegations of wrongdoing without providing "firsthand information … corroborat[ing]" its status as a victim. 631 F.3d at 446. AbbVie raised this argument when it moved to dismiss MMO's original Complaint, which contained no such information whatsoever.

In response, MMO has supplemented the SAC with an allegation that it "paid $38,962,566.73 for Defendants' TRT drugs from November 2001 through April 2015," together with a state-by-state breakdown of this sum. (SAC ¶ 38.) But this fixes nothing: the bare fact that MMO *paid for TRT drugs* does not "corroborate" that it was injured by the wrongdoing alleged against the AbbVie Defendants in the *qui tam* complaint.

In addition, as noted above, MMO has added a few sentences about "Patient 2," an MMO beneficiary who was allegedly prescribed AndroGel at some point between 2007 and 2011. (SAC ¶ 831.) Again, the SAC provides no facts suggesting that Patient 2's AndroGel prescription was medically inappropriate—let alone the result of one of the acts of racketeering alleged against the AbbVie Defendants. If anything, the SAC suggests that Patient 2's physician may have been influenced by a different manufacturer altogether. (*See id.* (noting that Patient 2's prescribing physician was a paid speaker *for Auxilium*).) This one underwhelming data point falls far short of the plaintiff's proffer in *Pirelli*, which the Seventh Circuit found inadequate.

### C.    Failure To Allege The Predicate Acts of Racketeering With Particularity

To state a RICO claim, it is not enough for a plaintiff to describe a RICO conspiracy and allege that it was "injured by an overt act done in furtherance of [that] conspiracy." *Beck v.*

*Prupis*, 529 U.S. 494, 495-96 (2000). The plaintiff must allege that it was injured *by a specific, indictable predicate "act of racketeering"* (here, supposedly, mail and wire fraud). *Id.* And to satisfy Rule 9(b), a complaint must "describe the predicate acts of fraud" with "specificity," and must "state the time, place, and content of the alleged false representations, the method by which [they] were communicated, and the identities of the parties to [them]." *Slaney*, 244 F.3d at 597.

The SAC goes on at length about various bad acts that the AbbVie Defendants allegedly committed. (As noted above, these allegations come largely from the King *qui tam* complaint.) However, the SAC provides virtually no detail about the *specific* predicate acts of mail or wire fraud by the AbbVie Defendants that supposedly caused injury *to MMO*. The SAC's only allegations about the AbbVie Defendants' actions vis-à-vis MMO—as opposed to generic "TPPs"—are found in Paragraphs 286, 300, and 302. These paragraphs suggest that, at an unspecified time or times, employees of the AbbVie Defendants had internal discussions about marketing AndroGel to MMO.

These vague assertions about communications (or potential communications) with MMO do not satisfy Rule 9(b). The SAC provides no clue about when the communications took place (if they took place at all) or who the involved persons were. It provides no reason to believe that the interstate mails or wires were used. And, most glaringly, the SAC provides absolutely no reason to think that any AbbVie communications with MMO *were false in any way*. Nor does the SAC describe the circumstances of any particular false statement AbbVie made to any specific MMO beneficiary, or to any particular doctor, that resulted in harm to MMO.

## III. MMO'S STATE-LAW CAUSES OF ACTION AGAINST THE ABBVIE DEFENDANTS FAIL TO STATE A CLAIM.

MMO purports to sue the AbbVie Defendants under the consumer protection laws of every single state. (SAC, 26th and 27th Claims for Relief.) As the Defendants' Joint Memorandum

explains, this is impermissible, as the relationship between MMO and each of the Defendants is centered in Ohio. (Joint Mem., V.A.1) Even assuming *arguendo* that the relationship between MMO and the AbbVie Defendants were centered elsewhere, that place could only be Illinois, Texas, or Georgia, where the AbbVie Defendants are allegedly based. (SAC ¶¶ 41-43, 46-48.)

Any claims under the Texas or Georgia consumer protection statutes are clearly barred. Pre-suit notice is a necessary element of any claim under the Texas and Georgia statutes, *see* Ga. Code Ann. § 10-1-399(b); Tex. Code Ann., Bus. & Comm. § 17.505(a), but MMO fails to plead that it gave such notice (because it did not do so). Moreover, the Georgia statute expressly forbids class actions. Ga. Code Ann. § 10-1-399(a). Accordingly, we focus on Illinois law here.

### A.   Illinois Consumer Fraud Act

MMO attempts to sue the AbbVie Defendants under the Illinois Consumer Fraud Act ("ICFA"), 815 ILCS 505/1. (SAC, 26th Claim for Relief.) That claim fails for five reasons.

First, the ICFA is "without extraterritorial effect." *Landau v. CAN Fin. Corp.*, 886 N.E.2d 405, 407 (Ill. App. 2008). Allegations of misrepresentations "disseminated from Illinois" or that AbbVie is "headquartered" in Illinois are irrelevant; the place where MMO *suffered injury* controls, and any injury to MMO's pocketbook was felt in Ohio. *Id.*

Second, for the reasons discussed above and in Defendants' Joint Memorandum, MMO has failed to plead "actual damage" cognizable under the ICFA. *Frye v. L'Oreal USA, Inc.*, 583 F. Supp. 2d 954, 957 (N.D. Ill. 2008). As with RICO, an ICFA plaintiff's injury must be "concrete" and "ascertainable," rather than "[t]heoretical." *Id.* at 957–58.

Third, for the reasons discussed in Defendants' Joint Memorandum, MMO has failed to plead "but-for" and proximate causation. *See Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 160 (Ill. 2002). Notably, the Illinois Supreme Court has considered and rejected an ICFA claim in very similar circumstances. *DeBouse v. Bayer AG*, 922 N.E.2d 309, 319 (Ill. 2009) (no viable

11

ICFA claim where plaintiff "fail[ed] to allege that *her particular doctor* was actually deceived by any of Bayer's advertisements"; allegation of "general deception of ... the medical community" was insufficient (emphasis added)); *see also Philip Morris*, 196 F.3d at 828 ("Illinois would apply the federal remoteness approach" to proximate causation in a TPP case).

Fourth, MMO's ICFA claim is untimely. The ICFA's statute of limitations is three years. *See* 815 ILCS 505/10a(e). It accrues upon "notice ... of a *possible* invasion of one's legally protected interests," which does not require specific knowledge of the defendant's conduct, or awareness of a valid cause of action. *Knox Coll. v. Celotex Corp.*, 430 N.E.2d 976, 980 (Ill. 1981) (emphasis added). Accrual requires only "sufficient information concerning [the] injury to put a reasonable person on inquiry to determine whether actionable conduct was involved." *Vector-Springfield Props., Ltd. v. Cent. Ill. Light Co.*, 108 F.3d 806, 809 (7th Cir. 1997). As discussed in the Joint Memorandum (Part IV.A), MMO either knew or should have known of "a possible invasion" of its interests by 2002, if not earlier—many years before the critical date of November 5, 2011 (*i.e.*, three years before this suit was filed).

Fifth, as discussed above, MMO has failed to plead its ICFA claim with the particularity required by Rule 9(b). *See Pirelli*, 631 F.3d at 446–47 (Rule 9(b) governs ICFA claims).

## B. Insurance Fraud and Common-Law Fraud/Negligent Misrepresentation

MMO asserts a claim under the Illinois Insurance Fraud Statute, 720 ILCS 5/17-10.5 (SAC, 28th Claim for Relief), which requires a plaintiff to plead and prove all "six elements of common law fraud," *Steadfast Ins. Co. v. Auto Mktg. Network*, 1998 U.S. Dist. LEXIS 20286, at *48 (N.D. Ill. Dec. 21, 1998). MMO also asserts common-law claims for fraud (40th Claim for Relief) and negligent misrepresentation (41st Claim for Relief). These claims all fail as well.

First, like the ICFA, the Insurance Fraud Statute lacks extraterritorial effect. *See Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 852–53 (Ill. 2005) (rule against extraterritorial

12

application is a "long-standing rule of construction in Illinois" with general application).

Second, as discussed above, MMO fails to plead that it relied on any particular false statement by AbbVie. *See Merrilees v. Merrilees*, 998 N.E.2d 147, 159 (Ill. App. 2013) (complaint "fail[ed] to sufficiently allege fraud because plaintiff's conclusory allegations d[id] not identify misstatements of material fact on which she reasonably relied").

Third, the Complaint does not adequately plead damages. As set forth in the Joint Memorandum, and as discussed above, MMO does not concretely allege that it paid for a single AndroGel prescription that was medically inappropriate.

Fourth, a defendant "[can]not be held liable under a negligent misrepresentation theory for economic losses," except where it "is in the *business of supplying information* for the guidance of others in their business transactions." *Neptuno Treuhand-Und Verwaltungsgesellschaft MBH v. Arbor*, 692 N.E.2d 812, 818 (Ill. App. 1998). AbbVie is in the business of selling pharmaceuticals, not supplying information.[4]

Fifth, these claims are time-barred. They are governed by a five-year statute of limitations that accrues when the plaintiff "knows or reasonably should know of his injury and ... that it was wrongfully caused." *Concert Health Plan Ins. Co. v. Killian*, 2015 U.S. Dist. LEXIS 23195, at *4 (N.D. Ill. Feb. 26, 2015); *Knox Coll.*, 430 N.E.2d at 979. As explained in the Joint Memorandum, MMO reasonably should have had such knowledge many years before the November 5, 2009 cutoff (*i.e.*, five years before it filed suit).

Sixth, and finally, for the reasons already discussed, these fraud-based claims are not pleaded with the particularity Rule 9(b) requires.

---

[4] Although AbbVie provides information about its drugs, "[w]hen the information offered by the defendant relates to the defendant's tangible goods…, [it] is considered merely ancillary or incidental, and the defendant is not deemed to be in the business of providing information." *Fox Assocs., Inc. v. Robert Half Int'l, Inc.*, 777 N.E.2d 603, 607 (Ill. App. 2002).

13

### C. Unjust Enrichment

MMO also alleges unjust enrichment (SAC, 42nd Claim for Relief). Because MMO's other tort claims all fail, this claim fails as well. *See Cleary v. Philip Morris, Inc.*, 656 F.3d 511, 517 (7th Cir. 2011) ("[I]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim…will stand or fall with the related claim.").

Moreover, "unjust enrichment is only available when there is no adequate remedy at law." *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013); *see Season Comfort Corp. v. Ben A. Borenstein Co.*, 655 N.E.2d 1065, 1071 (Ill. App. 1995) (dismissing unjust enrichment claim where plaintiff "ha[d] an adequate remedy at law" but did "not properly pursue[]" it). MMO fails to explain how a timely pursued claim under some other legal theory would have been insufficient to remedy its alleged injury.

Finally, MMO's unjust enrichment claim is time-barred. "[I]f [an] unjust enrichment claim is merely incidental to or duplicative of another claim with a shorter limitations period, the Court will not allow a plaintiff to avail himself of the longer limitations period" for an unjust enrichment claim, and thereby evade the statute of limitations. *Malmsteen v. Berdon, LLP*, 477 F. Supp. 2d 655, 667 (S.D.N.Y. 2007). Thus, the three-year ICFA statute of limitations should apply. But even if Illinois' five-year "catch-all" period governed, *see* 735 ILCS 5/13-205, this suit would still have been filed much too late, for the reasons already discussed.

## IV. THE COURT LACKS PERSONAL JURISDICTION OVER ALL CLAIMS AGAINST SOLVAY, S.A. AND SAI

It is the plaintiff's burden to show that *each* defendant is subject to personal jurisdiction. *See Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 799 (7th Cir. 2014). MMO has not made—and cannot make—this showing as to Solvay, S.A. or SAI.

A corporation is subject to general jurisdiction only if its affiliations with the forum state

14

are "so constant and pervasive 'as to render [it] essentially at home'" in that state. *Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014). *Daimler* makes clear that, absent unusual circumstances not alleged here, a corporation is subject to general jurisdiction only in its "place of incorporation and principal place of business." *Id*. at 760. Here, Solvay, S.A. is incorporated and has its principal place of business in Belgium, and SAI is incorporated in Delaware and has its principal place of business in Texas. (*See* Affidavit of Paul Vanderhoeven Regarding Solvay, S.A. ("Vanderhoeven Aff.") ¶ 3; Affidavit of Edwin J. Buckingham III ("Buckingham Aff.") ¶ 3.) Accordingly, neither is subject to *general* jurisdiction under *Daimler*.

Thus, MMO must establish *specific* personal jurisdiction. For the exercise of specific jurisdiction to comport with due process, "the defendant's *suit-related conduct* must create a *substantial connection* with the forum State." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (emphasis added). Moreover, the due process requirement "must be met as to *each defendant*." *Id.* at 1123 (emphasis added; internal quotation marks omitted).

MMO has not pleaded—and cannot plead—the requisite "suit related conduct" in the forum state (*Walden*, 134 S. Ct. at 1121) for Solvay, S.A. because it never developed, designed, manufactured, tested, labeled, distributed, marketed, promoted, or sold the AndroGel product that is at issue in this litigation. (Vanderhoeven Aff. ¶ 8.) The same is true for SAI. (Buckingham Aff. ¶ 16.) Accordingly, MMO cannot show that there were any "in-state activities" by these entities that were "not only…continuous and systematic, but also g[a]ve rise to the liabilities sued on.'" *Daimler*, 134 S. Ct. at 754.

## CONCLUSION

For the reasons above, as well as those set forth in the Defendants' Joint Memorandum, MMO's Complaint should be dismissed with prejudice as to the AbbVie Defendants.

8110767

Dated: July 31, 2015

Respectfully submitted,

*/s/ William F. Cavanaugh, Jr.*
William F. Cavanaugh, Jr.
Jonah M. Knobler (*pro hac vice*)
Scott C. Caplan (*pro hac vice*)
**PATTERSON BELKNAP WEBB
& TYLER LLP**
1133 Avenue of the Americas
New York, NY 10036
Tel: (212) 336-2000
Fax: (212) 336-2222
wfcavanaugh@pbwt.com
jknobler@pbwt.com
scaplan@pbwt.com

*Attorneys for Defendants AbbVie Inc., Abbott
Laboratories, Abbott Products, Inc., Solvay,
S.A., Solvay America, Inc., Solvay Pharmaceu-
ticals, Inc., and Unimed Pharmaceuticals, LLC*

16

8110767

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2015, I caused the foregoing to be filed electronically with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all registered attorneys of record.

    /s/ William F. Cavanaugh, Jr.
William F. Cavanaugh, Jr.

*Attorneys for Defendants AbbVie Inc., Abbott Laboratories, Abbott Products, Inc., Solvay, S.A., Solvay America, Inc., Solvay Pharmaceuticals, Inc., and Unimed Pharmaceuticals, LLC*

17

## Appendix

| *King* Fifth Amended Complaint | MMO Second Amended Complaint |
|---|---|
| Ever thirsty for expanded sales, over the years Solvay adopted a laundry list of other off-label promotions, promoting AndroGel for "wasting" in HIV and AIDS patients, women, methadone and other opioid users, diabetics and those with "metabolic syndrome" (i.e. obese). By 2006, AndroGel had grown to be Solvay's top-selling pharmaceutical product … AndroGel became Solvay's top-selling drug and the chief asset on sale when Abbott Laboratories bought the company in early 2010. According to publicly-released IMS data, even as recently as the twelve-month period from June 30, 2008 to June 30, 2009, the testosterone replacement drug class increased sales by twenty-five percent, to over $840 million, with AndroGel leading the way. (¶ 177) | Ever thirsty for expanded sales, over the years Solvay… [t]he AbbVie Defendants then further adopted a laundry list of other false and misleading off-label promotions messages, promoting AndroGel for "wasting" in HIV and AIDS patients, women, methadone and other opioid users, diabetics and those with "metabolic syndrome" (i.e. obese), obesity), cancer patients, patients with clinical depression, and patients suffering from osteoporosis. By 2006, AndroGel had grown to be to be Solvay's top-selling pharmaceutical product … AndroGel became Solvay's top-selling drug and the chief asset on sale when Abbott Laboratories bought the company in early 2010. According to publicly-released IMS data, even as recently as the twelve-month period from June 30, 2008 to June 30, 2009, the testosterone replacement drug class increased sales by twenty-five percent, to over $840 million, with AndroGel leading the way. (¶ 284) |
| Dr. John E. Morley … and his institution, St. Louis University, were beneficiaries of Solvay's largesse and partners in promoting the drug for years afterwards for the treatment of andropause through a national CME Grand Rounds series, and other programs. The Grand Rounds involved Solvay speaker events held in every region of the U.S., and dozens of speakers, including Drs. Ken Goldberg, Glenn Cunningham and Larry Lipschultz, all in Texas. Morley has since received Solvay funds to study testosterone and renal failure as well as membership on Solvay's and Unimed's speaker's bureaus. (¶ 193 (citation omitted)) | Not surprisingly, Dr. John E. Morley … and his institution, St. Louis University, were have been beneficiaries of Solvay'sthe AbbVie Defendants' largesse and partnershave partnered in promoting the drugAndroGel for years afterwardsafterward for the treatment of andropauseAndropause through a national CMEcontinuing medical education ("CME") Grand Rounds series, and other programs. The Grand Rounds involved Solvay speaker events held in every region of the U.S., and dozens of speakers, including physician participants Drs. Ken Goldberg, Molly Shores, Glenn Cunningham and Larry Lipschultz, all in Texas. Physician participant Dr. Morley has since received Solvay funds to study testosterone and renal failure as well as membership on Solvay's and Unimed's speaker's bureaus. (¶ 316) |
| The success of Luvox, Aceon, and AndroGel hinged on off-label promotion, but because Solvay had to maintain plausible deniability for such promotion, it was difficult to rely entirely on its sales force to promote the drugs off-label…. (¶ 247) | The success of Luvox, Aceon, and AndroGel hinged on false and misleading off-label promotion, but because Solvaythe AbbVie Defendants had to maintain plausible deniability for such promotion, it was difficult to rely entirely on its sales force to promote the drugsAndroGel off-label…. (¶ 320) |
| Similarly, in October 2005, Solvay provided an educational grant to the University of Wisconsin for a CME delivered by Drs. Ronald Swerdloff, Christina Wang, and Richard Spark on "Testosterone Deficiency in Men." The lectures touted the benefits of | Similarly, inIn October 2005, Solvaythe AbbVie Defendants and/or their associates provided an educational grant to the University of Wisconsin for a CME lecture series delivered by Drs. Ronald Swerdloff, Christina Wang, and Richard Spark on "Testosterone Deficiency in Men." The lectures touted the benefits of |

| *King* Fifth Amended Complaint | MMO Second Amended Complaint |
|---|---|
| testosterone and downplayed the risks.  Solvay AndroGel Speaker Bureau members delivered all three lectures, two of which focused on aging men, the third on diabetes.  The lectures were later packaged as CME articles.  In conjunction with publication of those articles, Solvay paid about $1 million to fund University of Wisconsin-sponsored doctor education 2005, 2006 and 2007 such as dinner meetings around the country and newsletters designed to reach more than 50,000 physicians.  Solvay hired for-profit medical education consultant Dowden Health Media to not only organize the events, but to participate in preparing the content of the lectures.  (¶ 275 (citations omitted)) | testosterone and downplayed the risks.  Solvay AndroGel Speaker Bureau members delivered all three lectures, two of which focused on aging men, the third on diabetes.  The lectures were later packaged as CME articles.  In conjunction with publication of those articles, Solvay paid about $1 million to fund University of Wisconsin-sponsored doctor education in 2005, 2006 and 2007 such as dinner meetings around the country and newsletters designed to reach more than 50,000 physicians~~,~~.  Solvay hired for-profit medical education consultant Dowden Health Media ~~to~~ not only to organize the events, but also to participate in preparing the content of the lectures.  (¶ 329) |
| Solvay conveyed off-label messages through promotional speakers as well.  Solvay's promotional speakers included, among others, otherwise inaccessible high prescribers whom sales representatives chose as regional speakers mainly in order to have an excuse to "build relationships." (¶ 254) | ~~Solvay~~The AbbVie Defendants conveyed ~~off-label~~false and misleading messages through promotional speakers as well.  ~~Solvay's~~The AbbVie Defendants' promotional speakers included, among others, otherwise inaccessible high prescribers whom sales representatives chose as regional or national speakers mainly in order to ~~have an excuse to~~ "build relationships."  (¶ 332) |
| In developing a speaker, PSAs would go to Marketing and ask questions like, "if you could have Dr. X Speaker say anything you wanted, what would it be?"  The more coachable of the speakers developed by PSAs were used more frequently and rose to national ranks.  (¶ 260) | In developing a speaker, PSAs would go to Marketing and ask questions like, "if you could have Dr. X Speaker say anything you wanted, what would it be?"  The more coachable of the speakers developed by PSAs were used more frequently and rose to national ranks.  (¶ 337) |
| Dr. Ramon Perez was another local speaker who became a popular regional traveling speaker for Solvay, eventually giving nationwide CME lectures, and speaking on AndroGel and expanded definitions of hypogonadism, as described above in Part VII(iii)(b)(II).  Other regional AndroGel physician speakers have included Dr. Glenn Cunningham, who spoke on AndroGel and diabetes.  (¶ 267) | For example, Dr. Ramon Perez was ~~another~~a local speaker who became a popular regional traveling speaker for ~~Solvay~~the AbbVie Defendants, eventually giving nationwide CME lectures, and speaking on AndroGel and expanded definitions of hypogonadism, as described above ~~in Part VII(iii)(b)(II)~~.  Other regional AndroGel physician speakers have included Dr. Glenn Cunningham, who spoke on AndroGel and diabetes.  (¶ 341) |
| The goal was to identify high prescribers within a product's drug class and high potential prescribers of the drug in addition to those already heavily prescribing the drug.…  Targeted AndroGel physicians include primary care doctors, gerontologists, endocrinologists, urologists, psychiatrists, and others, especially those prescribing high numbers of hormones, Viagra, or Cialis.  The same high-level managers and executives at Solvay Pharmaceuticals' Atlanta headquarters  who shaped the off-label schemes at issue assigned targeted doctor lists contained in electronic "DART" data (prescribing activity data | The goal was to identify high prescribers within a product's drug class (or for potential unapproved uses) and high potential prescribers of the drug in addition to those already heavily prescribing the drug.…  ~~Targeted AndroGel physicians~~  Physicians targeted by the AbbVie Defendants include primary care doctors, gerontologists, endocrinologists, urologists, psychiatrists, and others, especially those prescribing high numbers of hormones, Viagra, or Cialis.  The same high-level managers and executives at Solvay Pharmaceuticals' Atlanta headquarters (and presently at the AbbVie Defendants' Illinois headquarters) who shaped the ~~off-label~~false and misleading selling schemes at issue assigned targeted doctor lists contained in electronic "DART" data (prescribing activity data |

2

| ***King* Fifth Amended Complaint** | **MMO Second Amended Complaint** |
|---|---|
| purchased from an outside vendor) to districts and particular representatives on a semi-annual basis. (¶ 237) | purchased from an outside vendor) to districts and particular representatives on a semi-annual basis. (¶ 343) |
| To create the figures to support the magnitude of silent epidemic that Solvay contended existed, Solvay promoted an expanded definition of hypogonadism. Solvay was and is marketing AndroGel for "andropause," a dubious medical condition for which the FDA has never approved the drug. Solvay has promoted this off-label use despite admonitions from the FDA in early 2000 that andropause, or "age-related hypogonadism" is *not* an approved indication. Specifically, a pre-launch letter from DDMAC dated April 12, 2000 to Unimed objected to the following phrases in a proposed sales aid: "Age-associated' hypogonadal causes" and "Greater than 60 percent of men over 65 have free testosterone levels below normal values of men aged 30-35." DDMAC commented: | ~~To~~The AbbVie Defendants promoted an expanded definition of hypogonadism ~~to~~ create the figures necessary to support the ~~magnitude of silent epidemic that Solvay contended existed, Solvay promoted an expanded definition of hypogonadism. Solvay was and is marketing AndroGel for "andropause~~supposedly vast silent epidemic delineated in the Peer Selling Enterprise. The AbbVie Defendants have marketed (and continue to market) AndroGel for "Andropause," a dubious medical condition for which the FDA has never approved the drug. ~~Solvay has~~The AbbVie Defendants have promoted this ~~off-label~~unapproved and unsafe use despite admonitions from the FDA in early 2000 that ~~andropause~~Andropause, or "age-related hypogonadism" is not an approved indication. Specifically, a pre-launch letter from DDMAC dated April 12, 2000 to Unimed objected to the following phrases in a proposed sales aid: "'Age-associated' hypogonadal causes" and "Greater than 60 percent of men over 65 have free testosterone levels below normal values of men aged 30-35." DDMAC commented: |
| Claims and representation that suggest that AndroGel is indicated for men with "age-associated" hypogonadism or "andropause" are misleading. AndroGel is indicated in males with primary hypogonadism or hypogonadotropic hypogonadism.<br><br>(¶ 184) | Claims and representation that suggest that AndroGel is indicated for men with "age-associated" hypogonadism or "~~andropause~~Andropause" are misleading. AndroGel is indicated in males with primary hypogonadism or hypogonadotropic hypogonadism.<br><br>(¶ 349) |
| While the promotion of AndroGel for andropause began even before launch, AndroGel's sales exploded after the company focused more sharply on "educating" doctors about andropause. (¶ 186) | While the ~~promotion of AndroGel for andropause began~~AndroGel Peer Selling Enterprise had its Andropause messaging roots established even before ~~the~~ launch, AndroGel's sales exploded after the company focused more sharply on "educating" doctors about ~~andropause~~the Andropause condition its marketing vendors had created. (¶ 351) |
| In 2000, Solvay laid the foundation for sales by convincing influential specialists of an expanded need for testosterone supplementation. An outside consultant, EDU-Medical Management, Inc., issued a report to Unimed/Solvay in 2001 that stated, "It is understood, AndroGel cannot be promoted for off-label uses by Unimed Pharmaceuticals," with the apparent plan to take on that promotion on its client's behalf: its first "Medical Education Objective" was to "Create educational | In 2000, ~~Solvay~~the AbbVie Defendants laid the foundation for sales by ~~convincing~~scheming with influential specialists ~~of~~to support an expanded need for testosterone supplementation. An outside consultant, EDU-Medical Management, Inc.~~,~~...issued a report to Unimed/Solvay in 2001 that stated~~,~~: "It is understood, AndroGel cannot be promoted for off-label uses by Unimed Pharmaceuticals," with the apparent plan to take on that false and misleading promotion on its client's behalf~~:~~. ~~its~~Its first "Medical Education Objective" was to "Create educational |

| ***King* Fifth Amended Complaint** | **MMO Second Amended Complaint** |
|---|---|
| vehicles to identify age-related hypogonadism and showcase AndroGel® as the appropriate/ideal treatment option." (¶ 186) | vehicles to identify age-related hypogonadism and showcase AndroGel® as the appropriate/ideal treatment option." (¶ 352) |
| A March 2006 Solvay Field Contact Report was more explicit:  District Manager David Sharpe praised sales representative Laura Wheat for presenting the "diabetic message" to Dr. Twenty.  District managers gathered at national meetings for instruction in the sophisticated science related to diabetes necessary for making the pitch, which was delivered by trainers or opinion leaders.  District managers then returned to their respective districts to train their own representatives. (¶ 216 (citation omitted)) | A March 2006 Solvay Field Contact Report was more explicit:  District Manager David Sharpe praised sales representative Laura Wheat for presenting the "diabetic message" to ~~Dr~~physicians. ~~Twenty.~~ ... District managers gathered at national meetings for instruction in the sophisticated science related to diabetes necessary for making the pitch, which was delivered by trainers or opinion leaders.  District managers then returned to their respective districts to train their own representatives.  (¶ 389) |
| Solvay compensated for its size by engaging in particularly aggressive physician marketing efforts.  Solvay bribed doctors to use its drugs.  Whether the kickbacks took the form of bogus speaker and research fees, resort weekends, cash payments, or Harley Davidson goods, the motive was the same – to lock in patient referrals (i.e. prescriptions).  The recipients of these attentions were the high actual or potential prescribers on representative's target lists.  (¶ 302) | ~~Solvay compensated for its size by engaging~~[T]he AbbVie Defendants engaged in particularly aggressive physician marketing efforts.  ~~Solvay~~The AbbVie Defendants bribed doctors to ~~use its drugs~~prescribe AndroGel.  Whether the kickbacks took the form of bogus speaker and research fees, resort weekends, cash payments, or Harley Davidson goods, the motive was the same – to lock in patient referrals (i.e. prescriptions).  The recipients of these attentions were the high actual or potential prescribers on representative's target lists.  (¶ 398) |
| Solvay executives, managers, PSAs and sales representatives cooked up several kickback schemes in order to provide "incentives" in the form of cash to high-prescribers and to induce other physicians to prescribe high volumes of Solvay's drugs.  Many of the cash schemes were variations on the same theme.  For instance, one quasi-research theme was to pay doctors to fill out minimal paperwork on patients taking Solvay drugs, supposedly to further medical knowledge. (¶ 305) | ~~Solvay~~The AbbVie Defendants' executives, managers, PSAs and sales representatives ~~cooked up~~developed several kickback schemes in order to provide "incentives" in the form of cash to high-prescribers and to induce other physicians to prescribe high volumes of ~~Solvay's drugs~~AndroGel.  Many of the cash schemes were variations on the same theme.  For instance, one quasi-research theme was to pay doctors to fill out minimal paperwork on patients taking Solvay drugs, supposedly to further medical knowledge.  (¶ 401) |
| Durrani's October 8, 2001 email gave the following description of regional advisory programs for use in promoting AndroGel:<br><br>    Regional Advisory Panel:  Physicians attending a Regional Advisory Panel are paid consultants.  Too many of these programs could be suspect, as one only needs so many physician advisors.  These programs will likely be conducted with the help of your Medical Liaisons.  We recommend 0 to 4 per region, but you may do as many as you please.<br><br>(¶ 316) | Durrani's October 8, 2001 email gave the following description of regional advisory programs for use in promoting AndroGel:<br><br>    Regional Advisory Panel:  Physicians attending a Regional Advisory Panel are paid consultants.  Too many of these programs could be suspect, as one only needs so many physician advisors.  These programs will likely be conducted with the help of your Medical Liaisons.  We recommend 0 to 4 per region, but you may do as many as you please.<br><br>(¶ 412) |

| ***King* Fifth Amended Complaint** | **MMO Second Amended Complaint** |
|---|---|
| Another Solvay kickback scheme involved preceptorships. "Preceptorship" describes an arrangement where a doctor allows a pharmaceutical representative to shadow him for part of a day (usually four to eight hours). During this time, the representative promotes and sells Solvay products to a captive audience. Solvay used preceptorships to market its off-label uses to doctors. Indeed, Solvay mandated that its representatives participate in at least four preceptorships per month. In exchange for allowing the representative to shadow them, Solvay paid the doctors anywhere from $150 to $1,000. (¶ 330) | Another ~~Solvay~~of the AbbVie Defendants' kickback ~~scheme~~schemes involved preceptorships. ~~"Preceptorship"~~A "preceptorship" describes ~~an~~a fictitious business arrangement where a doctor ~~allows~~grants a pharmaceutical representative ~~to shadow~~the privilege of shadowing him/her for part of a day (usually four to eight hours).... During this time, the representative ~~promotes and sells Solvay products~~gets the added benefit of promoting the AbbVie Defendants' products, including AndroGel, to a captive (and usually already receptive) audience. ~~Solvay~~The AbbVie Defendants used preceptorships to market ~~its off-label~~AndroGel's unapproved and unsafe uses to doctors. Indeed, ~~Solvay~~the AbbVie Defendants mandated that its representatives participate in at least four preceptorships per month. In exchange for allowing the representative to "shadow" them, ~~Solvay~~the AbbVie Defendants paid the doctors anywhere from $150 to $1,000. (¶ 425) |
| "Nurse Betty" Scheme<br>This was a program to promote…AndroGel that Solvay first rolled out in urban areas in the Southwest region in 2002, with plans to expand into larger areas incrementally, as announced in a March 2002 mid-POA AndroGel presentation to the sales force. Solvay hired nurses to work within doctor's offices for the sole purpose of identifying and screening patients for Solvay's drugs, primarily AndroGel. Doctors and their staff were freed from such screening, potentially allowing them to see more patients. Brand management discussed potential expansion of this program at POA meetings…. (¶ 346) | One non-cash scheme was the "Nurse Betty" ~~Scheme~~ program. This was a program to promote~~…~~ AndroGel that ~~Solvay~~the AbbVie Defendants first rolled out in urban areas in the Southwest region in 2002, with plans to expand into larger areas incrementally, as announced in a March 2002 mid-POA AndroGel presentation to the sales force. ~~Solvay~~The AbbVie Defendants hired nurses to work within doctor's offices for the sole purpose of identifying and screening patients for ~~Solvay's drugs, primarily~~ AndroGel use. Doctors and their staff were freed from such screening, potentially allowing them to see more patients. Brand management discussed potential expansion of this program at POA meetings~~….~~. (¶ 433) |
| Solvay also sought out supposedly independent associations of specialists to issue "clinical practice guidelines" or "consensus guidelines" in favor of controversial positions that impacted its drug sales. Solvay's simultaneous lobbying and financial support of the Endocrine Society and its officers, discussed above, is an example. (¶ 245) | ~~Solvay~~The AbbVie Defendants and/or their associates also sought out supposedly independent associations of specialists to issue "clinical practice guidelines" or "consensus guidelines" in favor of controversial positions that impacted its ~~drug~~AndroGel sales. ~~Solvay's~~The simultaneous lobbying and financial support of the Endocrine Society and its officers by the AbbVie Defendants and their associates, discussed above, is an example. (¶ 470) |