## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: TESTOSTERONE REPLACEMENT THERAPY PRODUCTS LIABILITY LITIGATION | MDL No. 2545 |
| | Master Docket Case No. 1:14-cv-01748 |
| | Honorable Matthew F. Kennelly |
| THIS DOCUMENT RELATES TO ALL CASES | |

**PLAINTIFFS' STEERING COMMITTEE'S SUBMISSION IN SUPPORT OF PLAINTIFFS' PROPOSED CASE MANAGEMENT ORDER REGARDING *EX PARTE* CONTACT WITH PHYSICIANS**

## I.     INTRODUCTION

The Plaintiffs' Steering Committee (the "PSC") respectfully submits this memorandum in opposition to the proposed case management order ("CMO") submitted by Defendants AbbVie, Inc. and Abbott Laboratories, Inc. (collectively, with their predecessor companies, "AbbVie") (Dkt. No. 1143-1), and in support of its proposed CMO (Dkt. No. 1143-2), regarding *ex parte* contacts with physicians.  As an initial matter, AbbVie has not requested any *ex parte* contacts with Plaintiffs' physicians, outside of scheduling depositions, which is addressed at the end of this memorandum.  Indeed, AbbVie's proposal precludes it from such contacts.  *See* Dkt. No. 1143-1, at ¶ 5.[1]  AbbVie instead seeks to limit the scope of Plaintiffs' counsel's *ex parte* contacts with physicians solely to a plaintiff's medical care and treatment.  *See id.* at ¶¶1-3.

---

[1] Because AbbVie agrees that it is not entitled to participate in *ex parte* contacts with treating physicians outside the context of deposition scheduling, the cases it cites in footnotes 7 and 8 of its motion about *ex parte* contacts by a defendant are not pertinent.  Furthermore, state court decisions issued in jurisdictions that permit defense counsel to interview treating physicians *ex parte* are inapposite.  Notably, it is the public policy of Illinois to prohibit a defendant's *ex parte* contacts with treating physicians.  *Compare Petrillo v. Syntex Labs., Inc.,* 499 N.E.2d 952, 957 (Ill. Ct. App. 1986) ("Because public policy strongly favors both the confidential and fiduciary nature of the physician-patient relationship, it is thus axiomatic that conduct which threatens the sanctity of that relationship runs afoul of public policy.  That being so, we believe, for the reasons set forth below, that *ex parte* conferences between defense counsel and a plaintiff's treating physician jeopardize the sanctity of the physician-patient relationship and, therefore, are prohibited as against public policy."), *with Stempler v. Speidell,* 495 A.2d 857, 864 (N.J. 1985) (allowing defense counsel to interview plaintiffs' treating doctors) (cited in AbbVie's Motion at 4 n.8),

However, for fifteen years, AbbVie has inundated physicians with information about the positive attributes of AndroGel, while hiding information about its risks. Now, after collecting billions of dollars from drug sales, and essentially engaging in "woodshedding" by distributing what Plaintiffs allege are false and misleading materials to physicians and the public with no limits on what was said or sent, AbbVie wants to infringe upon the physician-patient relationship by limiting what Plaintiffs' counsel can discuss with and show physicians during *ex parte* contacts. AbbVie's motivation is not the prevention of "woodshedding," but the prevention of an even-handed presentation of both sides of the story. Its request should be denied.

## II. ARGUMENT

### A. Plaintiffs' Counsel Should be Permitted to Have Full and Complete Communications with Treating Physicians

Throughout the years, AbbVie has used multiple resources to promote AndroGel to medical providers and the public, representing that low testosterone levels signify a condition coined "Low-T." AbbVie claims that "Low-T" is an acquired form of hypogonadism – the only condition for which AndroGel is approved to treat – even though it is not. *See* Third Amended Master Long-Form Complaint and Jury Demand (Dkt. No. 1074), at ¶¶ 122, 136.

AbbVie has been trying to convince physicians that "Low-T" is widely under-diagnosed, and that common conditions associated with the normal aging process could be caused by "Low-T," which in turn should be treated with testosterone replacement therapy ("TRT"). *See id.* at ¶¶ 122-123. To profit from this, AbbVie has marketed AndroGel as a lifestyle drug meant to treat symptoms that men experience as a result of normal aging, to make them feel younger and increase libido. *See id.* at ¶¶ 124, 135.

---

*and In re Pelvic Mesh/Gynecare Litig.,* No. ATL-L-6341-10, slip op. (N.J. Super. Ct. Dec. 3, 2013) (Dkt. No. 1143-4) (cited in AbbVie's Motion at 7) (relying on *Stempler*). In Illinois, a defendant's *ex parte* contacts with treating physician may result in sanctions, "including reversal of the judgment in favor of the defendant and the award of a new trial." *Nastasi v. United Mine Workers of Am. Union Hosp.,* 567 N.E.2d 1358, 1365 (Ill. Ct. App. 1991).

AbbVie's expansion of the targeted population is evident from the user pool. When FDA approval for AndroGel was sought in 1999, the representation was that hypogonadism affected approximately "one million American men." *Id.* at ¶ 114. The next year, after approval was obtained, the market increased to "four to five million American men." *Id.* at ¶ 115. Three years later, the number increased again to "up to twenty million men." *Id.* This 2000% increase in the potential pool of users did not represent an increase in the number of men who actually had hypogonadism; it represented an expansion of the group of men targeted as potential new users. The FDA admonished AbbVie for this unilateral expansion of the indications for use, stating that AbbVie's "claims and representation that suggest AndroGel is indicated for men with 'age associated' hypogonadism or 'andropause' are misleading." *See id.* at ¶ 113.

AbbVie has relied on its sales force to convey this message. The sales force contacts physicians, in-person and on-line, and focuses efforts on taking "plenty of time to teach them [the treating doctors] the right way to diagnose and treat." *See id.* at ¶ 126, 133. They provide promotional materials and detailing, not only at the physicians' offices, but also at medical organization and society meetings, in display booths at conventions, at sponsored meeting sessions and satellite sessions, and through sponsored medical speakers. *Id.* at ¶ 133-134.

In addition, AbbVie maintains several websites to promote its message, *see id.* at ¶ 119, 125, and has its sales force direct physicians to access the websites to better educate themselves and patients on "Low T" and TRT products. *See id.* at ¶ 120. Physicians also obtain information from AbbVie through direct-to-consumer advertising on television and in promotional materials. *See id.* at ¶ 117-118. All of these communications are intended to encourage the prescription and use of AndroGel, while avoiding any discussion about significant, possibly fatal, side effects associated with its use. *See id.* at ¶¶ 392-402, 418-424.

In addition to making payments to specific prescribing doctors, AbbVie's multi-pronged marketing efforts have included a strategy of (i) branded and unbranded advertising to spread misinformation about the purported "Low-T" disease and the benefits of AndroGel in treating that disease; (ii) paying so-called "thought leaders" and "key opinion leaders" to lead

3

conferences and dinners for prescribing doctors to tout the benefits of AndroGel; and (iii)
encouraging paid AbbVie consultants to revise guidelines of the Endocrine Society to create an
aura of legitimacy around its efforts to expand the use of TRT as a lifestyle drug. AbbVie made
a concerted push to expand the use of AndroGel, with efforts that included promoting
prescriptions to those suffering from conditions such as diabetes, human immunodeficiency virus
("HIV"), and chronic obstructive pulmonary disease ("COPD"), which are not contemplated by
its approved labeling.

    As identified in the Plaintiff Fact Sheets, the 32 bellwether discovery cases involve a total
of 37 prescribing healthcare providers. As noted in the Defense Fact Sheets, 26 of those received
visits from sales representatives, and 26 received monetary payments. Indeed, many received
multiple sales visits and multiple payments. Of course, AbbVie's sales representatives continue
to meet with doctors to increase AndroGel's sales while this litigation proceeds.

    AbbVie is deeply invested in its AndroGel promotional efforts, spending over $80
million in 2012, and millions more on unbranded marketing. *See id.* at ¶ 127. Those efforts paid
off, because in 2013, it achieved $1.4 billion in AndroGel sales, making AndroGel the biggest
selling androgen drug in the United States. *See id.* at ¶ 128. Sales of AbbVie's testosterone-
replacement therapies have more than doubled since 2006, and are expected to triple to $5 billion
by 2017. *Id.* Plaintiffs are not trying to level the playing field with AbbVie through *ex parte*
communications with treating physicians. That would be impossible, given the bombardment of
information from AbbVie during the fifteen years that AndroGel has been on the market.
Plaintiffs instead want to understand their doctors' prescribing and treatment decisions, which
may include showing materials to physicians that they may or may not have seen before, which
might tell a story that differs from AbbVie's messaging and advertising about the intended use,
benefits, and risks of AndroGel. The physician could then take the time needed to read the
materials and fully assess and comprehend them, without the time constraints and pressured
environment of a deposition. Discussions could involve matters such as the importance of those
materials to the physician's personal treating and prescribing decisions, and the effect, if any,

they had on those treatment decisions. This is essential in preparing to meet Plaintiffs' burden of proof, particularly in cases that may involve "learned intermediary" issues.

Allowing counsel for Plaintiffs – and only counsel for Plaintiffs – to have those *ex parte* communications with treating physicians has become almost commonplace over the past decade. The opinion that has been most often cited is Judge Fallon's decision in *In re: Vioxx Prods. Liab. Litig.,* 230 F.R.D. 473 (E.D. La. 2005). Judge Fallon initially entered an order that "put Plaintiffs and Defendants on an equal footing with respect to interviewing the prescribing physicians," but he later modified his order, after noting that it otherwise could "have a destructive effect on the efficient handling of [the] litigation and become problematic to both sides as well as to the Court." *Id.* at 475.

In modifying his order to allow only Plaintiffs' counsel to have *ex parte* contacts with treating physicians that had not been named as defendants, Judge Fallon cited "the time honored doctor-patient confidential relationship which has been recognized and protected in both Western and Eastern civilization for over 2000 years." *Id.* at 476. He reasoned as follows:

> The Court, upon further reflection, now feels that the just option in this case is to protect the relationship between a doctor and patient by restricting defendants from conducting ex parte communications with Plaintiffs' treating physicians but allowing Plaintiffs' counsel to engage in ex parte interviews with those doctors who have not been named as defendants. This approach appears, at first glance, to be one sided and unfair. However, in actuality and as a practical matter, it is not. This modification does not leave the Defendants without any access to information. The Defendants still are entitled to all of the medical records of the Plaintiffs as well as the Plaintiff Profile Forms setting forth each Plaintiff's detailed medical history. The Defendants can also continue to exercise their right to depose the Plaintiffs' treating physicians or confer with them in the presence of Plaintiffs' counsel. Furthermore, as a practical matter, the Defendants already have information, including documentation, regarding what its representatives told the treating physicians about Vioxx. Therefore, the Defendants do not need the doctors to tell them in ex parte conferences what they already know.

*Id.* at 477.

5

This well-reasoned approach has been expressly adopted by other courts. *See, e.g., In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.,* No. 08-md-2004, slip op. at 2 (M.D. Ga. May 28, 2015) (Judge Clay Land) (attached as Exhibit A) (allowing *ex parte* communications between Plaintiffs' counsel and her treating physicians, while expressly adopting the rationale of Judge Fallon and another judge because it was persuasive); *In re: E.I. DuPont de Nemours and Co. C-8 Personal Injury Litig.,* No. 2:13-md-2433, slip op. at 3-4 (S.D. Ohio May 16, 2014) (Judge Edmund Sargus) (attached as Exhibit B) (adopting Judge Fallon's approach, while noting that "imposition of limitations on the communications between Plaintiffs' counsel and their clients' treating physicians is generally not the best course of action"); *In re Kugel Mesh Hernia Repair Patch Litig.,* No. 07-md-1842, 2008 U.S. Dist. LEXIS 63475, at *11 (D.R.I. Jan. 22, 2008) (Magistrate Judge Lincoln Almond), *approved,* 2008 U.S. Dist. LEXIS 63476 (D.R.I. Feb. 24, 2008) (Judge Mary Lisi) (allowing Plaintiffs' counsel to have *ex parte* contacts with treating physicians, while noting that he was "particularly guided by Judge Fallon's treatment of this issue in the Vioxx MDL.").

In the latter case, the court declined a request made four years after the first order was entered to limit approved topics for future *ex parte* communications to those involving the plaintiff's care, saying such limitations were "unnecessary and unworkable," and citing, *inter alia,* the difficulties associated with policing limits, the potential for unproductive side-litigations that could result from attempts to police, and the ability to explore improprieties and biases in depositions. *See In re: Kugel Mesh Hernia Repair Patch Litig.,* No. 07-md-1842, slip op. at 3 (D.R.I. Jan. 12, 2012) (Magistrate Judge Lincoln Almond) (attached as Exhibit C). To encourage openness and avoid the waste of deposition time, however, the court directed Plaintiff's counsel, at least 48 hours before a physician's deposition, to identify information about each meeting with the physician, including the date, the approximate duration, the location, the participants, and the materials shown or provided. *Id.* at 3-4.

Many other courts have conducted their own analyses and have similarly concluded that the limits suggested by Defendants should not be imposed on *ex parte* communications between

Plaintiffs' counsel and treating physicians. In *In re Levaquin Prods. Liab. Litig.,* No. 08-md-1943, 2012 U.S. Dist. LEXIS 116088, at *2-3 (D. Minn. Aug. 17, 2012) (Judge Glenn Suddaby), for example, the court reasoned:

> Defendants argue that Plaintiffs' counsel should not be able to discuss the scientific literature, product labels, or Plaintiffs' theories of liability with the physician. To determine what information the provider does and did possess concerning the treatment of a plaintiff, . . . , some discussion of the physician's knowledge of the risks of Levaquin, and when and how they became aware of those risks is appropriate. Clearly delineating the line between this proper questioning and what Defendants characterize as "woodshedding" or "lobbying" is difficult because some discussion of the scientific literature, product labels, or Plaintiffs' theories of liability may be necessary. The Court, moreover, is confident that Plaintiffs' counsel knows which conduct amounts to "woodshedding" or would be unfairly discriminatory and that the Court would not tolerate such conduct. The Court will, therefore, deny Defendants' motion.

Likewise, in *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices and Prods. Liab. Litig.,* 09-md-2100, 2011 U.S. Dist. LEXIS 21973 (S.D. Ill. Mar. 4, 2011) (Judge David Herndon), the court allowed Plaintiffs' counsel to have *ex parte* communications with treating physicians, which could involve showing the physicians documents and asking how these documents might have changed their prescribing or treatment decisions. *Id.* at *4. The documents could include research documents, scientific studies and related materials; Defendants' internal documents; documents identified as confidential; and product warnings or labels. *Id.* The court imposed only the following limitations: (1) Plaintiffs' counsel could not show notes, highlights, added redactions, or any other markings that would direct attention to a particular portion of the document; (2) Plaintiffs' counsel had to identify to Defendants the documents that had been shown at least 72 hours prior to the physician's deposition; and (3) Plaintiffs' counsel had to comply with the confidentiality order that already was in place. *Id.* at *4-5. *See also In re Pradaxa (Dabigatran Etexilate) Prods. Liab. Litig.,* No 3:12-md-02385, slip

op. at 1-2 (S.D. Ill. Aug. 8, 2013) (Judge David Herndon) (attached as Exhibit D) (applying only the same three limitations).

Similar, relatively minor, limitations were placed late last year in a decision allowing Plaintiffs' counsel's *ex parte* contacts with treating physicians. In *In re: Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.,* No. 12-md-2327, 2015 U.S. Dist. LEXIS 139926 (S.D. W.Va. Oct. 13, 2015) (Magistrate Judge Cheryl Eifert), prohibitions were placed only against showing: (1) notations, underlines, or highlights; (2) medical literature, expert testimony, or materials prepared by or on behalf of counsel, since the physicians were not experts; and (3) materials or information already ruled to be inadmissible. *Id.* at *3290. Plaintiffs' counsel also couldn't imply that the physician might be joined as a defendant, unless there was a good faith factual basis for that, or discuss products not implanted in the patient at issue. *Id.* at *3290-91. Plaintiffs' counsel also were required, at least 48 hours before a deposition, to identify the documents discussed or provided to the physician, if those documents were likely to be used at the deposition. *Id.* at *3291.

In holding that everything else was fair game, Magistrate Judge Eifert listed some of the "several reasons that a limitation on the scope of topics covered in *ex parte* meetings is not necessary or appropriate." *Id.* at *3285. "First, …, there is no statute or rule supporting such a limitation…. Second, limiting Plaintiffs' counsel to discussing only Plaintiffs' care and treatment unfairly restricts counsels' case preparation." *Id.* The court noted that "[t]reating physicians are crucial fact witnesses on a variety of disputed matters, including matters not directly related to the treatment of a specific patient." *Id.* at *3286. The court listed as examples the physicians' training and experience, their contacts with the defendants' representatives, the nature and adequacy of the instructions provided, and the effect different or additional information may have had on their treatment decisions. *Id.* The court pointed to the "legitimate right to collect information pertinent to the claims and defenses and prepare its case for trial." *Id.*

Magistrate Judge Eifert then said the following about the disadvantage of allowing only one party to have the *ex parte* communications:

> [T]here are disparities in every litigation. The court is hard-
> pressed to construct a completely level playing field. Moreover,
> attorneys, as officers of the court, have ethical rules that they must
> follow, which include a prohibition on *improperly* influencing
> witnesses. The court must presume that attorneys will abide by
> their ethical obligations; when they do not, there are sanctions that
> can be imposed to address the specific malfeasance. However,
> placing a blanket restriction on every Plaintiff's attorney, which
> governs his or her communications with every treating physician,
> is akin to using a sledgehammer to crack a nut.

*Id.* at \*3287. The court also cited *Kugel Mesh's* reference to the difficulties in policing and the

potential side-litigations involved with attempts to police. *Id.*

Finally, the court noted the ability of Defendant's counsel to explore the contacts at

deposition, and impeach credibility based on influence, bias, or personal interest. *Id.* at \*3288.

The following was then said about physicians, to dismiss the suggestion that physicians would be

readily and improperly swayed during their *ex parte* communications with Plaintiffs' counsel:

> Taken as a group, physicians are not known to be especially
> vulnerable to intimidation or suggestion. They are well-educated,
> intelligent individuals who, for the most part, are neither new to
> the litigation arena, nor overly impressed with lawyers. To the
> contrary, most physicians are suspicious of lawyers; particularly,
> when it comes to legal actions involving patient care. All of them
> will have had experience with [the products at issue], and that
> experience will already have shaped their perceptions. . . . [T]he
> court has no reason to believe that Plaintiffs' treating physicians
> will be particularly susceptible to lobbying by Plaintiffs' counsel.
> However, if inappropriate 'woodshedding' occurs, Ethicon's
> counsel will have the opportunity to fully demonstrate it to the
> jury. If it is egregious, Ethicon will have the right to seek
> sanctions.

*Id.* at \*3289-90.

This order was consistent with the terms of an order that had been entered in a sister

litigation, *In re: C.R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.,* No. 10-md-2187, slip op.

(S.D. W.Va. Aug. 3, 2012) (Magistrate Judge Mary Stanley) (attached as Exhibit E). In

declining to impose limitations on Plaintiffs' counsel's *ex parte* communications with treating

physicians, Magistrate Judge Stanley explained:

> Neither a statute nor a rule suggests that such limits are appropriate; in fact it is accepted that attorneys are expected to prepare their witnesses for the rigors of giving testimony. As this MDL develops, it becomes more apparent that the plaintiffs are pursuing multiple theories, including those of negligent design and negligent failure to warn. It is important to develop the facts as to what the defendants knew about their products' effects on women's pelvic organs and when they knew those facts. Contents of corporate documents and statements of sales representatives to treating physicians and surgeons are appropriate areas of inquiry as to whether full disclosure would have changed a doctor's mind about implanting a pelvic mesh product.

*Id.* at 3-4. The court incorporated into the order the offer by Plaintiffs' counsel to disclose at least 48 hours before a deposition the documents produced by the defendants that they planned to use during the deposition. *Id.* at 4.

Likewise, the Special Discovery Master declined to uniformly prohibit *ex parte* communications between Plaintiffs' counsel and treating physicians in *In re: Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.,* No. 12-md-2342, slip op. (E.D. Pa. June 12, 2013) (Special Master Andrew Chirls) (attached as Exhibit F), *approved,* slip op. (E.D. Pa. July 18, 2013) (Judge Cynthia Rufe) (attached as Exhibit G). In so ruling, he commented on the character of the members of the various leadership groups, some of whom also are members of the leadership groups here, and the ability to address problems later if problems arose:

> I am not persuaded by the idea that the restrictions proposed by Pfizer are necessary to prevent abusive contacts. I was not a participant in the Court's designation of Liaison Counsel and the Plaintiffs' Steering and Executive Committees. But I do assume that the court evaluated the experience, records and character of the lawyers whom it chose. Plaintiffs' attorneys in this case have not been shown to be anything other than honorable and respectful of ethical and legal restrictions on what they may do. I do not understand Pfizer to be saying otherwise. If developments show that restrictions should be imposed, the Court has appointed me to consider them upon presentation of those developments by either side.

*Id.* at 5. As safeguards, Plaintiffs' counsel had to identify all documents given to the physician, within the earlier of one week after it was given or three days before the deposition. *Id.* at 5-6.

The lack of any reason to suspect improper influence similarly formed the basis of the court's decision to reject a request to limit communications between Plaintiffs' counsel and treating physicians in *In re: Phen-Fen Litig.,* Control No. 114005, slip op. (Phila. Ct. Com. Pleas Jan. 8, 2008) (Judge Allan Tereshko) (attached as Exhibit H). The same decision was entered in the litigation four years later in *In re: PCCP Phen-Fen Litig.,* May Term, 1999, No. 00001, slip op. (Phila. Ct. Com. Pleas Mar. 26, 2012) (Judge Sandra Mazer Moss) (attached as Exhibit I).

The logic and reasoning described in each of the cases cited above applies equally here. Plaintiffs' counsel must discuss matters such as warnings, scientific literature, and theories with treating physicians, to be able fully to understand what the treating physicians knew at particular times, and how their decisions might have changed if they had known more.[2] This fact-based information is essential to establishing causation, particularly in cases from "learned intermediary" states.

Plaintiffs' counsel do not intend in any way to improperly influence or pressure physicians, who, as noted above, are not a group that is prone to bend easily to influence or pressure, particularly from members of the Plaintiffs' bar. Defense counsel has suggested no reason to expect otherwise, but if something triggers a concern, they can explore it at the deposition. Plaintiffs' counsel are well aware of the potential consequences of over-reaching, and are motivated to avoid participating in any actions that would subject themselves or their clients to those consequences.

### B. There is sparse support for the limits proposed by AbbVie.

AbbVie has cited no rule or statute that requires the limits it proposes, because there is none. AbbVie has cited only five cases that actually address the issue at hand, but none provides the depth of analysis that is contained in the opinions cited above.

In fact, one case cited by AbbVie – *In re Nuvaring Prods. Liab. Litig.,* No. 08-md-1964, 2009 U.S. Dist. LEXIS 23744 (E.D. Mo. Mar. 20, 2009) – did not even involve the plaintiff's

---

[2] Since those matters relate to *their own treatment decisions*, and not to how the treatment decisions of others would have been effected, they are not expert opinions.

contact with treating physicians, because the plaintiff agreed to the limits. *Id.* at *14. The only argument revolved around the defendants' proposed communications with treating physicians, *see id.* at *9, 14, which, as noted above, is not at issue here. If the issue of limiting the plaintiff's *ex parte* contacts had been presented, the result likely would have been to deny the request, because the court said it was "in complete agreement" with Judge Fallon's decision in *Vioxx*, and quoted the same portion of that opinion that is quoted at page six in this brief, discussing the "just option" being to allow *ex parte* communications with Plaintiffs' counsel only, without any mention of limits on those communications. *Id.* at *12-13 (*quoting Vioxx,* 230 F.R.D. at 477).

Two of the other opinions cited by AbbVie mentioned no reasoning to restrict plaintiffs' contacts. *See In re Ortho Evra Prods. Liab. Litig.,* No. 06-md-40000, 2010 U.S. Dist. LEXIS 10849 (N.D. Ohio Jan. 20, 2010); *In re: Chantix (Varenicline) Prods. Liab. Litig.,* No. 09-cv-2039, 2011 U.S. Dist. LEXIS 156968 (N.D. Ala. June 30, 2011). In fact, both courts favorably cited to Judge Fallon's *Vioxx* opinion*,* but then entered rulings that limited the scope of the communications. *See Ortho Evra,* 2010 U.S. Dist. LEXIS 10849, at *18-20; *Chantix,* 2011 U.S. Dist. LEXIS 156968, at *18-20.

The last two opinions cited by AbbVie relied primarily on *Ortho Evra* and *Chantix,* which, as noted above, provided no analysis, but had cited favorably to the *Vioxx* opinion. *See In re Pelvic Mesh/Gynecare Litig.,* ATL-L-6341-10, slip op at 4. (N.J. Sup. Ct. Dec. 3, 2013) (attached as Exhibit 4 to AbbVie's Motion); *Actos Prod. Liab. Cases,* Case No. BC411687, slip op. at 13-14 (Cal. Sup. Ct. Mar. 20, 2015) (attached as Exhibit 3 to AbbVie's Motion).

The *Pelvic Mesh* opinion also cited *Nuvaring,* and its own goal of preventing witnesses from being swayed. *See* AbbVie's Exhibit 4 at 4, 6. However, this state court opinion conflicts with each of the above-described opinions from the federal courts overseeing MDLs involving the same or similar pelvic mesh products. *See Ethicon Pelvic Repair Sys.,* 2015 U.S. Dist. LEXIS 139926; *Mentor ObTape* (Exhibit A); *Bard Pelvic Repair Sys.* (Exhibit E). Plaintiffs contend that the well-reasoned MDL opinions are more persuasive than the conflicting state court opinion.

As to the *Actos* opinion, the court was primarily motivated by procedural rules related to expert disclosure requirements in California – Cal. Code Civ. Proc. §§ 2034.210(b), 2034.260(c) – which require expert designations and disclosures for persons retained by a party in preparation for trial. *See* AbbVie's Exhibit 3, at 12-14. The court decided that providing confidential literature to treating physicians on an *ex parte* basis "would circumvent the specific requirements under the Code of Civil Procedure for expert witness designations," although neither party contended that an expert should have been precluded from testifying due to a failure to disclose.[3] *See* AbbVie's Exhibit 3, at 13. The court was secondarily motivated by a case management order that allowed confidential documents to be shown only at a deposition. *See id.* at 14-15. That issue is not relevant here, because Sections 9(c) & (f) of CMO No. 8 allows this Court to determine whether a healthcare provider may be shown confidential information outside of a deposition.

The numerous well-reasoned opinions supporting unfettered or almost unfettered *ex parte* communications between Plaintiffs' counsel and treating physicians are far more persuasive than these few opinions.

### C. Deposition Scheduling

Finally, the parties disagree about who should be permitted to contact treating physicians to schedule depositions. To avoid multiple firms calling the same physician and confusion, Plaintiffs propose that Plaintiffs make the first scheduling contact, after agreeing on dates with Defendants. *See* Dkt. No. 1143-2, at ¶ 4. Given AbbVie's concerns over delay, Plaintiffs have proposed that the right to the "first call" shall shift if, within seven days, Plaintiffs do not secure a date or provide a reasonable basis for not being able to do so. *Id.*

---

[3] AbbVie cited three opinions relating to the scope of permissible expert testimony by treating physicians in various state courts in footnote 4 of its motion. Their relegation to a footnote is indicative of AbbVie's recognition that expert disclosures are not at issue here. Even if they were at issue, since expert disclosure is a matter of federal procedure, the parties here would be subject to Fed. R. Civ. P. 26(a)(2), and not the state court rules involved in the opinions cited by AbbVie. If any treating physician is expected to provide expert testimony *at trial* – the only trigger for expert disclosure requirements under Fed. R. Civ. P. 26(a)(2)(A) – the appropriate disclosures will be made in accordance in compliance with the deadline listed in Fed. R. Civ. P. 26(a)(2)(D).

The alternate "compromise" proposed in footnote 16 of AbbVie's Motion, requiring the parties to divide the scheduling in half, could not be applied in many cases, because many cases involve only one treating physician, so there will be no list to split. Other cases may involve an odd number of treating physicians, making an even split impossible. Plaintiffs' proposal, on the other hand, provides one set procedure that can be followed with every single deposition, and will avoid any confusion with regard to what procedure should be followed for contacting one treating physician versus another.

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court reject AbbVie's proposed Case Management Order, and instead adopt Plaintiffs' proposal.

DATED:  February 1, 2016                              Respectfully submitted,

/s/ Christopher A. Seeger
Christopher A. Seeger
SEEGER WEISS LLP
77 Water Street
New York, New York 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
Email: cseeger@seegerweiss.com

Ronald Johnson, Jr.
SCHACHTER, HENDY & JOHNSON PSC
909 Wrights Summit Parkway, Suite 210
Fort Wright, Kentucky 41011
Phone: (859) 578-4444
Fax: (859) 578-4440
Email: rjohnson@pschacter.com

Trent B. Miracle
SIMMONS HANLY CONROY
One Court Street
Alton, Illinois 62002
Phone: (618) 259-2222
Fax: (618) 259-2252
Email: tmiracle@simmonsfirm.com

*Plaintiffs' Co-Lead Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2016, the foregoing Plaintiffs' Steering Committee's Submission in Support of Plaintiffs' Proposed Case Management Order regarding *Ex Parte* Contact with Physicians was electronically filed with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Trent B. Miracle*
Trent B. Miracle
SIMMONS HANLY CONROY
One Court Street
Alton, Illinois 62002
Phone: (618) 259-2222
Fax: (618) 259-2252
Email: tmiracle@simmonsfirm.com