1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


                                    )  Docket No. 14 C 1748
                                    )
IN RE:                              )
TESTOSTERONE REPLACEMENT            )
THERAPY PRODUCTS LIABILITY          )
LITIGATION                          )
                                    )  Chicago, Illinois
                                    )  October 18, 2017
                                    )  12:30 o'clock p.m.

          TRANSCRIPT OF PROCEEDINGS - TELEPHONICALLY
        BEFORE THE HONORABLE MATTHEW F. KENNELLY


APPEARANCES:

                    SEEGER WEISS LLP
                    BY:  MR. CHRISTOPHER SEEGER
                    77 Water Street
                    New York, NY  10005



                    SIMMONS HANLY CONROY
                    BY:  MR. TRENT MIRACLE
                    One Court Street
                    Alton, IL  62002



                    SCHACHTER, HENDY & JOHNSON, P.S.C.
                    BY:  MR. RONALD E. JOHNSON, JR.
                    909 Wright's Summit Parkway, Suite 210
                    Ft. Wright, KY  41011



Court Reporter:     MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                    Official Court Reporter
                    219 S. Dearborn Street, Suite 2102
                    Chicago, Illinois  60604
                    (312) 435-5639

APPEARANCES CONTINUED:

ARNOLD & PORTER KAYE SCHOLER LLP
BY:  MR. ANDREW K. SOLOW
250 West 55th Street
New York, NY  10019

ARNOLD & PORTER KAYE SCHOLER LLP
BY:  MR. DANIEL M. MEYERS
70 West Madison Street, Suite 4200
Chicago, IL  60602

ULMER BERNE LLP
BY:  MR. JEFFREY D. GEOPPINGER
600 Vine Street, Suite 2800
Cincinnati, OH  45202-2409

PATTERSON BELKNAP WEBB & TYLER
BY:  MR. JONAH M. KNOBLER
1133 Avenue of the Americas
New York, N&  10036

DECHERT LLP
BY:  MS. MICHELLE HART YEARY
902 Carnegie Center, Suite 500
Princeton, NJ  08540

REED SMITH LLP
BY:  MR. DAVID E. STANLEY
355 South Grand Avenue, Suite 2800
Los Angeles, CA  90071

(The following proceedings were had in chambers:)

MR. SEEGER:  Chris Seeger is here, along with Ron Johnson.

THE COURT:  Let's get the names.  So on the plaintiffs' side, it's Chris Seeger, and who is the other person?

MR. SEEGER:  Ron Johnson, and Trent Miracle is on as well.

THE COURT:  Okay.  Anybody else other than those three people on the plaintiffs' side?

All right.  Who is on for AbbVie?

MS. YEARY:  Michelle Yeary, your Honor.

THE COURT:  Anybody else for AbbVie?

Okay.  Who is on for Auxilium and Endo?

MR. SOLOW:  Andrew Solow, your Honor.

THE COURT:  Anybody else for your folks, Mr. Solow?

All right.  Who is on for --

MR. MEYERS:  Dan Meyers.

THE COURT:  Say it again?

MR. MEYERS:  Daniel Meyers is on as well.

THE COURT:  Okay.  Who is on for Lilly?

MS. YEARY:  David Stanley, your Honor.  Just me.

THE COURT:  Okay.  And who is on for Actavis?

MR. GEOPPINGER:  Jeff Geoppinger, your Honor, and Jeff Dodd.

THE COURT: All right. Is there anybody else whose name hasn't been mentioned yet?

Okay. I think the email -- or the entry that I made, which is docket entry 2191, is pretty self-explanatory. And my concern just to be clear about it is that -- and, honestly, this got past me before, and it really didn't come into focus until I've been working on the summary judgment motions relating to the Auxilium matter.

So what is going to happen in these situations, which, I think, is everybody else other than AbbVie where we have, by agreement, just two bellwether cases, what happens if one or both of them go out on summary judgment because of something particular to that case or otherwise, that's going to leave us with nothing, which I don't really regard as an acceptable situation. So that's why I made this entry, you know, a few days back saying we have to come up with a plan B.

So I'd like to hear what your thoughts are. And just identify who you are when you start to talk.

So let me hear from the PSC folks first.

MR. SEEGER: Your Honor, it's Chris Seeger. When I read your entry, I think --

THE COURT: We're losing you here, Mr. Seeger. So if you're on a speaker.

MR. SEEGER: Oh, I'm not. I'm actually on a land line.

THE COURT: Oh, that's bad. Start over again.

MR. SEEGER: Okay. I was saying that when I saw your --

THE COURT: For whatever reason, we have a bad connection here with you, and I'm hearing like about every fourth word.

MR. SEEGER: Would you mind if I hang up and call back in?

THE COURT: That's fine. I'll wait a couple seconds for you to do that.

MR. SEEGER: Sorry about that, your Honor.

(Brief pause.)

MR. SEEGER: I hope this is better.

THE COURT: Oh, that's way better. Okay. There you go. Go ahead.

MR. SEEGER: Sorry. Thought I'd just switch phones. Sorry about that.

So, yeah, what I said was when I saw your entry, I guess the same thought occurred to Ron, Trent, and I. You know, we have a couple of defendants where we've got, you know, one case being worked up and maybe two. I don't want to create, you know, unnecessarily, obviously, a lot of work for people because all experts will have to now be designated in new cases, but, you know, I'm more than open to a discussion with the defendants on adding more cases for each of the

defendants just in case it were to happen that we had a glitch, like we had a couple cases fall out of, obviously, the trial pool with AbbVie.

THE COURT: Right.

MR. SEEGER: And both sides worked very hard to not let that happen, and it still happened. So if that happens now --

THE COURT: The summary judgment thing is something that's really not under, you know, necessarily anybody's complete control.

MR. SEEGER: Yeah. Yeah. So I mean, the question to us do we have any pushback or resistance to exploring the addition of more cases. We don't.

THE COURT: Okay. So let me hear from people on the defense side. I think this is really mostly, at least for now, an issue for Auxilium, Lilly, and Actavis.

MR. SEEGER: Right.

MR. SOLOW: Your Honor, Andrew Solow for Auxilium and Endo.

Your Honor, there's two aspects to it. We -- as you know, the pool starts out with a random selection of a certain number of cases. Then there are selections from each side, plaintiff, defense. We get down to a small pool that is actually worked up through discovery. What the parties had originally proposed and agreed to was only then working up

through expert discovery and motion practice a smaller set number of cases, which was --

THE COURT: Two.

MR. SOLOW: -- for Auxilium like for the two trial slots.

An immediate issue, right now we have started on Auxilium with 60 cases, each side picking four, we lost three cases to the mixed-use pool, and we only have three left right now that have been worked up factwise; not the complete fact discovery, but the initial core discovery.

THE COURT: Let me interrupt you for a second. Is that three in addition to the two that are the trial cases?

MR. SOLOW: That's correct, your Honor.

THE COURT: All right. Go ahead.

MR. SOLOW: So if your Honor was to say, get something available for the next slot, the timing would become we would have to complete discovery, non-core discovery, and then each side would have to begin the process of expert discovery, which I certainly would have to do my expert reports after the plaintiffs' expert reports. So if that is the way the Court were so inclined, we could do that, and it would just take time, and, obviously, the parties would want a briefing schedule on --

THE COURT: Right.

MR. SOLOW: -- case-specific motions, et cetera --

8

THE COURT: Of course.

MR. SOLOW: -- which we have a -- in Auxilium, as your Honor may have seen, we have quite a tight schedule --

THE COURT: Right.

MR. SOLOW: -- of these. So it would be -- we could do it, but it would be tough to get something up for obviously November --

THE COURT: No, no, no. November is out of the question. We would be talking about April.

Okay. I get what you're saying.

MR. SOLOW: Right. Right.

THE COURT: So Mr. -- go ahead.

MR. SOLOW: Well, I was just going to say, so I have Endo too, your Honor. So there we had less cases. We had agreed to do a random pool of 50. As it turned out, we could only come up with 35 because of the mixed-use issue.

THE COURT: Yeah.

MR. SOLOW: We selected there three each to get to six. We are just beginning discovery there. In fact, one of the defense selections of the six was determined after selection to be filed in the fact sheet a mixed-use case. The parties have agreed we'll substitute that.

THE COURT: Okay.

MR. SOLOW: So, in theory, we could increase the number there and do expert discovery if the Court were so

inclined.

THE COURT: Okay. Mr. Stanley, what are your thoughts?

MR. STANLEY: Your Honor, the Lilly story is similar to the Auxilium story. We moved -- we started with 16, and when you take out dismissals and mixed-use cases, we're basically left with five, two of which are up for trial, so we have -- we would have three behind those that have been worked up through the basic core discovery but have not gone through the -- I think there's another, you know, sort of mop-up fact discovery period followed by, you know, expert designations, et cetera, et cetera. So it's almost exactly what Andy described in terms of the Auxilium story.

THE COURT: Okay.

MR. STANLEY: So we have three cases that could potentially go behind the two that are up.

THE COURT: Mr. Geoppinger?

MR. GEOPPINGER: Pretty much echoing the same sentiment, your Honor. In the Actavis cases, we had -- we are approaching the close of the core discovery on six cases.

THE COURT: Yeah.

MR. GEOPPINGER: We actually, in our CMO, provided for a backup case for our trial case, so when the Court picks the two cases, one will be set and one will be the backup case.

THE COURT: Okay. So on yours, it's just one trial that we are anticipating, and you're going to give me two options for it.

MR. GEOPPINGER: That's correct. Whichever one you don't pick will be the backup.

THE COURT: Okay. Got it. I don't know if you have anything on this that you want to say, Ms. Yeary. You may in a second --

MS. YEARY: No, your Honor. I think our pool has a large enough amount of cases at this point in time.

THE COURT: Yeah. So you may in a second, but not now.

So let me just talk through this a little bit with you. Without saying anything about what any ruling is going to be because I haven't made them yet, this is going -- I think there's a reasonably good chance that this is going to be a real live issue for Auxilium in fairly short order. So the issue about scrambling for what I think is an April date, you know, is very potentially going to become a live issue. But that's April, and there's time to adjust between now and April.

I haven't seen anything, obviously, on Lilly yet, but we don't have that kind of adjustment time on Lilly between trial one and trial two because the first one is set for the end of January and the second is set for the end of -- or the

beginning of March, if I recall correctly.

And so, you know, on both of you, I think you're going to have -- I need you, on Auxilium, to be thinking about what happens if, you know, summary judgment gets granted on a case, how the adjustment is going to be made so we don't lose the April date.

And on Lilly, I think the thinking has to be is there anything that we can do now to, you know, have a case potentially available to tee up if one or both of those cases that you have designated goes out on summary judgment.

And then the issue for AbbVie is going to be, I'm just going to be blunt about this, I made commitments about not moving up your fall trial dates. I didn't make any commitments about not moving up your spring trial dates, and I am not making any commitments about not moving those up. And so if I lose a date for something else, what you may find is that, you know, what was currently going to be -- I don't remember whether it's a May date or an April date or a June date, might end up getting moved up to something earlier.

And on Auxilium, I mean, I think we might want to be thinking about whether one backup is enough. Again, I don't know anything about any of those cases at this point, and you only know limited things about them because you're just in the fact discovery process, but we need to do some rethinking about this. I mean, honestly, if I had it to do all over

again, I would not have -- I would not have allowed a process that left us with only two cases for two slots for any defendant. I think it was, in retrospect, very unwise on my part to have allowed that.

So time to get to work on plan B and plan C. Okay?

I'll probably -- I'm going to give you a deadline to come back to me on with something, and I'm going to say let's just say three weeks, whatever that three weeks is. I guess that's something like the -- something like the 8th of November or something like that. So I'll put that in an entry saying that I want plans, a backup plan, for what happens if trial-designated cases go out on summary judgment. Okay?

Anything else anybody wants to say?

MR. SEEGER: Your Honor, it's Chris Seeger again. Just one thing. I don't know if this is something you want to think about now or maybe down the road, and I don't have a sense either right now, but what the Court is thinking as far as how far out you want to try cases. I mean, if at some point --

THE COURT: Ha, ha, ha, ha, oh, don't get me started. Okay?

MR. SEEGER: Yeah, yeah. I'm embarrassed about raising this issue. But the question I'll just cut to the chase on is in Vioxx, we had a similar incident. At some point, we just kind of stopped and said, look, we're going to

have to create a bigger pool of cases that's drawn from the trials.

THE COURT: Yeah.

MR. SEEGER: Instead of working up four or five with defendant, I mean, should we be thinking of numbers that are bigger in the pool --

THE COURT: Well, look, I am all for you thinking about -- I mean, and applying your previous experience, none of which I have, applying your previous experience to coming up with a plan B, and I am not saying that plan B necessarily just has to be, oh, let's add one or two more cases here or there. I mean, there may be another way of doing this.

Honestly -- so when -- I'll just tell you, when people say, how long are you going to be trying cases, I'm going to say -- I basically tell people until I die, which after trial, about five or six may be fairly quick.

And, you know, so at some point, the options may be that I get some colleagues around here to start volunteering to try cases so we don't have to try them seriatim but we are trying more than one at once. But, you know, that all remains to be seen, and we'll see where things go.

The one other thing I want to alert you to just as a heads-up for the plaintiffs' side and for Auxilium for this next trial and I guess for everybody else for the ones coming up, so we have had the luxury for the first couple of trials

of having an extra attorney -- or an extra room we can use as a second attorney/witness room on this floor so each side has had one. That's not the norm. Every judge gets assigned one.

I'm told as of this morning by Pam that the court is going to take over the second room because they need it for storage purposes for a whole bunch of new computers that are going to get rolled out over a six-month period, so we are going to lose that second room.

We are looking to see if there's another option either on this floor or another floor, but the preliminary indications I'm getting are not likely. And so we may -- I don't know what our plan B is going to be. I mean, what we have done in the past is we tell people, okay, the plaintiffs get that room when the plaintiffs are putting their case on, and the defendants get the room when they are putting their case on, but I just want to give you a heads-up that we are not necessarily going to have two rooms available. And as soon as I have more information, I'll have Pam let you know. Okay?

MR. SEEGER: I will pass that on to the trial counsel.

THE COURT: Anything else anybody wants to say before we sign off?

MR. SEEGER: No.

THE COURT: Okay. Thanks a lot. Take care.

(Which were all the proceedings had in the above-entitled cause on the day and date aforesaid.)

   I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____          _____
Carolyn R. Cox                   Date
Official Court Reporter
Northern District of Illinois

/s/Carolyn R. Cox, CSR, RPR, CRR, FCRR