1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

)  Docket No. 14 C 1748
)
IN RE:                          )
TESTOSTERONE REPLACEMENT        )
THERAPY PRODUCTS LIABILITY      )
LITIGATION                      )
)  Chicago, Illinois
)  November 30, 2017
)  11:30 o'clock a.m.

TRANSCRIPT OF PROCEEDINGS - MOTION
BEFORE THE HONORABLE MATTHEW F. KENNELLY

APPEARANCES:                SEEGER WEISS LLP
BY:  MR. CHRISTOPHER SEEGER
77 Water Street
New York, NY  10005


SCHACHTER, HENDY & JOHNSON, P.S.C.
BY:  MR. RONALD E. JOHNSON, JR.
909 Wright's Summit Parkway, Suite 210
Ft. Wright, KY  41011


Court Reporter:             MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
Official Court Reporter
219 S. Dearborn Street, Suite 2102
Chicago, Illinois  60604
(312) 435-5639

APPEARANCES CONTINUED:

                    PAUL WEISS
                    BY:  MR. DAVID M. BERNICK
                    1285 Avenue of the Americas
                    New York, NY  10019


                    KAYE SCHOLER LLP
                    BY:  MR. ANDREW K. SOLOW
                    250 West 55th Street
                    New York, NY  10019

(The following proceedings were had in open court:)

THE CLERK: Case No. 14 C 1748, In Re: Testosterone Replacement Therapy Products Liability Litigation.

THE COURT: All right. Welcome to all of those who are on the phone.

The meeting we had in chambers, which is identified on the docket by an order I entered yesterday, took longer than I thought. So for those of you who aren't here and might be listening in, which I suspect for each of these is a dwindling number of people, I try to draw a balance in these things between efficiency and transparency. Obviously, the things that happen in open court are more transparent because everybody can listen to them. Sometimes they are less efficient. And so I'm trying to draw a balance.

Nothing that happens in our meeting in chambers is in the least bit private, and everybody is free to talk about it as much as they want. So the plaintiffs' steering committee folks who are there can disseminate it however they want to. Same is true on the defense side.

So I got very detailed proposals from both sides, which I greatly appreciate. I just want to talk -- and we have talked about a good deal of this back in the pre-meeting meeting that we had. So I want to just talk generally so that there is a record of it about a couple of sort of big picture items.

So first of all, on the question of enhancement of the plaintiffs' fact sheet, I'm sensitive to the fact that a good deal of information is already included in the existing plaintiffs' fact sheet as part of case management order 9, and there's more information that's required as part of what I directed in connection with the mixed-use case management order. I am blanking on the number of that. It's in the 70s somewhere.

I don't want to make people have to re-provide information that they have already provided. That's just make work, and there's certainly, as I said in the order that I entered that gave rise to today's conference, part of what I think is appropriate to do once we have reached this point in the litigation is, you know, do things that will result in winnowing of cases or defendants in cases, but I don't want to make somebody just do make work for the purpose of having a hoop to jump through that some people aren't going to jump through.

So we had a discussion in chambers about the differences between what each side has proposed in terms of a fact sheet and what's already existing and on the table.

And we had a discussion also about -- from the defense side what the defense considers to be big gaps, I guess, in terms of information gathering. And two of the things that were identified by the defendants that are missing

from the current regime, the case management order 9 regime, if you will, is information regarding the amount of product that was dispensed -- in other words, by a pharmacy -- and information regarding the amount of product that was used. In at least one of the bellwether trials that we have had, there was -- maybe more than one, there was testimony about the person not using the whole amount, what was prescribed, so I'm certainly cognizant that those are issues.

I think where I draw the line at this point, I mean, I do think that it's appropriate to require the plaintiffs to include the dispensing information, including documents; in other words, make the plaintiffs, as part of the fact sheet process or, for existing cases, the supplemental fact sheet process, go out and get the pharmacy records.

I am not prepared yet to require information about exact usage. I think that's a much more complicated thing, particularly when you're talking about something that's effectively an interrogatory answer. I think that's something that's more appropriately done during the discovery process for cases that are picked out.

So what I was -- what I was suggesting or what I'd like to see as part of the -- what I'd like to see done is going forward, we're going to have -- the plaintiffs' fact sheet regime is going to be essentially what already existed in case management order 9, plus whatever we added on for the

mixed-use case cases, plus, if it's not included in one of those places, which it may be, a requirement to go get the dispensing -- or the pharmaceutical record -- the pharmacy records regarding the amount of drug dispensed. I communicated to the lawyers that I thought that we really needed to have a form because there's still significant numbers of cases coming in. I think I got somewhere between 30 and 50 this month.

So we need to have a form that includes everything, and then -- but more importantly, because of the bigger number of cases, at least in the short term, we need to have some sort of document or something that the lawyers or that the parties in the existing cases can execute to say either, I've already provided all of this, you know, and cite their prior disclosures, or, here's the information. And I agree with the defendants that this is something that ought to be signed by the plaintiff, not just by the lawyer. My view on that is that that will likely enhance the likelihood that the disclosures will be meaningful and accurate. It's going to require more work, but that's part of what happens when you file a lawsuit.

So in terms of the contents of that, of the enhancement of the fact sheet, that's what I think ought to happen.

The one thing we did not talk -- and if anybody wants

to say anything about that, feel free.

The one thing we didn't talk about in the back was the -- what I'll call the enforcement process. So I guess I would like to hear a little bit of argument about that.

So currently -- and, again, I'm kind of painting in broad strokes here. Currently, the way it works is you have a deadline to provide a fact sheet. It's X number of days after you file the lawsuit. If you don't do that, there's a letter that goes out, I think, from the defendant saying, you're not in compliance. There's sort of a cure period. And then there's -- if it's not cured during the cure period, then the defendant can file a motion to dismiss.

Is that basically right? I don't know what the dates are.

And, honestly, the way that I have dealt with these, and it's not surprised anybody, I haven't had a huge number of those motions generally, but the way I have tended to deal with them is that even when the motion gets filed, if the party then comes into compliance, I deny the motion to dismiss. I think -- I may have not done that in one or two cases, but that's been my practice.

I don't think I said this in so many words in the order that gave rise to today's meeting, but I guess part of what I was trying to communicate is I'm at the point where I'm inclined to be a bit less generous and maybe a lot less

generous with that, at least on the last part. In other words, I'm going to -- you know, the universe is going to consist of what's filed as of the deadline, and I guess what I had in mind is, frankly, even contracting the process before that. I certainly understand -- I mean, you know, I was a practicing lawyer too, and I preside over any number of cases, and I know that it's not always easy to get clients to sign off on stuff and so on. But, again, they're parties in lawsuits, who filed lawsuits, and I think that process needs to be shortened, and I think it needs to be simplified, and what I mean by "simplified" is maybe a step taken out of it. So -- but I'd like to hear your thoughts on that.

Since it's really more of a defense issue, why don't you talk first, and I'll let the plaintiffs talk after that.

MR. BERNICK: David Bernick for the AbbVie defendants.

I think that the part of the existing process that's most problematic is that it invites -- indeed, it requires -- kind of a back-and-forth communication --

THE COURT: Right.

MR. BERNICK: -- in order to try to resolve issues before they come to the Court's attention. And what this means is you get, you know, emails back and forth, and let's go talk to the client, and stuff like that.

And so what we proposed is to try to make this more

routinized by simply -- we take the burden, of course, in going through everything and finding where the non-compliance is, and then we simply submit a chart of the non-compliant forms --

THE COURT: Submit it to me.

MR. BERNICK: -- to the Court.

THE COURT: Yeah.

MR. BERNICK: That's correct.

And then it's at that point --

THE COURT: Then I issue some sort of an order to show cause or something like that.

MR. BERNICK: Exactly. And then the plaintiffs can come back and cure or respond or do whatever.

My sense also is -- this is an editorial comment, is that based upon the experience that we've had so far with the enhanced -- you know, the additional questions for mixed-use --

THE COURT: Yeah.

MR. BERNICK: -- there really is a very substantial, you know, in the sense, dropout rate at this point. You know, our preliminary review says there are many, many cases that are going to be dismissed or people haven't supplemented. And so there really is a winnowing process that's taking place, and it doesn't require, in a sense, much to make it happen. People are not really interested in pushing the case or not

really interested in providing the information.  It surfaces pretty readily and that process hasn't taken an awful long time.

So I really think that it probably is the right time to say if it's non-compliant, it should just come to the Court.  If it's going to be cured or if there's going to be an objection to it, let that be the process that does --

THE COURT:  In other words, you submit the thing to me, and it's -- there's a case management order that says that once that's submitted, the person has 28 days or 21 days or whatever it is to show cause why the case shouldn't be dismissed, and that's basically the cure process.

MR. BERNICK:  That's exactly right.

THE COURT:  Your thoughts?

MR. SEEGER:  I mean, so we are a representative committee.  You have law firms here that have a number of cases, you have law firms that have a handful.

THE COURT:  Right.

MR. SEEGER:  And they really kind of fall into different buckets.  I mean, one lawyer may be somewhat less engaged than I am, obviously, in this litigation, and I hate to see a client hurt because somebody didn't -- you know, because we have now condensed that cure period and he is trying -- he or she is trying --

THE COURT:  Give this to me in practical,

what-happens-on-the-ground terms.

MR. SEEGER: Yeah. That's what I'm trying to make an effort to do. There are different -- I'm trying to say this tactfully. I mean, you have different quality of lawyers with different resources, frankly, that pay, you know, different levels of attention to this stuff.

I wouldn't have a problem with a show cause process that occurred after the cure. If we could keep the cure process in place so at least when you do -- if and when you do dismiss a case, we're pretty satisfied it's because the client either didn't comply or the lawyer -- but we can satisfy ourselves that something occurred between the lawyer and the client, and that's my concern; that if we start condensing the time frames, we're going to have -- you're going to find -- you're going to have some clients probably writing letters saying, you know what? I wasn't told, nobody contacted me, nobody said this, nobody said that.

THE COURT: Yeah.

MR. SEEGER: I understand -- let me give you one example of where I think this has worked. I mean, Mr. Stanley for Eli Lilly has used his authorizations, has sent letters to almost everybody where there's mixed-use issues, and he's gotten a number of people to voluntarily either dismiss him from the case in mixed-use case examples or to just simply say, we got it wrong.

So -- there are also -- on the defense side, there are also different levels of enforcement and really trying to sort of --

THE COURT: I know that. I know I get more motions from some defendants than others. And there hasn't been a huge volume of them.

So, look, I mean, I get all of that, but I guess I have to, at some level -- and, again, this isn't a brand new MDL. It's three and a half years old. Okay? It's three and a half years old. And it has -- you know, the number is north of 7,500 cases that got filed, and I think currently pending, there are about 6100, the biggest chunk of the dismissals being the Pfizer cases.

So people have filed lawsuits. Okay?

So if we never had an MDL, the way the plaintiffs' fact sheet process would be happening is that part of it would be 26(a) disclosures, which nobody has had to do in this case, part of it would be interrogatory answers, which nobody has had to do in this case, and the plaintiffs' fact sheet is essentially a -- is a compressed or a condensed version of those things. I mean, it's less information than people would have to provide if there was no MDL and they were just prosecuting their lawsuit. And I don't think it's in the least bit unfair, too onerous or inappropriate to expect people to do that, whether they got two lawyers at their firm

or 20 lawyers at their firm, whether they got 20 cases or they've chosen to file 250 cases.

And, obviously, I'm concerned about the clients too. I have been extremely stingy about letting lawyers withdraw from cases, as I'm sure at least some of you know if you have been following it. I almost always make them come in. Some of the motions to withdraw have been withdrawn because of what I -- all of the hoops I make people jump through. And part of the reason I do that is that I certainly know, because I've heard it in this case, that, you know, sometimes I have lawyers who have never met with the clients and then basically come in and move to withdraw saying, well, my client never contacted me. Like, did you ever contact them?

So the people that I have allowed to withdraw, they've tended to be situations where I've got an affidavit that shows really in most cases beyond any shadow of a doubt that the client has just completely gone off the grid, and so it's really a client problem, not a lawyer problem. And that's been deliberate on my part; I want to make sure that it's a client problem, not a lawyer problem. Now, that's withdrawals, not fact sheets, but there's not a whole lot of difference between the two.

You know, we've reached a point here where I need to be thinking about not just -- and we all need to be thinking about not just getting information, but also how does this

case advance towards some ultimate conclusion. And I just think that being more onerous -- and honestly, it's less onerous than it would be in an individual lawsuit prosecuted in federal court or in most state courts -- being more onerous in terms of requiring people to provide information, giving them less second, third, and fourth chances, is part of it.

So I appreciate what you're saying and I obviously understand the folks who are here in the room are talking in a representative capacity, and, you know, I get that, but I think I'm -- we can talk about the time period, but I think the defendants' proposal is the way to go on this. I'm -- I want to take out that middle step, the middle step being the back and forth. So that's going to come out.

And we can talk about -- I mean, the end result of today, which is going to happen in about 15 minutes, 14 and a half, is going to be you need to get together really fast and draft an order. But, you know, see if you can agree on a date for that show cause process and exactly how it's going to happen. But if you can't, just let me know, and I'll resolve it for you.

So that's plaintiffs' fact sheet.

The second kind of big picture thing is how that all works in connection with the selection of more cases. And what I said is that -- what I said to the lawyers in the back is after having read both sides' proposals -- and the

plaintiffs' proposal in very broad terms was to do, I guess, limited individual case discovery in a large number of cases, use those to select a smaller number of cases, and then those would be the additional trial cases -- the defendants have it happening in waves, I guess.

But the other big difference is the defendants didn't want the proposal of selecting additional trial cases to start until after the plaintiffs' fact sheets had been enhanced.

And so what I said, and my intention is, I want to have at least eight more cases beyond what we're already anticipating that are going to be trial ready as of August 1st. So when I say "beyond what we're already anticipating," what we're already anticipating are the cases that have already been selected and the mixed-use cases. So it's eight more beyond that that are ready -- that are going to be ready for trial as of August the 1st of this year -- I know that involves a lot of work, a point I'll return to in a moment -- and then a greater number than that of additional cases ready for trial as of the first of next year, and a greater number than that ready for trial as of, let's say, the middle of next year, July 1st.

I'm not in a position to be specific on those numbers. I'm going to leave that to people to propose in advance. I think what you should assume is that the likelihood is that I am going to be farming some things out or

trying to farm things out to other judges or we will be doing multiple plaintiff cases. I have not made a decision on that, and the final version of the order is going to say that's just still an option on the table that I'll decide later and I've, you know, thought about and continuing to think about what both sides have submitted on that topic.

So how that fits in with the plaintiffs' fact sheet thing is -- for the additional cases for the end of this year, it's just not practical; there's not enough time to do an enhancement of the supplementation of the plaintiffs' fact sheet before those cases get picked because you are going to have to start doing the work on them quicker.

I think as a practical matter, the wave two and later waves are going to be cases that -- where the fact sheet will have already been enhanced at that point because of just the timing of when I do that, but for the first set, no.

Then we get to the -- kind of the big kahuna -- "kahuna," I believe, is spelled k-a-h-u-n-a; I think that's the official spelling of "kahuna." So -- and that is how the cases get picked.

So my -- and both sides made very detailed submissions on this, and I completely understand where both sides are coming from.

So the plaintiffs' idea was we should pick everything. I get why -- I get the rationale for it. There

is a certain amount of sense to it. And I'm certainly cognizant of the issue of not overburdening particular law firms. I just don't think that has the appearance of fairness, and maybe not actual fairness, so I'm not willing to do that.

On the defendants' side, the proposal was random selection. And I've said this before: Random doesn't mean representative. Random means random. Coin can come up heads six times in a row. That's random. It's not representative. So I don't agree with that either.

I wish I had the idea to tell you, do it this way. I don't. I'm sorry. I don't. I think that it's conceivable, and I made this suggestion, that for this initial group of cases, that you might be able to pull additional cases from the mixed-use cases where you've already got, at least in theory, the enhanced fact sheets, which I think were due this past Monday. We've got a little bit more information about those which, you know, could allow some intelligent thing -- I mean, I think, honestly, if we can't come up with something else, the default is going to be we do some sort of 50/50 thing if you can't agree to something, because that's just -- you know, that's what Solomon does when Solomon can't -- when the parties can't do it. You just chop the baby in half, or at least threaten to do so.

In terms of the proportions, what I said is that I

think that the proportions of cases should mirror the overall proportions of cases that each defendant has in the MDL, with the exception of the extra ones we are putting in for this year.  For those cases, Actavis and Endo are further behind, and so they should be left out of the extra ones for this year.

And so the proportions should be whatever the proportions are for -- AbbVie's obviously got the most, AbbVie, Auxilium, and Lilly.  And then for the cases that you're doing next year, you sort of equalize the proportions.

A big issue, though, is when lexicon happens, when lexicon gets dealt with.  I think really what this boils down to is, ideally, lexicon waivers would be solicited, and nobody has to waive lexicons; you know, people have a choice whether or not to do that.  Lexicon waivers would be solicited towards the front end, the concern being that if it happens towards the back end and there's, you know, less than optimal percentage of lexicon waivers, you have to assume that's what's going to happen, so you have to put more cases in on the front, which is more work for everybody.

Again, I don't have any precise answers as to how that should be done, but you guys are all very smart, and you've done this before, and I think you ought to be able to come up with something.

I do want to preserve the thing that, you know, a

non-waiver of lexicon doesn't get you out of the mix, and that's just -- frankly, it's in there, it's in there as a -- for want of a better word is you don't get a free pass. I mean, it's one little way of preventing people from gaining it, so that somebody understands that even if they don't waive lexicon, the case is still going to have to work up because there's other ways I can deal with that. I can remand it, I can ask to be assigned to another district to go try it there. So -- and I don't want people to be able to think, oh, all I have to do to get out of the system is just refuse to waive lexicon. So that should be kept in.

And I think I've pretty much covered all of the points I wanted to cover. Let me just go through my notes really quickly here.

And so my -- I guess my two closing comments is that -- and these are also both things that I said in our meeting prior to the case management conference, all of the current trial dates are set in stone until I say they aren't; but I am not prepared to or willing to say that the 2018 schedule is what it is and everything else comes after that. As I said, we're going to have more cases ready for trial later in this year. Some of the dates that are set for later in this year -- and I'm talking about the -- when I say "this year," I mean 2018, and when I say "2018," I really mean the second half of 2018 -- we've got some dates in some of the

case management orders. Those might end up being changed. As I've said in the order that set today's conference, there's, you know, at least some significant possibility that there may be multiple trials going on in front of different judges at the same time, and that includes state cases, obviously.

And, basically, the bottom line is this is going to involve a lot more work for everybody; myself included, but I'm not, you know, going to complain about that. I'm the one that's imposing the extra work.

The fact is it's a very large MDL. It's got 7,000 -- like I said, north of 7500 cases filed, north of 6100 still pending. In an ideal world, these things don't last forever, and I need to find ways to kind of move it towards moving it toward a conclusion, I think is the best way I can put that.

So I would like to get -- I guess, ideally, I would like to have a draft order from you all by a week from today, the idea being that I sign it a week from tomorrow, or I tweak it and sign it a week from tomorrow, and then we go on from there.

So what do people want to ask or say?

MR. BERNICK: Yeah. The scope of the order that you want us to submit?

THE COURT: Yeah. Maybe it's more than one order, honestly. Maybe it's one order for the fact sheet thing and it's a different order for the picking cases and so on.

And I will add that I think on some of the defendants, the idea was to pick cases from an existing list or an existing pool. I'm -- absolutely, that's -- that is an appropriate way to do it, but if there's disagreement about that, I'll obviously have to adjudicate it and just make sure that it gets teed up for me.

So I think it probably ought to be more than one order. I think we ought to have an order on the fact sheet thing that's cleaner, and I think we ought to have an order -- and maybe it's more than one order. I mean, I would like to have -- just because it's easier for me to grasp what's going on, I know that I got separate orders for AbbVie, Endo, Actavis, Auxilium, and Lilly. I would frankly prefer to have all of those in different sections in one order.

MR. BERNICK: I think you've given -- another option might be fact sheet, maybe an order for 2018 trials, and then --

THE COURT: That's fine too.

MR. BERNICK: -- more for 2019 trials --

THE COURT: That's fine too. That's fine too. Yeah, that's fine.

MR. BERNICK: Okay. I just had three questions.

THE COURT: Sure.

MR. BERNICK: One, just so we can at least predict or have some notion of where you're -- when do you think you

might be involving other judges?

THE COURT: I don't -- so just realistically, I don't expect it to be -- this is why I'm talking about second half of 2018. That's when.

MR. BERNICK: Okay. Okay.

THE COURT: That's when.

MR. BERNICK: Second --

THE COURT: I have a sales job to do, so it takes a while.

MR. BERNICK: With respect to the timing for the -- for the PFS supplements --

THE COURT: Yeah.

MR. BERNICK: -- I take it from what you have said is that that's a forget it in connection with the trials in 2018 --

THE COURT: Correct.

MR. BERNICK: -- but should we be thinking about the timing of when those need to be submitted?

THE COURT: Well, so what I --

MR. BERNICK: In part by 2019.

THE COURT: What I would say is for the existing cases, I think what ought to happen is there ought to be some -- you know, just to be general about it -- reasonable time period from whenever I enter the order, that it's going to have to be supplemented or somebody is going to have to

say, I've already provided this information; one of the two. I don't know exactly what that time period is. Maybe it's 60 days, maybe it's 90 days. I don't know. I'll leave that for you to negotiate.

MR. BERNICK: Okay. The last thing that I just -- by way of information, maybe to draw a distinction that may be helpful to your Honor, so if we're thinking about populating the eight additional cases to be trial ready by the -- by August of 2018, you've said, you know, expanding mixed-use may be a way to go.

If we're working within the confines of the 100 that were selected where we now have -- you know, people have gotten --

THE COURT: Yeah.

MR. BERNICK: Based at least upon our predictions right now or our estimate right now, it looks like there will be a substantial enough volume of those cases -- that is, at least from AbbVie's point of view -- that will be -- that we'll have done the submission and complied with the submission, to pick more cases from that. And that might be, you know, a helpful thing to deal with.

THE COURT: Do you have any thoughts on that?

MR. JOHNSON: I don't think at this point -- I'm sorry, your Honor.

THE COURT: Do you know?

MR. JOHNSON: Ron Johnson for the PSC.

THE COURT: Yeah.

MR. JOHNSON: We don't want to necessarily -- until we know what that looks like, I don't want to limit ourselves to that.

THE COURT: Yeah. That's fine. I mean, I did suggest -- and I think I maybe neglected to say it out here -- I did suggest when I had our meeting that using those cases might be a way of getting kind of a leg up on adding some more cases on. I don't intend for that to be sort of, okay, it's got to come from those, but, you know, those would be cases at least where you've got additional information at this point where you don't have to then tell somebody to go back and do more. But I'm not going to impose that.

So it's certainly an option to consider. And, you know, maybe -- you know, maybe if what we end up as a default is that the plaintiffs are picking half and the defendants are picking half -- because you're picking your half --

MR. JOHNSON: Right.

THE COURT: -- the defendants are picking their half from that because you know more about those cases.

MR. BERNICK: One, experts. If we're going to be gearing up for a significant number of additional new trials at the back end of the year, we may have to involve, you know, additional experts.

THE COURT: Yep. And this -- and these orders should include the schedules for all of that kind of stuff.

MR. BERNICK: Okay. And then the last thing is that random selection, so we have the selection of the cases that are to be worked up for trial, and I know that random is off the table for that, but what about kind of getting the cases from which we can make our recommended selection?

So, for example, we had the 100 cases for the bellwethers, we have the 100 cases for the mixed-use cases, and those were all random selection as opposed to the parties going back over the pool as a whole where you know the arguments back and forth --

THE COURT: Yeah, we had this discussion before. I am just going to short-circuit this. I'm not going to do what I did with the original AbbVie pool, which is where I basically said, okay, we're going to randomly pull a subset so you have a smaller chunk to look at. I mean, you are free to do that on your own, if you want, but I am not going to impose that. That's the bottom line.

MR. BERNICK: Okay.

THE COURT: Been there, done that. Okay.

Anything on the plaintiffs' side you want to raise? Mr. Solow?

MR. SOLOW: Andrew Solow for Auxilium and Endo, your Honor.

Just one quick item. With the eight additional cases and going forward in the future, if your Honor is leaving it to the parties to decide what the selection method is going to be, so we can get some guidance, is it clear that there will be some ability within the process, in your mind's eye, of arguments of non-representative? I know you dealt with this previously --

THE COURT: Yeah, sure, of course. Right. I mean, people are going to be able to come in and say, don't let this case go to trial. It's an outlier. Absolutely. I mean, I don't want -- I want to have cases to try. I don't want them to be complete oddball cases on either side.

So, yeah, sure, of course.

MR. SOLOW: With that guidance, we will hopefully be able to negotiate. Thank you, your Honor.

THE COURT: I mean, you know, honestly, I want to have -- as I have before, I want to have some input in this is the case that's going to trial and so on. And it's particularly true if I'm, to use a Chicago term, Lujacking these things to other people.

All right. Thank you for coming in today. See you in a few weeks.

MR. JOHNSON: Thank you, Judge.

MR. SEEGER: Thank you, Judge.

(Which were all the proceedings had in the above-entitled cause on the day and date aforesaid.)

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____          _____
Carolyn R. Cox                     Date
Official Court Reporter
Northern District of Illinois

/s/Carolyn R. Cox, CSR, RPR, CRR, FCRR