UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| In re: TESTOSTERONE REPLACEMENT THERAPY PRODUCTS LIABILITY LITIGATION | MDL No. 2545 |
| | Master Docker Case No.: 1:14-cv-01748 |
| | Honorable Matthew F. Kennelly |
| This Document Relates To: ALL CASES | |

**BERNSTEIN LIEBHARD LLP'S OBJECTIONS TO THE PLAINTIFFS' STEERING COMMITTEE'S MOTION TO AMEND CASE MANAGEMENT ORDER NO. 16**

Bernstein Liebhard LLP ("BL") submits the within Objections to the Plaintiffs' Steering Committee's Motion to Amend Corrected Case Management Order No. 16 ("CMO 16"), which seeks to increase the assessment of common benefit fee and expense fund to a total of 19.5% ("Motion") and respectfully shows the Court the following:

### ARGUMENT

The instant attempt by the Plaintiffs' Steering Committee ("PSC") to nearly double the already substantial ten (10%) percent assessment it was granted in CMO 16, is excessive, unfair in application, and lacks transparency, and thus should not be permitted by this Honorable Court.

1. **An Increased Assessment is Fundamentally Unfair**

As the Court will recall, on September 10, 2018, it entered Case Management Order No. 134 ("CMO 134") staying all claims against the AbbVie Defendants as "the parties have entered into a Confidential Term Sheet regarding a potential global settlement…" CMO 134 was entered after the Court stayed all deadlines from August 31, 2018 forward in the eight (8) "Wave 1" cases selected to

begin trial against the AbbVie Defendants as early as October 2, 2018, presumably because the PSC and counsel for Defendants advised the Court that settlement was imminent.

To date, the PSC has not communicated the amount of the proposed AbbVie settlement to BL, nor is BL aware that the value was communicated to any non-PSC firm. Thus, the only entities privy to the value of the proposed settlement, are the PSC firms and Defendants. Notwithstanding the fact that BL and the other non-PSC firms remain in the dark about the settlement values, *a mere twenty (20) minutes* after the entry of CMO 134, the PSC raced to file the instant application, asking this Court to nearly double its share of the settlement, the *value of which is known only to its members*. Regardless of whether the AbbVie settlement is large or small, this fact alone creates an irreconcilable conflict and screams toward an interpretation of self-dealing that warrants outright denial of the PSC's motion.

Moreover, for over four (4) years, since Case Management Order No. 6 ("CMO 6") was entered establishing Plaintiffs' Leadership, and CMO 16 was entered just over two (2) months later, the PSC members were under a fiduciary obligation to accept the responsibilities enumerated, and perform the work set forth therein for a total assessment of ten (10%) percent. The PSC's argument now is tantamount to "it took more work and money than we thought it would" to resolve the litigation. Any miscalculation as to the effort and expense that membership on the PSC would involve should not, at the eleventh hour, result in slashing BL's fee contracts with its clients, nor should it unfairly burden BL's clients with an unprecedented cost assessment, greater than what was imposed in *any* case cited by the PSC in its motion.

Moreover, BL (and undoubtedly other plaintiffs' firms) incurred significant case-acquisition costs in representing plaintiffs retained after the entry of CMO 16. Part of calculus in deciding to make such expenditures was the ten (10%) assessment set forth therein. BL should not bear the

burden of the PSC's alleged miscalculations now, years later, after already having made those significant expenditures relying upon, *inter alia*, the assessment ordered by the Court.

### 2. "Wave 1" Bellwether Cases

It is without question that the preparation and prosecution of the eight (8) "Wave 1" cases through case-specific discovery, experts, *Daubert* briefing and motions *in limine* was the impetus for resolution of the litigation against AbbVie on the eve of the commencement of trials.

Beginning in December 2017, the PSC solicited, from all TRT plaintiffs' counsel, representative cases to be part of a bellwether pool and to be worked up for trial. BL (as a non-PSC firm) volunteered a number of AbbVie cases for consideration in the process, and after vetting by the PSC, two (2) of BL's cases were selected[1] as "plaintiffs' picks", one as part of "Wave 1," and the other part of "Wave 3."

Commencing in March 2018, BL undertook the prosecution of the *Natale* matter as a bellwether pick in "Wave 1." Thereafter, BL expended hundreds of hours in preparing for and conducting ten (10) case-specific fact witness depositions, conducting three (3) general and case-specific expert depositions, preparing a case-specific expert report, preparing affirmative motions *in limine*, preparing and submitting briefs in opposition to the AbbVie Defendants' case-specific *Daubert* and summary judgment motions, and preparing opposition to the AbbVie Defendants' motions *in limine*.

While the PSC would offer assistance and guidance through the process, it stressed and emphasized that it did not have sufficient resources to prosecute each of the eight (8) bellwether cases through trial, and that it was therefore each individual firm's responsibility to work the cases up through discovery, assemble a trial team and ultimately try each case. No fewer than five (5) of

---

[1] *Edward Natale, Jr. v. AbbVie Inc., et al.* (1:16-cv-05706) ("Wave 1") and *Frederick Carullo, Jr. v. AbbVie Inc., et al.* (1:15-cv-08679)("Wave 3")

3

the eight (8) "Wave 1" bellwether plaintiffs were represented by non-PSC firms. The role of the individual plaintiffs' firms (including BL) and the pressure the bellwether cases brought to bear in the resolution of the AbbVie cases must not be minimized.

In arguing for an increased assessment, the PSC notes in its motion, *inter alia*, that it "conduct[ed] more than 100 case specific depositions for Bellwether cases," unequivocally acknowledging that such case-specific work is indeed for the common benefit of all litigants. When it came to the "Wave 1" cases, however, BL conducted all case-specific fact depositions and virtually all other work-up with its own team.[2]

Notwithstanding the fact that BL's work in the "Wave 1" cases clearly, by the PSC's own definitions, constitutes common benefit, it should be noted, that the PSC, in arriving at its proposed 19.5% assessment, never asked BL to submit its bellwether time before seeking relief in the instant motion before the Court. Ultimately, the PSC's conduct in (1) not shouldering the burden of the eight (8) "Wave 1" AbbVie bellwether cases; (2) failing to consider the work of BL and the other firms that *did* provide the leverage necessary to resolve the AbbVie litigation; and (3) its subsequent rush to the Court, *after* resolution (and before disclosing the value of the settlement to individual attorneys)[3], in an effort to nearly double the assessment that it had the right to expect, demonstrates that the PSC's sole interest at this juncture is self-interest. It is respectfully submitted that the Court should not permit this eleventh-hour attempt by the PSC to double the size of its slice of the pie to the detriment of BL in its fee agreements with its clients.

3. **The Increase Sought by the PSC is Unprecedented and Unwarranted**

The cases cited by the PSC, in an effort to establish a 25% "benchmark" are inapposite. They all relate to class-action matters, and none of the cited cases concern personal injury/product

---

[2] BL intends to submit its hours and expenses in connection with the *Natale* matter to the PSC for reimbursement as common benefit.

[3] Even as of this date, the PSC has yet to disclose the value of the proposed settlement.

4

liability claims such as in the within litigation. The undersigned is unaware of any pharmaceutical or medical device product liability mass tort in which any court established such a 25% "benchmark" for common benefit fees, and the attempted creation of such by the PSC in this context is a fiction, nothing short of audacious, and must fail. Accordingly, the suggestion that a 19.5% assessment is a relative bargain compared to 25%, must likewise fail. The plaintiffs in this MDL are already represented by attorneys who have their own contingency fee agreements/contracts with their clients, and have invested significant time and shouldered substantial costs in acquiring, screening and prosecuting their claims.

The PSC's request runs counter to the premise that an individual attorney, as each client's attorney of choice, is the primary attorney and that a common benefit fee is supposed to be a *subset* of the primary fee. *See* William B. Rubenstein, On What a "Common Benefit Fee" Is, Is Not, and Should Be, 3 Class Action Att'y Fee Dig. 87, 89 (2009) ("As a judicially imposed portion of a larger privately-negotiated contingent fee, the common benefit fee is logically, therefore, generally a lower fee than the class action fee award").

The PSC cites to only two (2) mass tort cases, similar to the TRT MDL, specifically, *NuvaRing* and *Vioxx*. The Court in *Vioxx* recognized that the interest of primary counsel should be considered in the context of the defined pool of fees while establishing a benchmark percentage:

> … the Court finds that 6% of the settlement amount is a reasonable benchmark percentage for a common benefit fee award. This figure represents about 20% of the total attorneys' fees. This figure is within the range of MDL awards and assessments described above. No part of this 6% will come from the recovery of any Vioxx claimant; rather, it will be assessed against the contingent fee recoveries of all Vioxx primary plaintiffs' attorneys. Furthermore, in recommending the Settlement Agreement to their clients and participating in the Settlement Program, all Vioxx *primary plaintiffs' attorneys consented to a common benefit assessment of up to 8%. Accordingly, an assessment of 6% is clearly acceptable to them.*

*In re: Vioxx Prods. Liab. Lit.*, 760 F. Supp. 2d 653 (emphasis added).

The Court further determined:

> Based on its observation and knowledge of the amount and nature of the common benefit work done in this case, the Court concludes that a reasonable adjustment is 0.5%. Accordingly, the Court will increase the benchmark percentage upward from 6% to 6.5% of $4,850,000,000, or $315,250,000. *Primary Vioxx attorneys will receive over 25% of the total settlement value in this matter,* amounting to approximately $1,236,750,000. This should be adequate compensation for the primary attorneys, particularly in light of the benefits of economies of scale and for the relief of the burden of pretrial discovery and settlement negotiation.[4]

*Id.* at 658 (emphasis added).

Here, the PSC is asking for an assessment *triple* what was permitted in *Vioxx*. The 14.5% from attorneys' fees it seeks would unfairly reduce a standard 33 1/3% retainer to less than 19% and reduce a 40% retainer to less than 25%. Exhibit "A" to CMO 16 states, in pertinent part, that "Plaintiffs' Leadership Group will recommend to the MDL Court that *appropriate consideration will be given to individual case contracts between attorneys and their clients*" (emphasis added). The PSC's proposal is appalling, and results in the opposite – namely, draconian cuts to the fee agreements of individual attorneys.

Given the unprecedented nature of the PSC's request, BL requests leave to audit all of the time and expense records and any other records/submissions made by the PSC member firms, examine and inspect any and all records, criteria or formulas used to arrive at its proposed assessment, review any minutes, e-mails, texts, correspondence or other writing concerning the proposal, and otherwise conduct full discovery as to the bases of the PSC's claims to entitlement to an assessment of 19.5%.

---

[4] The PSC's reliance on *Vioxx* is misplaced. There, the Court based its decision, in part, upon the knowledge of the total value of the settlement, and adjusted the common benefit upwards by 0.5%, recognizing a dollar amount that would adequately compensate the PSC attorneys for work performed while minimally disturbing the primary attorneys' fee contracts. By contrast, here, the PSC has elected to request a near doubling of its allowed assessment, even *prior* to publicly disclosing the value of the settlement.

## CONCLUSION

The PSC's Motion seeking an increased assessment from 10% to 19.5% is excessive, unfair in application, and lacks transparency. Accordingly, it is respectfully submitted that the PSC Motion must be denied in its entirety.

Dated: New York, New York
       September 28, 2018

Respectfully submitted,

/s/ Sandy Liebhard
Sandy Liebhard, Esq.
BERNSTEIN LIEBHARD LLP
10 East 40th Street
New York, New York 10016
Phone: (212) 779-1414
Fax: (212) 779-3218
E-mail: liebhard@bernlieb.com
*Attorneys for Plaintiffs*

## Certificate of Service

I hereby certify that on September 28, 2018, I electronically transmitted the foregoing document to the Clerk of the United States District Court using the CM/ECF system for filing and service to all parties/counsel registered to received copies in this case.

/s/ Daniel C. Burke
Daniel C. Burke
BERNSTEIN LIEBHARD LLP
10 E. 40th Street
New York, NY 10016
Phone: (212) 779-1414
Fax: (212) 779-3218
Email: dburke@bernlieb.com