IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: TESTOSTERONE REPLACEMENT THERAPY PRODUCTS LIABILITY LITIGATION | MDL No. 2545 |
| | Master Docket Case No. 1:14-cv-01748 |
| | Honorable Matthew F. Kennelly |
| THIS DOCUMENT RELATES TO ALL CASES | |

**Plaintiffs' Steering Committee's Consolidated Response to
Objections to Motion to Amend CMO 16**

The Plaintiffs' Steering Committee (PSC) states as follows in response to the three objections to the motion for an increase in the common benefit assessments. At the outset the PSC will draw the Court's attention to the fact this was an MDL in which Plaintiffs had to prosecute claims against *inter alia* AbbVie, Auxilium, Endo, Actavis, and Eli Lilly. The case against each Defendant required full discovery, expert opinions and motion practice. The cases against AbbVie and Auxilium required full bellwether trials. This tremendous undertaking required a PSC of 30 law firms, all of whom performed difficult and meaningful work toward the common benefit of all Plaintiffs. It also required a staggering amount of capital that was raised and provided by the PSC firms. The PSC has now asked the Court to increase the common benefit assessment to an amount that is commensurate with this amount of work and expense.

This Court provided ample notice for any firm with a case filed in the MDL to present objections to the increase sought by the PSC. There are more than 200 attorneys/law firms who have entered an appearance on behalf of one or more plaintiffs in this multi-district litigation in the Northern District of Illinois. Of those, only three law firms filed an objection to the request for an increase in the common benefit assessment percentage. Similarly, those three law firms represent a

1

total of 63 individual plaintiffs out of the approximately 7,000 plaintiffs with cases filed in this Court. There is no better evidence of the nearly unanimous support for this increase than the fact that less than 2% of law firms and less than 1% of plaintiffs objected to it. This is largely due to the fact that most non-objecting firms took the time to speak to someone in leadership in order to learn the facts supporting the increase. Those firms that did not object understood and appreciated the tremendous effort and expense that was put forth by the PSC in achieving a global settlement with all Defendants. The PSC will address each of the three objections in order below.

### I. Objection of the Plaintiff Cheryl Griffin and attorney Janet Spence.

Ms. Spence on behalf of her client, Cheryl Griffin objects on several grounds, which are responded to as follows:

#### a. Increase in assessment for CB fees will leave her Plaintiff at disadvantage.

This is not true. An increase in the assessment for attorneys' fees from 8% to 14.5% will have no impact on any individual plaintiff's net recovery. For fees, as opposed to expenses/costs, the assessment percentage is deducted from the attorney's contingency fee, not the client's portion of the settlement. So, if Ms. Spence has a contingency fee of 40%, 14.5% percent of that will go to common benefit and she will keep 25.5%, but none of that 14.5% will come from the client's 60% net. It is disingenuous of her to claim otherwise and this fact was explained to her repeatedly by leadership prior to her filing an objection.

#### b. Plaintiff Counsel does not know the amount of the settlement.

This is not true. Leadership had a call with Ms. Spence in which this information was provided to her under the strict constraints of the confidentiality terms of the settlements. Unfortunately, Ms. Spence has disclosed some of that confidential information in her pleading. Ms.

Spence has made a misrepresentation to this Court by stating in a filed pleading that she was denied this information regarding the costs of the litigation and the amount of the settlement.

### c. Plaintiff counsel does not know amount of PSC fees and costs.

As stated above, this information was provided to Ms. Spence on a telephone call. Her claim to the contrary is not true.

### d. Violation of FRCP 23 (h).

Counsel argues that the request for a fee increase violates FRCP 23(h). That rule only governs fees in *certified* class actions. This is not a certified class action but multi-district litigation under 28 U.S.C. 1407. That rule has no application to the determination of the proper common benefit percentage in a mass tort. Although some courts have referred to aggregate settlements as quasi class actions and have applied Rule 23 principles to attorneys' fees, they have essentially done so to ensure notice to those affected and an opportunity to object and be heard. The Court is the ultimate decision maker of what fees and expenses are awarded. The hold back now requested is to ensure there are sufficient funds available to support the Court's ultimate decision.

### e. Which cases benefited from time and money spent by the PSC.

Another basis for the objection is that "Griffin is unable to determine . . . weather (sic) the cost expended were for the benefit of the MDL, or for the benefit of the PSC and Steering Committee's own clients." No one particular case was the beneficiary of the expenses incurred by the PSC. Certain cases were selected as bellwether cases, but the work that was done for those cases benefited all. It consisted of: the review of millions of pages of documents; the negotiation of more than one hundred case management orders; extensive motion practice at the pleading stage, as well as dispositive motions at the close of discovery and expert disclosure; the taking of hundreds of depositions; finding and preparing expert disclosures; pretrial preparation and motion practice,

including motions *in limine*, deposition cuts, and jury instructions; full bellwether trials; and post-trial motion practice, all of which was for the common benefit of the entire litigation. Also, the allocation of all money for fees and expenses will be done in accordance with the Court's case management order and oversight of the Court and special master. This was explained to Ms. Spence by leadership on at least two telephone calls.

### f. Trials only lasted one week and were not expensive.

The Court is well aware that the bellwether trials were lengthy and required significant resources in terms of money and time. No trial lasted only one week, and most of the trials were kept at three weeks only because of time limitations imposed by the Court. Every trial required the testimony of multiple live expert witnesses, the work of many lawyers and support staff, and months of pretrial preparation. The expense of conducting each of these trials was significant.

### g. Additional 3% will negatively impact settling Plaintiffs.

Counsel is correct that the request of an increase in the common benefit assessment for expenses will affect the individual Plaintiffs. The percentage deducted for cases expenses does come from the client's portion of the settlement, as case expenses are the responsibility of the client. So, if a plaintiff has a settlement of $100, he will have to pay $5 under the current request for an increase in the common benefit assessment from 2% to 5%. This is an entirely reasonable percentage for expenses, and it is actually far less than the case expenses would be in a typical single event product liability case. Even at 5% the expenses incurred by individual plaintiffs in this MDL are a fraction of what they would have been had the cases not been consolidated. The MDL Plaintiffs will net significantly more money in their settlements because this was coordinated litigation.

### h. Requested increase is a "windfall" for PSC firms.

Given the number of hours submitted by the more than 30 law firms that performed significant work in this case and the amount of the settlements with all Defendants, simple math

4

demonstrates that there will be no windfall for any law firm. Furthermore, the allocation of fees and expenses will be done in accordance with the case management and oversight of this Court.

> i. **PSC will not disclose itemization of costs.**

Leadership did disclose the total amount of the expenses incurred by the PSC firms to date. Leadership also disclosed the number of hours to those who requested it. Beyond that information the manner of reporting, recording, auditing and disclosing expenses is governed by a case management order of this Court, which has been adhered to by the PSC.

> II. **Objection of the Plaintiffs Michelle Guinn; Mason Shell; Ronald Barnes; William Jones; and the law firms of Sean Clearly and Andres Pereira.**

Attorneys Cleary and Pereira on behalf of their clients, Guinn, Shell, Barnes, and Jones, object on several grounds, which are responded to as follows:

> a. **Counsel request that "they be provided with specific information regarding the settlement . . . both specifically and on a proposed per Plaintiff-basis. . ."**

If counsel for these Plaintiffs would like information regarding the basis for the request for an increase in common benefit percentage, they should contact one of the three co-lead counsel. To date, they have not done so. It is important to note that the total of 19.5% for costs and fees is only a holdback. The final determination of how much is paid to those firms that funded the litigation and performed all the work will occur in accordance with the Court's order. Also, the amount of the settlement on a "per-Plaintiff basis" has not yet been determined by the appointed Special Master. Once those determinations are made, they will be provided to all counsel.

> b. **The request for an increase is premature and seeks costs and fees that are not typical.**

The request is not premature in that it was made after the last remaining defendant in the MDL executed a term sheet so that the PSC knew the exact amount of the total of all settlements,

and after the determination of total expenses and time submissions. The latter of which were calculated only after all outstanding expenses were accounted for and there would be very little, if any, new expenses or time expended for the common benefit of the litigation, aside from the expenses associated with settlement implementation.

      **c. Request for information regarding time and expense submissions.**

Before filing an objection to the motion to increase common benefit assessment percentages counsel should have sought this information from leadership, but they did not. Had they done so, leadership would have provided them with the information that clearly supported the increase sought. Beyond that information the manner of reporting, recording, auditing and disclosing expenses is governed by a case management order of this Court, which has been adhered to by the PSC. It is worth noting that those firms who did request and receive that type of information did not object to the request for an increase.

      **d. Whether expenses were incurred for MDL or individual plaintiff benefit.**

Which cases were litigated using the expenses incurred by the PSC is a matter of public record and available to any counsel willing to take the time to review the bellwether selection CMO's. No fees or expenses are being sought for the benefit of a particular case, but only for the common benefit of the entire litigation. This will be reviewed and put under scrutiny during the audit process that is set forth in CMO 16.

      **e. Request for Court review of time and expense submissions.**

The PSC has provided this data to the Court.

      **f. No reimbursement for time or expenses not documented correctly.**

The requirements for documenting time and expenses are governed by a case management order already entered by this Court. The Court will decide if they were adhered to.

> **g. Use of an appropriate method to determine reasonableness of attorney fees.**

The PSC agrees, and this is provided for in the applicable CMOs.

> **h. Ignorance of amount of settlement this type of confidential information.**

Again, counsel needs to contact leadership for this information. Due to the strict terms of confidentiality in the governing master settlement agreements and term sheets, this is not the type of information that can be disclosed through blast emails, list-serves, or large conference calls. Leadership has, and will continue, to provide this information confidentially on one-on-one telephone calls or in-person meetings.

> **i. Keep costs and fees in line with MDL cases where 6-6.75% was ordered.**

While there is no reason to doubt that 6% or 6.75% was the common benefit percentage ordered in one or more MDLs, it is not an "industry standard" or benchmark that is applicable to all MDLs. In some MDLs a number less than 6% may be appropriate. In other MDLs a number higher than 6% may be appropriate. It is completely dependent on the facts and circumstances of each litigation. This concept was articulated by the Court in *In re: Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, MDL 1708 (Dist. MN 2008):

> Further, the Court does not agree that strictly looking to other cases with similar settlement amounts will result in reaching a reasonable percentage for a particular case. That approach would not take into account the work actually completed for the benefit of the plaintiffs nor would it take into account what is most fair to the plaintiffs in light of the specific circumstances of the particular case in question.

The PSC has previously cited to analogous situations in which courts have ordered increases in common benefit in line with what is being sought here. By way of example *Vioxx* was a 4.85 billion dollar settlement in which the court ordered a holdback of 6.5% for attorney's fees, which created a fund magnitudes larger than what is being sought here given the amount of this settlement.

7

### III. Objection of the law firm Bernstein Liebhard.

The Bernstein Liebhard firm (BL) objects on several grounds, which are responded to as follows:

#### a. The PSC did not disclose the amount of the settlements or details regarding time and expenses.

On September 10, 2018, the PSC filed the motion to increase the common benefit percentage. On September 14, 2018, the Court entered CMO 136 setting a briefing schedule that provided two weeks for firms to object. In those two weeks, the BL firm drafted an objection to the increase that was largely based on their claim that leadership would not provide the settlement amounts and information regarding the common benefit expenses and time submissions, yet they never contacted any lawyer in a leadership position to ask for this information. BL is objecting to the motion on the grounds that they were not provided information that they never once asked for. Had they asked, the information would have been provided as it was to a large number of firms.

#### b. PSC was under fiduciary obligation to perform all work for the percentage ordered by the Court at the outset of the litigation.

Here, the leadership diligently and competently litigated an incredibly difficult and complex case against five Defendants past dispositive motions and through multiple trials. They then negotiated settlement with each of the Defendants on behalf of all claimants, not just inventory settlements for their own clients. To suggest that the leadership in this MDL has somehow run afoul of its obligations to the MDL plaintiffs is simply untrue. Leadership is simply seeking a modification of the CMO to adequately reflect the amount of time and expense required to achieve settlement for all plaintiffs.

### c. <u>Increase in common benefit percentage unfairly burdens BL's clients with an unprecedented cost assessment</u>

The BL firm states that the PSC cites to no precedent for a common benefit assessment in a range similar to what is being sought here. This is not correct, but the PSC will cite to them again here. *See In re: Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, MDL 1708 (Dist. MN 2008) (holding that there is nothing improper about increasing the assessment percentages from those are established at the outset of the litigation, and increasing the percentage for fees from 2% to 15% and expenses from 2% to 4.166%); *In re: FEMA Trailer Prods. Liab. Litig.* (14.25% fees); *In re Medtronic Prod. Liab. Litig.* (11% for fees, 4.5% for expenses); and *In re: NuvaRing Prod. Liab. Litig.* (17% for fees and 1.36% for expenses).

And, again, the increase in percentage for attorney fees will have no impact on BL's clients or any other MDL clients. While there clearly is precedent for this amount of common benefit assessment, it more important to recognize that the correct percentage for a given MDL is highly variable and turns on the myriad of individualized factors and special circumstances that can arise. In an MDL where the defendant elects to settle before any litigation occurs because of clear liability and a desire to avoid transactional costs, a proper percentage may be 1-2%. But, in a five defendant MDL that lasts for more than four years, requires the work of 30 law firms on the PSC, requires significant financial resources, results in multiple bellwether trials, and ultimately resolves in a manner that will result in payment of claims to all eligible plaintiffs, a very different percentage is warranted. It is the view of the PSC and other lawyers in the case that the current common benefit assessment is insufficient to compensate and reimburse the lawyers who achieved this case's result.

### d. **BL's case acquisition costs preclude any increase in the common benefit assessment.**

Perhaps the most disturbing grounds put forth by the BL firm as a reason to deny the motion is its opposition to an additional 4.5% deduction from their contingency fee agreement because they "incurred significant case-acquisition costs." Presumably "case-acquisition costs" is another way of saying the cost of TV commercials and other marketing to get clients. A law firm's decision whether and how to market for cases that it can file into an MDL is theirs alone to make.

Practicing law on behalf of plaintiffs is an exercise in managing risk. Plaintiffs' lawyers should know that any case they spend money marketing for could end up dismissed or with a defense verdict. If there is any reason that should never be considered as a factor on the proper percentage for common benefit assessment, it is definitely the amount any law firms spent marketing for cases. It is not this Court's obligation to ensure that the common benefit assessment is set at an amount that allows firms to recoup their marketing costs. The BL firm has 58 cases filed in the MDL. If the BL firm really needs the additional 4.5% to cover their "case-acquisition costs" maybe they should start spending less on TV ads.

Filing cases into the MDL and sitting on the sidelines waiting for a fee is not the only way to participate in an MDL. Many non-PSC firms did important and valuable work in this case and will be compensated for it. BL never approached the PSC to do any type of work in this case. It is inconceivable that a firm would complain about not making enough money on a case that they did not work on. A court supervising mass tort litigation is allowed to "intervene to prevent or minimize an incipient free-rider problem" and may use "measures reasonably calculated to avoid unjust enrichment of persons who benefit from a lawsuit without shouldering its costs." *In re Nineteen Appeals Arising out of San Juan Dupont Plaza Hotel Fire Litig.*, 982 F.2d 603, 606 (1st Cir. 1992)

("To allow the others to obtain full benefit from the plaintiff's efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense.").

### e. BL's work on the *Natale* in the Wave 1 bellwether pool is reason that AbbVie settled.

Setting aside the fact that it is ridiculous for BL claim that its work on the *Natale* case resolved the AbbVie litigation, it is difficult to determine why this claim by BL would be the basis for an objection to an increase in the common benefit assessment. The increase is specifically designed to enable the PSC to make sure that the firms that did common benefit work are compensated for it, and those that funded it are reimbursed. Presumably, BL is objecting because it acknowledges in its objection that it failed to submit any time sheets for the work it performed on the *Natale* case because the PSC "never asked BL to submit its bellwether time . . ." No other firms in the MDL required the PSC's invitation to submit time sheets. BL should have read the CMO 16 as all the other firms did.

CMO 16 governs the terms for submitting time for common benefit compensation in this MDL. Leadership is not under an obligation to invite firms to submit time. It is the obligation of firms that accept assignments for common benefit work to correctly submit that time as set forth in CMO. BL admits that it failed to submit time sheets for "hundreds of hours" of work it spent on an assignment is accepted, and states that is grounds for denying the PSC's request to increase the common benefit assessment. Such an argument is not only lacks merit; it is an admission of BL's own failures. Despite that, the PSC will accept BL's submissions for the time that they did spend working on their case. Yet another reason that the holdback needs to be increased.

Additionally, BL claims that the PSC forced it to prepare the *Natale* case for trial is simply not true. The PSC did ask each firm with a Wave 1 bellwether case to take an active role in the preparation of that case for trial. Each firm readily agreed with no objection, including BL. Had any

11

firm rejected that request, the PSC would have taken over the case as it did in the initial bellwether cases that were worked up for trial. Most firms relish the opportunity to take their own bellwether case to trial and leadership tried to respect that, but BL's allegation that the PSC did not "shoulder the burden" of the eight Wave 1 AbbVie bellwether cases is not only false, it is especially untrue in the *Natale* case.

In the Wave 1 bellwether cases, the PSC taught the case to individual counsel via regularly scheduled conference calls and in-person meetings, as well as the creation of a document depository of medical literature, expert reports, previously filed motions, responses and jury instructions that was constantly updated. Despite this level of assistance by the PSC, BL attorney Daniel Burke contacted numerous attorneys on the PSC asking them to take over the *Natale* case once it became apparent that it would be set for trial. Mr. Burke contacted David Buchanan of Seeger Weiss; Matthew Leckman of Pogust Millrood; and Ron Johnson of Schachter, Hendy & Johnson (SHJ). The law firm of Douglas & London also provided the BL firm with the expert opinions it needed to survive dispositive and *Daubert* motion practice. On a telephone call with Ron Johnson, Mr. Burke said that no one at his firm was qualified or able to take the *Natale* case to trial because they were not "trial lawyers".

Mr. Johnson informed Mr. Burke that his October calendar was full, but that he would move all commitments to take over the *Natale* case. Mr. Burke then contacted Matthew Leckman to take over the case in the event that Mr. Johnson was not able to move his October commitments. Mr. Leckman also agreed to take the case to trial for Mr. Burke. Ultimately, Mr. Johnson was able to clear his October commitments and his firm immediately jumped into preparing the *Natale* case for trial in October 2018.

During the month of August 2018, Ron Johnson and Sarah Emery started working on the *Natale* case. They retained a trial tech for exhibit management and began reviewing the case

materials to see what potential the case had. Despite BL's initial statements about the weakness of the marketing aspects of the case, Ms. Emery quickly found testimony that clearly supported the marketing claims. The SHJ lawyers began work on the motion *in limine* responses, and drafted the majority of their Pre-Trial Order, including: witness list; exhibit list; and questionnaire. Additionally, it was agreed that SHJ lawyers would take the lead on cutting all of the corporate depositions, and Mr. Johnson would be lead trial counsel. While the firms with other Wave 1 cases were diligent and capable in the preparation of their cases for trial, the BL firm was a noteworthy exception.

The proposition that the BL firm "provided the leverage necessary to resolve the AbbVie litigation" through its work on one bellwether case that it admitted it could not take to trial is preposterous. The BL firm begged PSC firms to take the *Natale* case off its hands when it became known that it would go to trial.

f.  **The PSC is seeking an increase after the resolution of the litigation.**

BL claims that the PSC motion to increase common benefit assessments should be denied because the PSC's "rush to the Court after resolution . . . demonstrates that the PSC's sole interest at this juncture is self-interest." While there was no "rush to Court" as it relates to the timing of a motion that was filed more than four years after the initial entry of CMO 16, it certainly was filed after the resolution of the claims with AbbVie.

It is difficult to understand why this would be objectionable. Before the resolution with AbbVie the PSC did not know how much the total settlement amount would be, and so could not know what percentage would be required to reimburse the firms that funded the litigation. The only time when the PSC could be precise about the percentage required to reimburse those firms was after it knew the exact amount of the settlements with all Defendants. That did not occur until after the execution of the term sheet with AbbVie. It is noteworthy that one firm is objecting to the

13

PSC's motion for being premature, while the BL firm is objecting on grounds that it was too late. Perhaps this is the best evidence that it was filed at the most appropriate time.

### g. BL request to audit all time and expense records.

CMO 16 governs this issue, and it states that a five-person fee committee will be assembled from the members of the PSC to audit time and expense submissions among other responsibilities. The leadership of this MDL will assemble the fee committee as set forth in the CMO and it will undertake these tasks and report to the Court accordingly. At this point it is premature to disclose this information because the protocol as set forth in CMO 16 has not yet begun.

The BL firm is not a PSC member. As this Court may recall the process of appointing the members of the Plaintiffs' Steering Committee was lengthy and difficult. Many qualified firms desired to be on the committee, but were denied because some limit on the number of firms had to be imposed. This is important because the BL firm never requested to be a member on the PSC. If the BL firm wished to perform tasks such as auditing the time and expense submissions, it should have expressed this desire when the PSC was being formed rather than at the end of the litigation.

### IV. Conclusion

The fact that more than 98% of the law firms and more than 99% of the Plaintiffs did not file any objection to the increase sought by leadership is the best evidence that it is well-deserved and warranted given the unique circumstances of this litigation. Leadership purposefully waited until a term sheet was executed with AbbVie before it made the motion so that it could calculate the exact percentages of the total settlement amount with all Defendants that would cover the expenses. It is worth noting that while the 5% sought for expenses is calculated to precisely reimburse those firms that funded the litigation, the 14.5% sought for fees will still be insufficient to adequately compensate the attorneys for the time they have submitted. In spite of this fact, leadership chose to

request only 14.5% so as to minimize the impact on the fees of those attorneys who filed cases in the MDL yet did no work for the common benefit of the litigation.

The three law firms that objected did so largely on the claim that they did not know the amounts of the settlements and time and expenses submitted. Two of those firms never requested it, and the other objector was, in fact, provided that information. The increases sought by the PSC will impact Plaintiffs in a very minor fashion. An increase in their case expenses from 2% to 5% will have a minimal effect on their net recovery, a recovery that would not have occurred had the PSC members not spent such a significant amount of money in the prosecution of the Plaintiffs' claims. Therefore, the PSC respectfully requests that all relief sought by the three objectors be denied, and that the Court enter an amended case management order raising the common benefit assessment to 5% for expenses and 14.5% for attorneys' fees.

Dated: October 3, 2018				Respectfully submitted,

						*/s/ Ronald E. Johnson, Jr.*
						Ronald E. Johnson, Jr.
						Schachter Hendy & Johnson PSC
						909 Wright's Summit Parkway, Suite 210
						Ft. Wright, KY 41011
						(859) 578-4444
						Email: rjohnson@pschachter.com

						Christopher A Seeger
						Seeger Weiss LLP
						55 Challenger Road, 6th Floor
						Ridgefield Park, NJ 07660
						(212) 584-0700
						Email: cseeger@seegerweiss.com

						Trent B. Miracle
						Simmons Hanly Conroy
						One Court Street
						Alton, IL 62002
						618-259-2222
						Email: tmiracle@simmonsfirm.com

						*Plaintiffs' Co-Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 3, 2018, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will automatically serve and send a notice of electronic filing to all registered attorneys of record.

> /s/ Brendan A. Smith
> Brendan A. Smith
> Simmons Hanly Conroy
> One Court Street
> Alton, IL 62002
> 618-259-2222
> Email: bsmith@simmonsfirm.com