IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: TESTOSTERONE REPLACEMENT THERAPY PRODUCTS LIABILITY LITigation ) ) ) ) | Case No. 14 C 1748 |
| ---------------------------------------------------------------- ) | MDL No. 2545 |
| THIS DOCUMENT RELATES TO: ) ALL ACTIONS ) | |

CASE MANAGEMENT ORDER NO. 138
(Memorandum Opinion and Order on PSC's Motion to Amend
Case Management Order No. 16, establishing
<u>common benefit fee and expense funds</u>)

MATTHEW F. KENNELLY, District Judge:

      Plaintiffs in this multidistrict litigation (MDL) proceeding allege that they suffered either arterial cardiovascular injuries or injuries related to blood clots in the veins as a result of taking prescription testosterone replacement therapy (TRT) drugs. Defendants—AbbVie, Inc., Actavis, Inc., Auxilium Pharmaceuticals, Inc., Eli Lilly & Company, Endo Pharmaceuticals, Inc., GlaxoSmithKline, LLC, and affiliated entities— are manufacturers of TRT drugs. More than 7,800 individual cases have been filed in the MDL, and a little under 6,000 remain. As of September 10, 2018, the Court has stayed all proceedings in the MDL, except as ordered by the Court, based on the parties' reports that they have finalized or are in the process of finalizing master settlement agreements.

      The Court previously entered an order establishing a common benefit fund to cover work performed and expenses incurred on behalf of all plaintiffs in the case. Case Mgmt. Order 16, dkt. no. 488 (Nov. 25, 2014) (CMO 16). CMO 16 provided,

among other things, that ten percent—eight percent for attorney's fees and two percent for expenses—would be held back from any amounts paid by defendants through a settlement or pursuant to a judgment. *Id.* ¶ IV.B.3. The order stated that these amounts would not be altered absent a further order by the Court. *Id.* All disbursements from the fund are ultimately subject to review and approval by the Court. *Id.* ¶ V.A.

On September 10, 2018, the Plaintiffs' Steering Committee (PSC) filed a motion seeking to approximately double the holdback for the common benefit fund. Specifically, the PSC now asks the Court to increase the holdback in each case to 19.5 percent (14.5 percent for attorney's fees and five percent for expenses). For the following reasons, and in the interest of moving the settlement process forward, the Court grants the PSC's motion. The Court emphasizes, however, that this order serves only to increase the amount of the holdback. The Court will determine how much of the holdback should actually be disbursed for common benefit fees and expenses at a later date.

## Background

**A. CMO 16**

The Court issued CMO 16 in late 2014 "to provide for the fair and equitable sharing among plaintiffs, and their counsel, of the burden of services performed and expenses incurred by attorneys acting for the common benefit of all plaintiffs in this complex litigation." CMO 16 ¶ I. CMO 16 applies to all cases that were pending at the time CMO was issued "as well as to any case later filed in, transferred to, or removed to this Court and treated as part of" the MDL. *Id.* ¶ I.B. It also applies to (1) each attorney

who represents a plaintiff in such cases and (2) "each attorney who represents only plaintiffs with cases filed in state court who elects to sign" the voluntary Participation Agreement attached as Exhibit A to CMO 16.  *Id.*

These attorneys (collectively, Participating Counsel) are "entitled to receive all the common benefit work product performed by the PSC."  *Id.* ¶ I.C.  Participating Counsel may also perform common benefit work under the conditions set forth in CMO 16.  *Id.* ¶ III.B.  Common benefit work includes, but is not limited to, maintaining the document review database, retaining and developing certain experts, preparing for and taking certain depositions, conducting work on "any cases designated as 'common benefit trials' by Plaintiffs' Co-Lead Counsel," and conducting settlement-related work.  *Id.* ¶¶ I.A, III.B.  "Counsel who choose not to execute the Participation Agreement are not entitled to receive common benefit work product[.]"  *Id.* ¶ I.C.

As previously indicated, CMO 16 establishes a common benefit fee and expense fund.[1]  *Id.* ¶ IV.A.  More specifically, all plaintiffs and their attorneys who are subject to CMO 16 and who obtain a gross monetary recovery "are subject to an assessment of" the recovery.  *Id.* ¶ IV.B.1.  The assessment amount, or "holdback," is ten percent: eight percent for attorney's fees and two percent for expenses.  *Id.* ¶ IV.B.3.  In effect, the expenses are taken directly from a plaintiff's recovery, and the attorney's fees are taken from the fees that a plaintiff agreed to pay his or her individual attorney.  *See, e.g.*, PSC Mot. at 1 n.1.  The holdback amount "shall not be altered absent further order of the Court."  CMO 16 ¶ IV.B.3.  When defendants pay a settlement or judgment to

---

[1] CMO 16 actually establishes two separate common benefit funds—one for attorney's fees and one for expenses, *see id.* ¶ IV.A—but for ease of reference the Court will refer to them as a single fund.

plaintiffs and their counsel, they must withhold the assessment amount and pay it into the common benefit fee and expense fund. *See id.* ¶ IV.B.5. The money in the fund is "available for distribution to Participating Counsel who have performed professional services or incurred expenses for the common benefit." *Id.* ¶ V.A.

Each Participating Counsel may present a claim or claims for disbursement from the fund. *Id.* ¶ V.B. The Court will appoint a Common Benefit Fee Committee, which will "make recommendations [to the Court] for distributions to Participating Counsel." *Id.* No Participating Counsel will receive any disbursement "without review and approval by the Court, or such other mechanism as the Court may order." *Id.* ¶ V.A. In assessing disbursement applications, the Court will review, among other things, time and expense records from Participating Counsel. CMO 16 states that each Participating Counsel who conducts common benefit work or incurs common benefit expenses shall submit time and expense records every month. *See id.* ¶ II.A. Although CMO 16 does not designate a recipient for those submissions, evidently the PSC has been collecting them—though it is unclear when and how this has occurred. The Court asked the PSC for details regarding the submissions but has so far received only summaries at a relatively general level.

**B.    The objectors**

Three sets of plaintiffs and / or individual attorneys have filed oppositions to the PSC's motion: (1) Bernstein Liebhard LLP (BL); (2) plaintiffs Christopher Guinn, Mason Shell, Ronald Barnes, and William Jones, and their attorneys (the Guinn objectors); and (3) plaintiff Cheryl Griffin (Griffin). The Court understands that BL represents approximately fifty-eight individual plaintiffs in the MDL. *See* PSC Reply at 2.

4

## Legal Standards

"In the United States, parties to a lawsuit usually bear their own expenses, regardless of which party prevails. This is sometimes called the 'American Rule.'" *Florin v. Nationsbank of Georgia N.A.*, 34 F.3d 560, 562 (7th Cir. 1994). Courts, however, may "make an exception to the American rule based on equitable doctrines" such as the "common fund" doctrine. *Id.* at 563. The common fund doctrine "provides that 'a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.'" *In re Southwest Airlines Voucher Litig.*, 898 F.3d 740, 745 (7th Cir. 2018) (quoting *U.S. Airways, Inc. v. McCutchen*, 569 U.S. 88, 96 (2013)); *see also Florin*, 34 F.3d at 562. "MDL courts have consistently cited the common fund doctrine as a basis for assessing common benefit fees in favor of attorneys who render legal services beneficial to all MDL plaintiffs." *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 647 (E.D. La. 2010); *cf. In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 743-48 (7th Cir. 2011) (discussing how attorney's fees from common fund should be allocated between MDL counsel and two class lawyers in a multidistrict, putative class action); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, MDL No. 05-1708 (DWF / AJB), 2008 WL 682174, at *4 (D. Minn. Mar. 7, 2008) (applying common fund principles in determining amount of holdback for both attorney's fees and expenses).

A district court has discretion to use a percentage method or a lodestar method to calculate reasonable attorney's fees in a common fund case. *See, e.g.*, *Florin*, 34 F.3d at 566. Regardless of the method a court uses, however, it "must do [its] best to award counsel the market price for legal services, in light of the risk of nonpayment and

the normal rate of compensation in the market at the time." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001); *see also id.* ("[T]he district court must estimate the terms of the contract that private plaintiffs would have negotiated with their lawyers, had bargaining occurred at the outset of the case[.]"); *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 957 (7th Cir. 2013); *In re Trans Union*, 629 F.3d at 744.

Notably, the Seventh Circuit decisions cited above assess common benefit fee awards for one or several attorneys representing one or several classes. This Court is not aware of any Seventh Circuit decision assessing common benefit fee awards in MDL inventory settlements such as those involved in the present proceeding, where potentially hundreds of attorneys represent thousands of individual plaintiffs. There is overlap, however, between the Seventh Circuit's market-rate approach and the methodologies that out-of-circuit MDL courts use to calculate fee awards in mass-tort inventory settlements. In the Fifth Circuit, for example, courts use a "'blended' percentage method," meaning that they (1) "determine the valuation of the benefit received by the claimants" and "select an initial benchmark percentage;" (2) "determine whether the benchmark should be adjusted" by considering twelve factors traditionally relevant to a lodestar analysis; and (3) "conduct a rough lodestar analysis to cross-check the reasonableness of the percentage fee award." *See In re Vioxx*, 760 F. Supp. 2d at 651-52; *see also, e.g.*, *In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907, 922-23 (N.D. Ohio 2003) (similar); *In re NuvaRing Prods. Liab. Litig.*, No. 4:08 MDL 1964 RWS, 2014 WL 7271959, at *2-*4 (E.D. Mo. Dec. 18, 2014) (similar). Among the factors courts consider in a blended approach are the time and work required in the case, the difficulty of the legal questions, the attorneys'

"experience, reputation, and ability," customary fee agreements, which relate to attorneys' expectations of risk "at the outset of the case," and "awards in similar cases." *In re Vioxx*, 760 F. Supp. 2d at 650, 657 (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)); *compare In re Synthroid*, 264 F.3d at 721 ("The market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case."); *In re Continental Illinois Sec. Litig.*, 962 F.2d 566, 573 (7th Cir. 1992) (stating that one way to "simulate the market" is to "obtain[] evidence about the terms of retention in similar suits . . . that differ only because, since they are not class actions, the market fixes the terms").

Given the commonalities between the Seventh Circuit's market-rate approach and other courts' methods for assessing common benefit fee awards in mass-tort inventory settlements, this Court draws guidance from both sources.

## Discussion

As previously noted, the Court does not have complete time and expense records, the Common Benefit Fee Committee has not been selected, and no recommendations for payment have been made. Accordingly, it is premature—not to mention infeasible—for the Court to determine the amount of attorney's fees and expenses that will ultimately be awarded from the common benefit fund. Instead, the Court has been asked to determine at this point only whether there is a basis to increase the holdback amount and whether a holdback of 19.5 percent (14.5 percent for attorney's fees and five percent for expenses) is reasonable at this time.

7

A. **Whether the Court should increase the holdback amount**

First, the PSC argues that the Court should increase the holdback amount because when the Court initially set it, "the amount of work and expenses that would be required to prosecute this case could not be adequately assessed." PSC Mot. at 2. The PSC concedes that it anticipated certain challenges, such as the need to conduct voluminous document review, take depositions, develop experts, and conduct bellwether trials. According to the PSC, however, it did not foresee more than four years of litigation, the need to conduct eight bellwether trials, seven of which were tried to verdict, or the need to prepare "three additional waves of bellwether cases." *Id.* at 3. The PSC argues that a 19.5 percent holdback is necessary to compensate for this additional work and the expenses it generated. In response, BL argues that the PSC had a fiduciary duty to conduct its work for the ten percent assessment established in CMO 16 and that BL should not bear the burden of the PSC's "miscalculations." BL Opp. at 2-3. Griffin argues that because the PSC has extensive MDL experience, its contention that it underestimated the work and expenses required for this MDL is dubious.

The PSC's contention that it could not foresee four years of litigation or a significant number of bellwether trials is a bit hard to swallow. Absent some indication early on that the defendants were willing to come to the bargaining table—which the PSC does not contend was the case—a years-long process was eminently predictable, particularly given the fact that the MDL was, in effect, a number of putative MDLs (one for each manufacturer) rolled into a single, larger proceeding. And bellwether trials are a matter of commonplace in mass tort MDL proceedings.

That said, certain aspects of this MDL may have been unexpected. For example, it is plausible that when it proposed the holdback amount in 2014, the PSC could not reasonably anticipate the second, third, and fourth waves of bellwether cases that were worked up during 2018 and scheduled for multiple overlapping trials for late 2018-early 2019. According to the PSC, "[t]hese circumstances . . . led to a greater than expected amount of work being performed by expert witnesses, vendors and the 30 law firms in the [PSC]." PSC Mot. at 3. The PSC also "taught the case to individual counsel" so that non-PSC law firms could assist with the fall 2018 trials. PSC Reply at 12.

Based on the PSC's representations, the Court is satisfied that there is a reasonable basis supporting the PSC's contention that there was significant unanticipated work and expenses that justify an increase in the holdback amount. *Cf. In re Vioxx*, 760 F. Supp. 2d at 644, 656, 662 (granting motion for common benefit fee award larger than initial holdback amount, in part due to a post-hoc analysis of "the work required to bring about the achieved result"); *In re Guidant*, 2008 WL 682174, at *2, *15-*16 (approving master settlement agreement that overrode a previously established assessment amount and instead carved out a higher holdback for potential disbursement, including due to "substantial amount of work" certain PSC attorneys performed for the common benefit).

In opposing any increase in the holdback amount, BL presses several other arguments. BL, for example, contends that any increase is unfair because BL itself performed some of the common benefit work for the fall 2018 bellwether trials. This argument is illogical: BL, like any other Participating Counsel, can apply for a disbursement from the common fund as compensation for that work. *See* CMO 16 ¶

9

V.B. And although BL effectively admits that it failed to timely submit records to support such an application, *see* BL Opp. at 4, the PSC represents that it will not object to BL's application on that basis. See PSC Reply at 11. BL also argues that it will suffer prejudice if the Court increases the holdback amount because it incurred case acquisition costs with the expectation that the holdback would be ten percent. Even though CMO 16 gives notice that the Court may adjust the holdback amount, BL's reliance argument carries some weight. *See* CMO 16 ¶ I¶ IV.B.3. And the Court will certainly take this point into account in making the final determination regarding the amount to be disbursed from the fund. But this point is insufficient to warrant denial of the request to increase the holdback—which the Court again emphasizes amounts to the creation of an escrow fund for *potential* payment of common benefit fees and expenses, not a determination regarding the amount that is appropriately disbursed out of the fund.

Finally, and relatedly, BL argues that increasing the holdback ignores individual attorneys' interests and the importance of fee contracts that they negotiated with their clients. BL Opp. at 5-6. BL, for example, points to the Participation Agreement, which states that the "Plaintiffs' Leadership Group will recommend to the MDL Court that appropriate consideration will be given" to these contracts. *Id.* at 6 (quoting CMO 16, Ex. A ¶ II.E). BL also emphasizes that in *In re Vioxx*, the court considered whether the common benefit fee award would be acceptable to individual plaintiffs' attorneys. *See* BL Opp. at 5 (citing *In re Vioxx*, 760 F. Supp. 2d at 653, 658). These are fair points, but they minimize the purpose of a common fund: to ensure that attorneys who perform work that benefits all plaintiffs are compensated and that other attorneys cannot free

ride. The Court will carefully review time and expense records before disbursing funds to ensure that any disbursements are consistent with these principles. The Court also notes that the vast majority of plaintiffs and their individual attorneys did not object to the proposed increase, which suggests they do not believe that the PSC's proposed holdback will result in cuts to their negotiated fee contracts that are unfair under the circumstances.

**B.      Whether a 19.5 percent holdback is reasonable**

Next, the PSC contends that a 19.5 percent holdback is reasonable. In support of this argument, the PSC states that "[a]ttorney's fees awarded under the percentage method are often between 25% and 30% of the fund," and urges the Court to use that range as a "benchmark." PSC Mot. at 2 (quoting Manual for Complex Litigation § 14.121 (4th ed. 2015); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011)). The Manual for Complex Litigation, however, identifies this "benchmark" percentage range in a general discussion of attorney's fee awards in class actions. See Manual for Complex Litigation § 14.121 (4th ed. 2018); *see also In re Bluetooth*, 654 F.3d at 942 (primarily citing class action cases for proposition that twenty-five percent of a common fund is a benchmark for a reasonable fee award). Class actions typically do not involve large numbers of separately represented clients, meaning that common benefit fees are generally the only attorney's fees disbursed. Cf. Manual for Complex Litigation § 22.927 (4th ed. 2018) ("A major difference between mass torts and other class actions is that class members in mass tort litigation are often represented by individually retained plaintiffs' attorneys."); *id.* § 22.927 & n.1524 (cross-referencing § 14.121 as guidance for allocating attorney's fees using the percentage

method in mass tort settlements, but also citing mass tort settlements in which attorney's fees ranged from three to ten percent). Accordingly, the Court is not persuaded that an award (or holdback) amounting to twenty-five or thirty percent of a common fund is a reasonable benchmark or otherwise supported by the market for legal services in this MDL, given that these are but a part of the overall fees and expenses to be paid, and potentially hundreds of individual plaintiffs' attorneys may be entitled to common benefit fees and costs.

In arguing that a 19.5 percent holdback is reasonable, the PSC also highlights two MDL cases in which courts approved common benefit holdbacks or awards of 15.5 percent and 18.54 percent, and in which plaintiffs were separately represented by individual attorneys that also received contingency fees. *See In re NuvaRing*, 2014 WL 7271959, at *1, *7 (approving and partially distributing a 15.5 percent holdback from the total settlement fund—eleven percent for attorney's fees, subtracted from the attorney's fees portion of plaintiffs' fee contracts with their individual attorneys, and 4.5 percent for expenses, subtracted from plaintiffs' recoveries)[2]; *In re Guidant*, 2008 WL 682174, at *12-*13, *20 (approving an 18.54 percent holdback from the total settlement fund— approximately 14.375 percent for attorney's fees, which plaintiffs would pay on top of attorney's fees under contracts with their individual attorneys, and 4.16 percent for expenses, which would be subtracted from plaintiffs' recoveries). The PSC also relies on *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 836 (E.D. La. 2007), a consolidated class action. As part of the settlement agreement in *Turner*, defendant agreed to pay common benefit fees and costs "over and above the class recovery." *Id.*

---

[2] *See also In re NuvaRing*, Am. CMO No. 3 at A.1.b, dkt. no. 1129 (Dec. 9, 2011).

at 839, 857. The common benefit fees were to be paid not only to members of the Plaintiffs' Steering Committee, but also to other plaintiffs' counsel "upon demonstrating contributions to the common benefit." *Turner*, 472 F. Supp. 2d at 858. The Court determined that a common benefit fee award amounting to seventeen percent of plaintiffs' total recovery was reasonable. *Id.* at 845, 869. It appears that plaintiffs independently paid contingency fees to their individual attorneys. *See Turner*, Mem. in Supp. of Mot. of Plaintiffs' Steering Committee (PSC) for Common Benefit Fees and Expenses Pursuant to Rule 23(h) of the Federal Rules of Civil Procedure at 5 n.1, dkt. nos. 865-1, 865-2 (November 13, 2006) (stating that the motion does not address, and the PSC does not challenge, the basis for awarding legal fees earned under contracts by individual plaintiffs' attorneys). The PSC acknowledges that in *In re NuvaRing*, *In re Guidant*, and *Turner*, the holdbacks and awards were lower than 19.5 percent, but it argues that this MDL required more time and expense. PSC Mot. at 3-5; PSC Reply at 9. According to the PSC, therefore, a larger holdback is reasonable here.

In response, the objectors point to MDL cases where plaintiffs were separately represented by individual attorneys and holdbacks or awards were much lower than 19.5 percent. *See, e.g.*, *In re Vioxx*, 760 F. Supp. at 662, 646 (concluding that 6.5 percent of the total settlement amount was a reasonable common benefit attorney's fee award, which would "come out of the attorneys' fees of [plaintiffs'] primary counsel"); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, 553 F. Supp. 2d 442, 457-58, 496 (E.D. Pa. 2008) (approving and partially distributing a combined common benefit fee and cost assessment of six percent of settlement value for cases in federal court and four percent of settlement value for cases in state court;

assessments were "to be taken from the fee of each plaintiff's individual attorney, if the plaintiff [was] represented"); *In re Sulzer*, 268 F. Supp. 2d at 927, 937 (awarding less than five percent of the settlement fund as common benefit attorney's fees, without deducting from contingency fees plaintiffs owed to individual attorneys; a settlement trust separately paid a portion of plaintiffs' contingency fees, and this was considered a benefit to plaintiffs rather than a deduction from their recoveries); BL Opp. at 5-6 (discussing *In re Vioxx*); Guinn Opp. ¶ 16 (discussing *In re Diet Drugs* and *In re Sulzer*). Griffin also criticizes the PSC's argument that because this MDL lasted several years longer than *In re Guidant*, a larger holdback is warranted. According to Griffin, the attorneys in that case "could have expended more time" on the case than the attorneys in this MDL because in Griffin's view, the issues in *In re Guidant* were more complicated. Griffin Opp. at 4.

  Because the Court has not received complete time and expense submissions, it cannot determine whether this MDL in fact required more common benefit work or generated more common benefit expenses than the cited cases. Arguments that the Court should adjust the holdback based on comparative time spent or expenses incurred in other cases are therefore unpersuasive at the present juncture. At the same time, the Court acknowledges that a great deal of work was indeed required to bring this MDL to resolution. The MDL was active for a little over four years before the final, and largest, settlement was announced. The parties took extensive fact and expert discovery; engaged in voluminous motion practice; conducted eight bellwether jury trials; prepared to conduct eight additional bellwether trials; and diligently worked toward settlement all the while. The amount of work necessary to litigate a case is a factor to

14

consider in determining a reasonable fee award. *See In re Synthroid*, 264 F.3d at 721; *In re Vioxx*, 760 F. Supp. 2d at 650. Because records may bear out the PSC's representations regarding the time and expenses reasonably generated for the common benefit, this factor weighs in favor of increasing the holdback to 19.5 percent.

Other factors also support the requested increase. For example, attorneys on the PSC (and, likely, many Participating Counsel) assumed financial risk by conducting work and incurring expenses for the common benefit of thousands of plaintiffs, without any guarantee of success. *See In re Synthroid*, 264 F.3d at 721. The MDL raised difficult legal and factual questions, including causation and federal preemption; involved several different drug manufacturers and a range of alleged injuries; and encompassed significant technical issues that required testimony from a significant number of expert witnesses. *See In re Vioxx*, 760 F. Supp. 2d at 650. There were highly experienced attorneys on both sides. *See id*; *see also In re Synthroid*, 264 F.3d at 721. And the stakes were high—not only because plaintiffs sought millions of dollars in damages, but also because they alleged they suffered serious physical and emotional harm. *See In re Synthroid*, 264 F.3d at 721.

Finally, holdbacks and awards in other products liability MDLs indicate that a 19.5 percent holdback for *potential* distribution is within a reasonable range. *See, e.g.*, *In re Vioxx*, 760 F. Supp. 2d at 650, 658; *cf. In re Continental*, 962 F.2d at 573. Although 19.5 percent exceeds the higher end of the range in comparable cases of which the Court is aware, it does not do so by all that much. For example, in *In re NuvaRing*—an MDL concerning a pharmaceutical product and in which common benefit attorney's fees were, as here, to be deducted from attorney's fees owed to individual

plaintiffs' attorneys—the combined holdback for common benefit attorney's fees and expenses was 15.5 percent. See 2014 WL 7271959, at *3. Similarly, in In re Orthopedic Bone Screw Prods. Liab. Litig., No. 1014, C.A. 97-381, 2000 WL 1622741, at *1, *4, *7, where parties to a class action within an MDL reached a settlement, the court awarded twelve percent of the settlement amount in common benefit attorney's fees to the Plaintiffs' Legal Committee and other attorneys who performed common benefit work. The common benefit attorney's fees were "deducted from the fee that would otherwise be payable to [each plaintiff's] privately retained attorney." Id. at *1. The court also appears to have approved a common benefit expense award of up to 3.9 percent of the settlement amount. See id. at *9-*10 & n.22.

In re Guidant and Turner are less instructive for evaluating the proposed increase in the holdback for common benefit attorney's fees because unlike here, fees in those cases were not deducted from contingency fees owed to plaintiffs' individual attorneys. See In re Guidant, 2008 WL 682174, at *12-*13, *20; Turner PSC Mot. at 5 n.1. In other words, in those cases, larger holdbacks for common benefit attorney's fees did not affect total compensation for individual plaintiffs' attorneys. And although some objectors argued in In re Guidant that the increased holdback reduced plaintiffs' recoveries, see 2008 WL 682174, at *13, a larger holdback would not operate in that manner here. Regarding expenses, on the other hand, the court's decision in In re Guidant to set aside approximately 4.16 percent of the settlement fund is a comparable data point because there, as here the expenses were deducted from plaintiffs'

recoveries. *See* 2008 WL 682174, at *4.[3]. Overall, particularly considering that the Court is not currently determining how much of the holdback to disburse, the Court concludes that increasing the holdback to 19.5 percent (14.5 percent for attorney's fees and five percent for expenses) is reasonable at this time.

**C.    Other objections**

The Court addresses the objectors' remaining arguments in turn.

First, the objectors contend that the PSC has not disclosed the total or per-plaintiff settlement values to them. As a result, they argue, they cannot fully assess whether a 19.5 percent holdback is reasonable. *See* BL Opp. at 2; Griffin Opp. at 2; Guinn Opp. ¶¶ 3, 16. In its reply, the PSC explains that the parties have not yet determined per-plaintiff settlement values. The PSC also represents that it has disclosed the total settlement values in private conversations with individual attorneys who have requested this information—including Griffin's attorney. According to the PSC, the other objectors did not contact the PSC for this information before filing their oppositions. Because Griffin's opposition suggests that her attorney knows details about the settlement value, the Court finds the PSC's representations to be credible and will not deny the PSC's motion—or extend objectors' time to respond to it—on the ground that the PSC has not disclosed material information. The Court directs the PSC to disclose to individual plaintiffs' counsel who request the information the settlement amounts for defendants their clients have sued, but also bars counsel who receive this information from using or disclosing it for any purpose other than this litigation and from disclosing it to anyone other than their clients in this litigation.

---

[3] The same is not true of *Turner*, where defendants paid common benefit fees *and* costs on top of the total settlement value. *See Turner*, 472 F. Supp. 2d at 839, 870.

17

Similarly, the objectors argue that they cannot fully evaluate the reasonableness of the PSC's request without access to, and additional time to audit, all common benefit fee and expense records. BL Opp. at 6; Guinn Opp. at 1-2, 6; Griffin Opp. at 2-3. The objectors raise a legitimate concern, but again, the Court is not making any final decisions regarding disbursement amounts at this time. The objectors may renew their request to audit common benefit fee and expense records if they object to the Court's ultimate disbursement determinations. The Guinn objectors also stress that a court must carefully review such records when analyzing common benefit fee and expense requests. *See* Guinn Opp. at 2-5 (citing *In re Sulzer*, 268 F. Supp. 2d at 924-26). Because the Court intends to carefully review the records before determining any disbursement amounts, this objection does not change the result.

Griffin asks the Court to perform a lodestar cross-check to determine whether a 19.5 percent holdback is reasonable. A lodestar analysis, however, requires data regarding hours expended and proposed billing rates—information that this Court does not yet have. The Court cannot conduct a lodestar cross-check at this time, and the cross-check is not required in any event. *See Florin*, 34 F.3d at 566. That said, the Court intends to conduct such a cross-check in determining any actual disbursements from the holdback.

Finally, the Guinn objectors ask the Court to decrease the holdback to six or 6.5 percent. *See* Guinn Opp. ¶ 17. The Court denies this request because for the reasons discussed above, a 19.5 percent holdback, which amounts to the creation of an escrow fund for *potential* payment of common benefit fees and expenses, is within a reasonable range.

**Conclusion**

For the foregoing reasons, the Court grants the PSC's motion to amend Case Management Order No. 16, establishing common benefit fee and expense funds. [dkt. no. 2868]. The PSC is directed to submit an appropriate draft amended version of CMO 16 for signature by the Court. In addition, nominations for the Common Benefit Fee Committee are to be made by October 26, 2018.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: October 15, 2018