**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re Testosterone Replacement Therapy ) <br> Products Liability Litigation Coordinated ) <br> Pretrial Proceedings ) <br> ) <br> (This document applies to all cases and to ) <br> *Martin v. Actavis, Inc.*, Case No. 15 C 4292)  ) | Case No. 14 C 1748 <br> MDL No. 2545 |

**CASE MANAGEMENT ORDER NO. 187
(Ruling on Actavis's sixth motion *in limine* in
<u>*Martin v. Actavis, Inc.*, Case No. 15 C 4292</u>)**

MATTHEW F. KENNELLY, District Judge:

      In this order, the Court rules on Defendant Actavis's sixth motion *in limine* concerning the upcoming trial in *Martin v. Actavis*, Case No. 15 C 4292. The Court has already ruled on the parties' other motions *in limine*. For the following reasons, the Court denies Actavis's motion subject to limitations discussed below.

      Actavis moves to exclude evidence regarding its agreement with Solvay Pharmaceuticals, Inc. to "co-promote" Solvay's testosterone replacement therapy (TRT) drug, AndroGel. Actavis also asks the Court to exclude evidence concerning its promotion of AndroGel under the agreement. Actavis and Solvay signed the co-promotion agreement in September 2006. At the time, Actavis was called Watson Pharmaceuticals, Inc. AbbVie, Inc. bought Solvay in 2009 or 2010, when the co-promotion agreement was still in effect. Under the agreement, between September 2006 and the end of 2011, Actavis sales representatives visited urologists to promote and sell AndroGel. They did not promote or sell Androderm during that time. At the end of 2011, the Food and Drug Administration approved Androderm patches in new

strengths (2 milligrams and 4 milligrams). Once that happened, Actavis sales representatives started to promote and sell Androderm along with AndroGel. They continued doing so until 2013, when the co-promotion agreement ended.

The parties agree that while Actavis representatives were promoting both products, AndroGel was considered the top priority, whereas Androderm was considered the second or third priority. Thus, Actavis representatives typically discussed Androderm with physicians only if they had time, and it would be the second or third product they mentioned. Plaintiff Brad Martin was prescribed and used Androderm between October 2012 and May 2013.

Actavis argues that the Court should exclude evidence regarding the co-promotion agreement (and AndroGel promotion) because, according to Actavis, there is no evidence that its promotion of AndroGel under the agreement had any relation to its promotion of Androderm. Because Martin used only Androderm, Actavis contends, the co-promotion evidence is irrelevant and could confuse or mislead the jury. Martin responds that Actavis leveraged its promotion of AndroGel to sell Androderm during the co-promotion period and that the evidence is therefore relevant and admissible.

Martin's position has greater merit. The undisputed evidence shows that between 2006 and the end of 2011, Actavis helped build a market for AndroGel. And there is evidence tending to show that, when Actavis began promoting both drugs at the end of 2011, it leveraged that market (including physicians' familiarity with AndroGel) to sell Androderm. For example, Christopher Cassarino—a former sales trainer and sales manager for Actavis—testified during his deposition that when Actavis sales representatives promoted both drugs, they did not spend much time discussing

Androderm.  Instead, after educating physicians about AndroGel, they sometimes presented Androderm as an "alternative" for patients who did not want to use a gel. Martin Opp. to Actavis MILs, Ex. 5 (Cassarino Dep.) [dkt. no. 181-4] at 109:18-112:24; see also Martin Opp. to Actavis MILs, Ex. 12 (Androderm Qualitative Research Assessment) [dkt. no. 180-3], at -6519 (physicians who interacted with Androderm sales representatives in 2012 reported that they perceived three "core" messages being communicated about Androderm:  there had been a formulation change, Androderm was "user friendly," and Androderm was "an effective substitute for patients who failed or were intolerant to gel-based TRTs").

This evidence permits a reasonable inference that in sales visits with physicians, Actavis representatives expressly or impliedly suggested that the education they had provided about AndroGel was also applicable to Androderm.  "[T]he standard for relevance under the Federal Rules of Evidence is a liberal one. . . ."  *Wilson v. City of Chicago*, 758 F.3d 875, 882 (7th Cir. 2014); see also *Stegall v. Saul*, 943 F.3d 1124, 1128 (7th Cir. 2019) (Rule 401 establishes a "broad relevancy standard").  By identifying evidence that reasonably can be interpreted as showing a connection between Actavis's AndroGel promotion and its Androderm promotion, Martin has satisfied that standard.

In addition, Martin points to deposition testimony that tends to show an overlap between the training that Actavis sales representatives received for AndroGel and Androderm during the co-promotion period.  Specifically, although Actavis provided separate training for each drug, Cassarino testified during his deposition that Actavis used some of the same disease-state awareness materials for training on both.  *See*

Cassarino Dep. at 239:23-240:4 ("[T]he disease state was the same for both products, and each product had its own learning modules, and in the classroom, the disease state was taught as hypogonadism . . . you know, it wasn't product specific."); *see also id.* at 107:8-14 (testifying that "anatomy and physiology" training was not product specific); Martin Opp. to Actavis MILs, Ex. 6 (Dep. of Eric Pluckhorn, former director of marketing at Actavis) [dkt. no. 180-2] at 371:3-372:6 (testifying that Actavis trained sales representatives about AndroGel and Androderm separately, but that "there would be a lot of the disease state material that was the same"). Like the testimony about sales representatives' discussions with physicians, this testimony reasonably can be interpreted as showing a connection between Actavis's AndroGel and Androderm sales strategies.

Finally, Martin's prescribing physician (Dr. Firestone) was a primary care physician (PCP), and Martin identifies evidence tending to show that Actavis sales representatives marketed AndroGel and Androderm to PCPs under the co-promotion agreement. *See* Cassarino Dep. at 223:15-19, 229:17-230:2 (testifying that the "UP" group promoted both drugs to urologists and PCPs). Martin has, therefore, shown a link between the co-promotion agreement and his individual circumstances.

Actavis, for its part, maintains that its representatives promoted AndroGel only to urologists, and it argues that evidence regarding the co-promotion agreement is irrelevant and misleading because Dr. Firestone was not a urologist. In support, Actavis cites the deposition testimony of Lynn Amato, Actavis's former vice president of sales and marketing for branded products. *See* Actavis MIL, Ex. I (Amato Dep.) [dkt. no. 170-2] at 76:20-22 (testifying that Actavis did not "detail[ ]" PCPs about AndroGel). The fact

4

that Amato and Cassarino provided seemingly contradictory testimony about promotion to PCPs is a matter involving weight, not admissibility. Actavis is free to press the point at trial, but it does not warrant exclusion of the co-promotion evidence.

Actavis's remaining arguments for exclusion are also unpersuasive. First, Actavis contends that the co-promotion agreement is irrelevant because there is no evidence that Actavis sales representatives visited Dr. Firestone or that Dr. Firestone saw AndroGel marketing materials. Actavis advanced a similar theory in arguing that the Court should exclude all evidence about alleged off-label promotion of Androderm. In its ruling on the parties' other motions *in limine*, the Court explained that a limited amount of marketing material is relevant and admissible even when "there is little or no evidence linking the plaintiff or his physician to particular materials." *In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinate Pretrial Proceedings*, MDL No. 2545, Case Nos. 14 C 1748, 15 C 4292, 2021 WL 1611710, at *10 (N.D. Ill. Apr. 25, 2021) (internal quotation marks omitted). The same reasoning applies here.

Second, Actavis observes that Solvay, not Actavis, created the AndroGel-related training and marketing materials for use under the co-promotion agreement. Even if that is true, it does not mean the materials are irrelevant. As already discussed, a factfinder reasonably could infer from the evidence that Actavis used AndroGel-related materials as a springboard for Androderm promotion. Next, Actavis argues that the co-promotion agreement is irrelevant because Androderm marketing was "negligible" during the co-promotion period. Actavis MIL [dkt. no. 168] at 19. Androderm marketing may have been infrequent, but Martin has pointed to evidence tending to show that when it occurred, it was intertwined with AndroGel marketing. Finally, Actavis maintains

5

that when it did market Androderm during the co-promotion period, it used a slogan—"Keep it Contained. Keep it Safe."—which, according to Actavis, was intended to "differentiate Androderm from gel products." *Id.* at 20. Actavis is free to make that argument at trial, just as Martin is free to argue that sales representatives drew no clinical distinction between AndroGel and Androderm during sales calls. It is the jury's role to weigh the evidence, and the parties' disagreement about what it shows does not require exclusion.

To summarize, Martin has shown that Actavis's efforts to market and sell AndroGel under the co-promotion agreement are relevant to its efforts to market and sell Androderm. Martin has also drawn a sufficient connection between the co-promotion agreement and his case by pointing to Cassarino's testimony that Actavis sales representatives marketed both products to PCPs like Dr. Firestone. The Court is satisfied that the probative value of the co-promotion evidence is not substantially outweighed by the risk of confusing the jury or wasting trial time. Therefore, the Court denies Actavis's sixth motion *in limine*.

This ruling does not serve to increase the overall amount of off-label marketing evidence that Martin will be able to introduce, consistent with the ruling on Actavis's first motion *in limine*. Furthermore, the Court is not at this time ruling on the admissibility of the specific co-promotion-related documents that it asked Martin to submit for review. If Martin wishes to introduce any of those documents at trial, he will have to lay a foundation for their admissibility consistent with this opinion.

_____
MATTHEW F. KENNELLY
June 26, 2021United States District Judge